1                   UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF OHIO

2                        EASTERN DIVISION

3

    UNITED STATES OF AMERICA,       Case No. 12CR238

4

             Plaintiff,

5                        Wednesday, May 30, 2012

6         vs.               9:10 a.m.

7     DOUGLAS L. WRIGHT,

    BRANDON L. BAXTER,

8     ANTHONY HAYNE,

    CONNOR C. STEVENS,

9     JOSHUA STAFFORD,

10            Defendants.

11

12       TRANSCRIPT OF DETENTION HEARING PROCEEDINGS

       BEFORE THE HONORABLE DAVID D. DOWD, JR.

13           UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES:

 2    For the Government:      Duncan T. Brown,
                               Assistant United States Attorney
 3                             801 West Superior Avenue
                               400 U.S. Court House
 4                             Cleveland, Ohio    44113
                               (216) 622-3600
 5

 6    For Defendant Wright:    Anthony J. Vegh, Esq.

 7
      For Defendant Baxter:    John S. Pyle, Esq.
 8

 9    For Defendant Hayne:     Michael J. O'Shea, Esq.

10
      For Defendant Stevens:   Jennifer E. Schwartz, Esq.
11

12    For Defendant Stafford:  Andrew P. Hart, Esq.

13
      Court Reporter:          Susan Trischan, RMR, CRR, FCRR
14                             7-189 U.S. Court House
                               801 West Superior Avenue
15                             Cleveland, Ohio    44113
                               (216) 357-7087
16
      Proceedings recorded by mechanical stenography.
17    Transcript produced by computer-aided transcription.

18

19

20

21

22

23

24

25
```

1          THE COURT:  We're somewhat delayed because one

2     of the defendants is in Trumbull County and they, I guess,

3     forgot they are supposed to have him here.  I'm told they

4     will have him here by 9:45, but I thought that rather than

09:09:13  5     keep everybody waiting, I would do this in somewhat reverse

6     order, and that is inquire of each defendant and counsel why

7     you think your client ought to be entitled for favorable

8     consideration with respect to bond and, if so, where and

9     under what conditions.

09:09:13 10          And then by the time the last defendant's

11     here, then turn it over to counsel for the government to

12     explain why they believe detention is appropriate.

13          So I think we'll go in that order, but I see

14     the defendants aren't in here yet, so if we can get the

09:09:14 15     other defendants down here, that would be helpful.

16          (Pause).

17          MR. PYLE:  Your Honor, may I be heard?

18          THE COURT:  Let's wait until we get the

19     defendants out here.

09:13:13 20          (Defendants in)

21          THE COURT:  Let the record show that the Court

22     is proceeding with a hearing in Case Number 1:12CR238 that

23     involves five defendants.  We're waiting for one defendant.

24     The other defendants are in the courtroom as well as

09:13:44 25     counsel.

1           As I understand it, the government is seeking

2     an order of detention as to each of the five defendants.

3           Mr. Pyle, you asked to address the Court.

4           MR. PYLE:  Your Honor, when I entered the

09:14:03  5     Court today, I had a tape recorder in which I recorded

6     segments of some of the tapes so as to use that tape rather

7     than try to fool around with the computers.

8           The blue coats said it would require a Court

9     order.  I understood they were going to call up to give me

09:14:20 10     permission to bring it to the courtroom.

11           THE COURT:  And you want to play that as a

12     part of your proposition that your client's entitled to be

13     out on bond?

14           MR. PYLE:  Yes, in connection with the

09:14:33 15     dangerous, the "Dangerous" element.

16           THE COURT:  Well, I'd rather listen to each

17     defendant as to why the defendant believes he would be a

18     justifiable risk to be out on bond; then listen to what the

19     government has to say after the fifth defendant arrives.

09:14:58 20           And after the government's presented its case,

21     then we'll decide whether to go with your motion.

22           MR. PYLE:  Thank you, Your Honor.

23           THE COURT:  I think the very first thing I

24     want to address is the government's motion with respect to

09:15:21 25     Joshua Stafford requesting a determination of his mental

1   capacity.

2                   Who is representing Mr. Stafford?

3                   MR. HART:  I am, Your Honor.  Good morning,

4   Your Honor.

09:15:31 5                   THE COURT:  Have you seen the motion?

6                   MR. HART:  I have.

7                   THE COURT:  Do you have any objection to it?

8                   MR. HART:  I do, Your Honor.  The motion

9   states that based on my proposed conditions of release which

09:15:40 10  requested inpatient psychiatric treatment, that that offered

11  a reasonable basis pursuant to statute to refer Mr. Stafford

12  for a competency evaluation.

13                  My office retained a clinical psychologist

14  Dr. McPherson shortly after Mr. Stafford's arrest.  She has

09:15:58 15  partially completed an evaluation of Mr. Stafford.  The most

16  recent interview, I think, was as recent as last week, and

17  it's her opinion at this point, even though the diagnostic

18  criteria have not all been completed, that he is currently

19  competent or would meet the standards for competency under

09:16:16 20  federal law.

21                  So at this point based on Dr. McPherson's

22  partial assessment, based on the fact of my own

23  conversations with Mr. Stafford, I don't believe he has

24  presented a sufficient basis to date to warrant him being

09:16:32 25  committed to the Bureau of Prisons for a competency

1    evaluation.

2              On a practical level, Your Honor, and I think

3    this goes to the heart of whether someone can meaningfully

4    assist in their defense, we discussed the logistics of all

09:16:49  5    the defendants having the discovery available to them very

6    shortly at CCA, and I think that once that's completed and

7    Mr. Stafford has full access to the discovery materials,

8    whether or not he is, in fact, able to assist in his defense

9    will be more fully appreciated.

09:17:05 10              But based on Dr. McPherson's partial

11    assessment, I feel comfortable in opposing the motion for

12    competency evaluation at this time.

13              THE COURT:  Mr. Brown.

14              MR. BROWN:  Well, Your Honor, the government

09:17:17 15    has not seen any report, partial or complete, and the

16    government's a little concerned that the defense is basing

17    its request on a partial report that it has sought that

18    hasn't reached any conclusion, yet is still asking for a

19    remedy that almost assumes the need for psychiatric

09:17:37 20    treatment.

21              I think if he needs treatment, the remedy

22    under statute is for the BOP to provide it and to determine

23    whether he needs that treatment.  It's by statute the BOP's

24    job to conduct the assessment.

09:17:54 25              So by want of asking for that remedy of any

1    sort of inpatient treatment, the defense has raised that

2    issue, and by statute the means to address it is via BOP

3    evaluation.

4              MR. HART:  Your Honor.

09:18:09  5              THE COURT:  Well, how did they raise the

6    issue?

7              MR. BROWN:  Well, as a condition of release

8    they wanted him to have inpatient psychiatric --

9              THE COURT:  Oh, I appreciate that.

09:18:21 10              MR. HART:  Your Honor.

11              THE COURT:  Yes.

12              MR. HART:  I think we're confusing two

13    separate issues.

14              A person can be accused -- a defendant who

09:18:28 15    requires psychiatric treatment is not by conclusion

16    incompetent to stand trial.

17              Certainly the Court has had the experience to

18    observe many defendants who require psychiatric treatment

19    who nonetheless meet the standard of competency.

09:18:41 20              So I don't think that the proposed condition

21    or the indication that inpatient psychiatric treatment would

22    be appropriate given Mr. Stafford's characteristics,

23    necessarily would automatically lead the Court to the

24    conclusion he's incompetent.

09:19:00 25              THE COURT:  Well, when do you expect to have a

1    final report from your clinical examinations?

2                    MR. HART:  Your Honor, Dr. McPherson hasn't

3    given me a final date, but she has indicated that she has

4    completed parts of it.

09:19:17  5                    I don't know exactly which diagnostic criteria

6    she still has to administer.

7                    My understanding, that it's written materials

8    which could not be administered to Mr. Stafford last week

9    because he was in shackles and CCA would not remove the

09:19:36 10    shackles.

11                    THE COURT:  She's visiting him while he's in

12    custody?

13                    MR. HART:  Correct.  CCA would not permit

14    Mr. Stafford's shackles to be removed, so she wasn't really

09:19:47 15    practically able to administer some of the written tests.

16                    THE COURT:  Do you suppose you could intervene

17    to have his shackles removed for the purpose of completing

18    her examination?

19                    MR. BROWN:  Your Honor, I have, on a variety

09:20:04 20    of issues, been working with the Marshals.  However, my -- I

21    have to tell you I have an extremely limited sphere of

22    influence and it does not extend to CCA, Your Honor.

23                    I think if he's undergone these battery of

24    tests, the statute provides for a means and methods, I think

09:20:23 25    it's in our motion the report is ordered within 30 days for

1    evaluation, which honestly, Your Honor, even with a private

2    evaluation we would be seeking afterwards anyway.

3                   The statutes for competency and those sorts of

4    things are very clear it needs to be done within the Bureau

5    of Prisons setting.

6                   THE COURT:  Who is your person again that's

7    helping you?

8                   MR. HART:  I'm sorry, Your Honor?

9                   THE COURT:  Who is the professional person

10   that wants to administer these tests?

11                  MR. HART:  Dr. Sandra McPherson.

12                  THE COURT:  And where is she located?

13                  MR. HART:  Well, Your Honor, I'm not from here

14   so I can't say exactly where.

15                  MR. VEGH:  Cleveland Heights.

16                  MR. PYLE:  Beachwood.

17                  MR. HART:  Cleveland Heights, Your Honor.

18                  And, Your Honor, I understand my obligation to

19   raise issues of competency to the Court.  Certainly I would

20   never want anybody to have to undergo any Court proceedings

21   if I felt there was any basis for them to not be competent,

22   so I think the issue today is whether or not there's a

23   reasonable basis to commit Mr. Stafford to a BOP facility,

24   and I'm submitting to the Court that there isn't.

25                  And that if it turns out based on

1    Dr. McPherson's final report as well as on Mr. Stafford's

2    ability --

3              THE COURT:  How soon do you think she can give

4    you a final report?

09:21:46  5              MR. HART:  Your Honor, if I offered you a time

6    I'd just be guessing, so I don't know.  I can't represent

7    any specific time frame to the Court.

8              If the Court wants to set a deadline for us to

9    make a decision whether to rely on Dr. McPherson's opinions

09:22:05  10   today or to revisit the issue, that would be fine.

11             If the Court doesn't want to leave this as an

12   open-ended issue, I would understand that.

13             THE COURT:  Well, as I understand it, the

14   question of his competency has been raised by you, hasn't

09:22:18  15   it?

16             MR. HART:  Your Honor, I disagree with that.

17             I've indicated that an appropriate condition

18   of release for Mr. Stafford could be inpatient psychiatric

19   care.

09:22:27  20             Not every person that's currently a resident

21   at any of the six facilities at the Northcoast Behavioral

22   Health System is incompetent, so placement in that facility,

23   treatment in that facility does not by conclusion mean that

24   a person is forensically incompetent.

09:22:43  25             THE COURT:  I believe that the Rules provide

1    that if a defendant is going to raise the issue of his

2    competency, there's a deadline for doing that.

3              I think I'm correct on that, am I not, Mr.

4    Brown?

09:23:01  5              MR. BROWN:  I would have to check the statute,

6    but I believe so, Your Honor.

7              THE COURT:  Well, if you're going to raise the

8    issue of his competency on behalf of the defendant, I want

9    that issue raised by the 15th of June in writing.

09:23:33  10             MR. HART:  Understood.

11             THE COURT:  And I'll delay any ruling on this

12   motion, awaiting that motion.

13             MR. HART:  Thank you, Your Honor.

14             THE COURT:  Now, I gather that it is the

09:24:28  15   request of the defendant Connor Stevens if he's released on

16   bail, to be released to the custody of his mother.

17             Is that correct?

18             MS. SCHWARTZ:  That is correct, Your Honor.

19             THE COURT:  Have you reviewed that with his

09:24:42  20   mother?

21             MS. SCHWARTZ:  Yes, I have, and she is fine

22   with that.

23             THE COURT:  And where does she live?

24             MS. SCHWARTZ:  She lives 510 Lindberg

09:24:52  25   Boulevard in Berea.  She's lived there for six years, and in

1   northern Ohio her entire life.

2                    THE COURT:  Is she employed?

3                    MS. SCHWARTZ:  Yes, she is.  She works at

4   Sanford Brown College as a medical instructor and has been

09:25:10 5   there for seven years.

6                    THE COURT:  So she would not be at home all

7   the time if I placed Mr. Stevens there.

8                    MS. SCHWARTZ:  Your Honor, she works from 6:00

9   to 10:00 p.m.

09:25:22 10                   Connor has a brother Colin who is 24 who works

11   the morning shift until 3:00 p.m., so between the two of

12   them one of them would always be there to supervise Connor.

13                    THE COURT:  Thank you.

14                    Joshua Stafford also wishes to reside with his

09:25:39 15   mother if he's released.

16                    MR. HART:  Joshua Stafford, Your Honor?

17                    THE COURT:  Yes.

18                    MR. HART:  No, Your Honor.  In the original

19   motion for release on bond, Lisa Stafford was listed as the

09:25:51 20   third party custodian.  I filed a supplement to that motion,

21   I believe Tuesday or Monday, I can't recall, wherein we're

22   submitting that the appropriate release would be for him to

23   be approved for placement into the Northcoast Behavioral

24   inpatient psychiatric facility.

09:26:11 25                   THE COURT:  And who's going to guard him

1    there?

2                    MR. HART:  Your Honor, I would suggest that

3    probably the sequence of what would have to happen is that

4    based on Mr. Stafford's disability and eligibility,

09:26:25  5    Northcoast would have to accept him into the facility.  Once

6    Northcoast accepts him into the facility, then his

7    transportation from Youngstown into the facility would be a

8    secondary issue.

9                    I assume that if he were released to enter

09:26:41 10    into the program, that neither the Marshals, nor CCA would

11    be able to take him.  If that is the case, my office would

12    make arrangements to have him transported to the facility.

13                    THE COURT:  Yeah, my question is who's going

14    to make sure he stays there?

09:26:56 15                    MR. HART:  Your Honor, the Northcoast

16    facility, at least one of the units, is a lockdown unit

17    which would not allow him to leave voluntarily.

18                    Some of the units are outpatient care where

19    people can sign themselves out, but the specific unit that

09:27:12 20    Dr. McPherson had recently suggested would be appropriate is

21    a lockdown unit, which is employed routinely by Courts with

22    forensic defendants.

23                    THE COURT:  Thank you.

24                    Brandon Baxter is suggesting that he would be

09:27:31 25    located with his father, is that it?

1          MR. PYLE:  That is correct, Your Honor.  His

2     father is in court with us today.  His father lives on Wayne

3     Avenue in Lakewood, Ohio.  He is employed.

4          THE COURT:  Is he employed?

09:27:42  5          MR. PYLE:  Yes, sir.

6          THE COURT:  And who's going to take care of

7     your client when he's not there?

8          MR. PYLE:  Well, he's going to be

9     electronically monitored, of course, Your Honor, confined to

09:27:54 10     the house.

11          Your Honor, I submit as a fallback position

12     that a facility, halfway house-type facility like Oriana

13     would be appropriate as well.  That's what we will get into

14     later.  Our major concern is his access to the discovery

09:28:15 15     materials and his access to me.

16          THE COURT:  Thank you.

17          And Douglas Wright wants to live with Erica

18     Goldenkane.

19          MR. VEGH:  Correct, Judge.

09:28:28 20          THE COURT:  Who is she?

21          MR. VEGH:  That's his girlfriend.  Lives on

22     the west side of Cleveland.

23          THE COURT:  And I assume she's employed?

24          MR. VEGH:  I -- my understanding is she is

09:28:42 25     employed, Your Honor.  And again kind of echoing Mr. Pyle's

1      statements, we would be asking for electronic home

2      confinement and/or, as Mr. Pyle suggested, perhaps Oriana

3      House or a like facility.

4                      THE COURT:  Thank you.

09:29:08  5                  And Anthony Hayne, I didn't see any suggestion

6      with respect to Anthony.

7                      MR. O'SHEA:  Not as far as release, Your

8      Honor.  We just have this motion to modify his detention

9      conditions, and I think that we'll have an abundance of good

09:29:23 10   empirical reasons why the CCA situation is not going to

11     functionally work for you, Judge, for I think even the U.S.

12     Attorney's Office and certainly the defense group, in order

13     for us to digest the volume of evidence that has got to be

14     digested.

09:29:37 15                 I can explain now, Judge, or reserve that.

16                     THE COURT:  Thank you.

17                     Well, we'll be in recess for about 10 minutes

18     until they get here with the fifth defendant because I'm not

19     going to call on Mr. Brown to present his basis for an order

09:29:58 20   of detention until he's here.

21                     So we'll just be at ease while we wait for the

22     fifth defendant to appear.

23                     (Recess taken).

24                     THE COURT:  It now appears all five defendants

09:58:19 25   are present for the detention hearing.

1                   I'd now give the government an opportunity to

2       advance their cases for detention.

3                   You may proceed.

4                   MR. BROWN:  Thank you, Your Honor.

09:58:31  5                   Just a point of procedure, I do have one

6       witness.  We will be playing some videotapes.  Can I sort of

7       put him on, ask questions and then have sort of a summary at

8       the end?

9                   THE COURT:  Yes.

09:58:44  10                   MR. BROWN:  Thank you very much, Your Honor.

11                   Then at this point in time the government

12      would call Special Agent Ryan Taylor.

13                   And, Your Honor, because I have the computer

14      set up, can I stay here to ask questions?

09:58:59  15                   THE COURT:  Certainly.

16                   MR. BROWN:  Thank you very much.

17                          RYAN TAYLOR,

18          of lawful age, a witness called by the Government,

19                 being first duly sworn, was examined

09:59:14  20                     and testified as follows:

21                   THE COURT:  Just a minute, Marshal.

22                   Dave, I don't want people coming in or out so

23      if you're in, you're in for the duration.  If you want to

24      leave, now's the time to leave.  I'm not going to have

09:59:25  25      people parading back and forth.

1          Your name again, please?

2               THE WITNESS:  Ryan Taylor.

3               THE COURT:  You may proceed.

4               MR. BROWN:  Thank you, Your Honor.

5          DIRECT EXAMINATION OF RYAN TAYLOR

6     BY MR. BROWN:

7     Q.   By whom are you employed?

8     A.   Federal Bureau of Investigation.

9     Q.   How long have you been with the FBI?

09:59:45 10    A.   Approximately three years.

11    Q.   And who were you employed by before then?

12    A.   United States Army.

13    Q.   What were your duties with the U.S. Army?

14    A.   I was a captain in the Army with the military police

09:59:57 15    corps.

16    Q.   And what are your duties with the FBI currently?

17    A.   Currently I work as a domestic terrorism investigator

18    on the joint terrorism task force.

19    Q.   Do you have any other duties as assigned?

10:00:05 20    A.   I'm also the assistant weapons of mass destruction

21    coordinator for the division.

22    Q.   Okay.  Now, were you assigned a case involving the

23    five defendants present here in court today?

24    A.   Yes.

10:00:15 25    Q.   Okay.  And do you recognize the five defendants or the

1    five individuals seated in orange?

2    A.    Yes.

3    Q.    Five individuals you were investigating?

4              Could the record reflect he identified --

10:00:27  5         THE COURT:   The record may show

6    identification.

7              MR. BROWN:   Thank you.

8    Q.    Now, what was the nature of that investigation?

9    A.    The nature of the investigation, it started with a

10:00:42 10   threat surrounding the protest in downtown Cleveland.  There

11   was a threat related to us of potential violent criminal

12   activity, so the investigation initially started with those

13   threats, and proceeded to eventually getting to a threat to

14   blow up a bridge using explosive devices.

10:01:01 15   Q.    Okay.  And in that initial investigation, were any

16   individuals identified?

17   A.    Yes.

18   Q.    As a predicate of that threat, was it a general

19   investigation or was it an investigation of individuals?

10:01:13 20   A.    It was a general investigation.

21   Q.    Okay.  And in investigating those threats, did you

22   identify any individuals possibly related to those threats?

23   A.    Yes.

24   Q.    Okay.  And were those individuals known to the FBI

10:01:26 25   before or to you as an agent before receiving those threats?

1    A.    No.

2    Q.    Or that information?

3    A.    No.

4    Q.    Okay.  And after, as the investigation began, what

10:01:38  5    else happened then?

6    A.    As the investigation began, initially there was a

7    threat that was picked up about the potential use of smoke

8    grenades on the Detroit Memorial Bridge with being used as a

9    diversion with an eventual plan of bringing down bank signs

10:01:57  10    in downtown Cleveland.

11    Q.    Okay.  Did you take steps to investigate that threat?

12    A.    Yes.

13    Q.    And did the nature of that threat change at any point

14    in time during your investigation?

10:02:06  15    A.    Yes.

16    Q.    And how so?

17    A.    That was the original plan.

18          Once we heard that, of course started to look

19    into or continued the investigation.

10:02:14  20          That plan then started to evolve moving beyond

21    smoke grenades and bringing down bank signs to using actual

22    explosives.

23    Q.    And when did the talk of explosives begin?

24    A.    That talk began in February.

10:02:27  25    Q.    And by whom did that conversation begin?

1    A.    Douglas Wright.

2    Q.    Okay.  Now, it's true you had a source collecting

3    information in this case?

4    A.    Yes.

10:02:36  5    Q.    Did the source, was he part of that conversation?

6    A.    Yes.

7    Q.    Okay.  And did he initiate that conversation?

8    A.    No.

9    Q.    Okay.  Did that conversation cause any changes in your

10:02:50 10    investigative method?

11    A.    Yes.

12    Q.    What?

13    A.    As soon as we heard mention of actual explosives,

14    that's when we started to record conversations through the

10:02:59 15    source.

16    Q.    Okay.  And when you say recordings, those would have

17    been turned over in discovery 1-D-1 through 36 or so?

18    A.    Yes.

19    Q.    So the first 1-D-1 would be the first recording made?

10:03:15 20    A.    Yes.

21    Q.    And was that on or about February 24th?

22    A.    That's correct.

23    Q.    And do you recall what, if anything -- who was on that

24    tape?

10:03:24 25    A.    Initially Douglas Wright.

1    Q.    Okay.  And do you recall what, if anything, Mr. Wright

2    said on that day?

3    A.    Initially there was -- there was talk of upcoming

4    events in Chicago.

10:03:37  5    Q.    Okay.  Was there any talk about explosives?

6    A.    Yes.

7    Q.    And what do you recall that conversation being?

8    A.    The initial talk of explosives was talking about

9    making plastic explosives, specifically using large amounts

10:03:50 10    of bleach.  There was talk of the Anarchist Cookbook.  This

11    also lead into talks of C-4 and possibly using chunks of C-4

12    against the downtown casino opening.

13    Q.    Okay.  And who brought up making the explosives?

14    A.    Douglas Wright.

10:04:10 15    Q.    Who brought up the idea of bleach being used as an

16    explosive?

17    A.    Douglas Wright.

18    Q.    Was there any reaction by the source when he brought

19    that up?

10:04:18 20    A.    Initially the source just took in what he was saying.

21    The source had already told him he was not

22    part of the anarchist movement, he did not know much about

23    the anarchist movement, and at that point was really, I

24    think, trying to take the lead or taking the lead from them.

10:04:34 25    He did eventually throw out the idea of

1    because he was not an expert in mixing things and he had

2    never seen the Anarchist Cookbook, whether buying explosives

3    would make more sense than trying to make it or the pros and

4    cons of those two.

10:04:49  5    Q.    Let's take a step back.

6              Who mentioned the Anarchist Cookbook?

7    A.    Douglas Wright.

8    Q.    Who said he had a copy of the cookbook?

9    A.    Douglas Wright initially said he could get a copy.

10:05:01 10    They talked about getting a copy online and then he

11    eventually got a copy.

12    Q.    Does he talk about bringing anybody else into this

13    group at this time?

14    A.    Yes.

10:05:07 15    Q.    Who?

16    A.    The first person he mentioned was Brandon Baxter.

17    Q.    And was that the source saying "Let's bring Baxter in"

18    or was that Douglas Wright?

19    A.    That was Douglas Wright.

10:05:15 20    Q.    Did Wright on 1-D-1 talk about bringing anybody else

21    in?

22    A.    Initially he did not.

23    Q.    Do you recall if he talked about bringing either Tony

24    or Connor into the group on 1-D-1?

10:05:28 25    A.    Eventually he did.  Initially, like I said, Brandon

```
 1    Baxter was the first one he mentioned.  Then he also talked
 2    about -- at that time we didn't know their last names -- but
 3    Tony and Connor, basically saying that they were legit and
 4    they would be good people to bring in as well.
 5    Q.    Okay.  When they were mentioned, did the source or the
 6    FBI know either Brandon Baxter, Tony, or this Connor person?
 7    A.    No.
 8    Q.    Did you, during your investigation, find out who those
 9    people were?
10    A.    Yes.
11    Q.    And who were they?
12    A.    They were all basically friends of Douglas Wright.
13    Tony ended up being Anthony Hayne.  Connor was Connor
14    Stevens.
15    Q.    Okay.  Now, did, on that again 1-D-1, did Wright talk
16    about any sort of means of communications or modes of
17    communication?
18    A.    There was talk about using online communication.  They
19    were concerned about communications being monitored.  They
20    had talked about getting different secured e-mail accounts
21    using Hushmail accounts.
22              There was talk with the source asking him to
23    get a computer so they could use that computer and set up
24    security practices on that computer so they can communicate
25    in a secure fashion.
```

1    Q.    Again was there any talk about getting secure online

2    payment methods set up?

3    A.    Yes.

4    Q.    And what were those?

10:06:46   5    A.    It was called Bitcoin.

6    Q.    Okay.  And who talked about Bitcoin?

7    A.    Douglas Wright.

8    Q.    Okay.  Now, drawing your attention to 1-D-6 which is

9    approximately March 28th, do you recall that recording?

10:07:01  10    A.    Yes.

11    Q.    And by the way, you've reviewed all these recordings?

12    A.    Yes.

13    Q.    Okay.  And are they all accurate recordings of what

14    transpired?

10:07:10  15    A.    Yes.

16    Q.    Okay.  Do you recall who was part of that conversation

17    on March 28th or on or about March 28th?

18    A.    Yes, it was the CHS, Douglas Wright and Brandon

19    Baxter.

10:07:24  20    Q.    Okay.  And approximately 27:58 on that call, what, if

21    anything, did Brandon Baxter say?

22    A.    That was the point as they were traveling in the CHS's

23    vehicle, at that point they had talked about explosives,

24    they had talked about -- the discussion was whether to make

10:07:41  25    or to buy them, and at that point was the first time that

1    anybody had mentioned a bridge.

2                    And Mr. Baxter then said as they were crossing

3    the 480 bridge over Valley View, how much do you think it

4    would take to -- basically how much would it take to take

10:07:56  5    down a bridge.

6    Q.    So was that the first time bridges were mentioned?

7    A.    Yes.

8    Q.    Okay.  And when they were talking about buying versus

9    making, who initiated that conversation?

10:08:05  10   A.    The source is the one that brought up potentially

11   buying.

12   Q.    Okay.  Was there any resistance to buying?

13   A.    Initially there was -- they were weighing the cons,

14   the pros and cons.  I think the cost was probably the con

10:08:19  15   from the buying.

16   Q.    Okay.  But there was no hue and cry, "No, we can't buy

17   explosives"?

18   A.    No.

19   Q.    Other than the cost?

10:08:28  20   A.    Correct.

21   Q.    Okay.  Now, what did the plan eventually develop into?

22   A.    Plan developed into they talked about a couple

23   different targets, but eventually they started to settle on

24   the Detroit Memorial Bridge.

10:08:44  25                    They initially looked at trying to bring down

1    the bridge or bring down a pillar of the bridge, and then

2    that plan evolved into creating two water mines.  Basically

3    they would deploy the explosive devices into the Cuyahoga

4    River, let them sit there, and then wait for a cargo or a

10:09:00  5    freight ship to come down the river.

6              At that point they would detonate them and at

7    least sink or damage the ship to where it would shut down

8    the river access.

9    Q.    And who came up with that plan?

10:09:12  10    A.    Douglas Wright and Brandon Baxter.

11    Q.    And did they, in fact, discuss logistics of that plan

12    at great length?

13    A.    Yes.

14    Q.    Okay.  And were roles assigned at that point for that

10:09:25  15    plan?

16    A.    Yes.  They started talking about who would be the

17    driver.  In this case it was the CHS.

18              They talked about who would deploy the two

19    devices, basically throw them over the bridge.

10:09:38  20              Mr. Baxter talked about potentially going

21    downtown and trying to create a diversion to draw attention

22    away from the bridge but, yes, they were going through who

23    would do what jobs on the actual day.

24    Q.    And who would be in the deployment team?

10:09:51  25    A.    It would be Mr. Wright.

1    Q.    Okay.  Was there a role for Mr. Stevens at that point

2    in time?

3    A.    At that point Mr. Stevens had joined the group.  He

4    had talked about deploying the devices and they were still

10:10:04  5    trying to formulate who would actually, you know, trigger

6    the devices, at what side of the river they would be on to

7    trigger it, but, yes, Mr. Stevens was part of the group at

8    that time.

9    Q.    In fact, did he have any ideas about how to use

10:10:16 10    explosives?

11    A.    Yes.  Mr. Stevens actually, one of the ideas that he

12    had thrown out, he wasn't really sold as much on putting the

13    explosives in the water, more on the effect of this.

14          He had talked about at this point they had

10:10:28 15    already -- they were talking about getting multiple bricks

16    of C-4.  One of the -- one of the ideas he threw out was

17    you'd get more bang for your buck if you basically divided

18    up those blocks of C-4 and tried to go after individual oil

19    wells as opposed to bunching them altogether in just one

10:10:47 20    explosive.

21    Q.    Now, did there come a time when they secured what they

22    believed was C-4?

23    A.    Yes.

24    Q.    Okay.  And were videos made of that or audio/video,

10:10:57 25    some sort of recording?

1    A.    Correct.

2    Q.    Okay.  And was there any hesitation when the C-4 is

3    purchased?

4    A.    No.

10:11:02 5    Q.    Okay.  Was there any, you know, again, any call by any

6    of the people at that point, the three defendants, that they

7    shouldn't be doing that?

8    A.    No.

9    Q.    Okay.  Now, did there come a time when they picked up

10:11:16 10   the C-4?

11   A.    Yes.

12   Q.    Or they -- and who was present at that?

13   A.    Anthony Hayne, Douglas Wright, and Brandon Baxter

14   along with the CHS.

10:11:29 15   Q.    Okay.  And that Anthony Hayne is the Tony?

16   A.    Yes.

17   Q.    Okay.  And at the time they picked up the C-4, what,

18   if anything, happened?

19   A.    They entered the room.  Once they entered the room,

10:11:40 20   all of them were wearing gloves.  They did a -- what I would

21   call as a security sweep of the room, looking for bugs,

22   looking for recording devices.  They were pulling drawers

23   open.

24           Mr. Wright actually turned on the air

10:11:51 25   conditioner and the TV and later explained he did that to

1    drown out any kind of recording devices if they were being

2    recorded.

3    Q.    Okay.  At the end of the meeting did they, in fact,

4    take control or take possession of two IEDs or what they

5    believed were IEDs?

6    A.    Yes.

7    Q.    And those are improvised explosive devices?

8    A.    Correct.

9    Q.    Was there any hesitation by any of the group members

10   not to take them?

11   A.    No.

12   Q.    Was there any question about "Why are we doing this"?

13   A.    No.

14   Q.    How would you describe the mood when they got them?

15   A.    They were a little anxious.  I would say their biggest

16   concern at that point was they assumed law enforcement was

17   going to be coming in the door, so the big driving factor

18   was to get everything, get it gathered up and get into the

19   vehicle to leave the scene.

20            So there was a sense of urgency to leave the

21   area and make sure they were free.

22   Q.    Okay.  And did they get instruction on how to use

23   these things?

24   A.    Yes.

25   Q.    And could you briefly describe what the instruction

1    was?

2    A.    Yes, basically it was two IEDs both made of four

3    blocks of C-4, there's a blasting cap, cell phone detonator,

4    and a safety switch all attached on to the -- all to make up

10:13:04  5    the IED.

6                And the way they were explained is this was a

7    functioning device.  If it was not inert, C-4 would be a

8    functioning device.  They were shown basically to flip open

9    the cell phone, power up the cell phone.  Once the cell

10:13:17 10    phone was powered up, at this point the device was not

11    active.

12                Then once they get to the point where they

13    want to deploy the device, they would put it where they want

14    it, and the safety mechanism which had a light on it would

10:13:31 15    be the indicator that the circuit was complete.

16                So they were told turn the cell phone on, when

17    you're ready to go flip the safety switch, and at that point

18    you have an active device.

19    Q.    Were they given a code to type in?

10:13:41 20    A.    Yes.

21    Q.    Okay.  And --

22                THE COURT:  Who's providing them this?

23                THE WITNESS:  This was an FBI undercover.

24                THE COURT:  They're getting -- they're getting

10:13:53 25    the devices from an undercover FBI officer?

1                    THE WITNESS:  Yes, Your Honor.

2                    THE COURT:  Where?

3                    THE WITNESS:  It was a hotel out in -- I

4       forget the exact address, but it was on the east side of

10:14:04  5       Cleveland close to Maple Heights, I believe.

6                    THE COURT:  Thank you.

7       BY MR. BROWN:

8       Q.    Did there come a time when they used those devices?

9       A.    Yes.

10:14:14 10      Q.    When was that?

11      A.    That was on the night of April 30th.

12      Q.    Okay.  And what was the plan on the night of

13      April 30th?

14      A.    The plan was for all the men to gather up in the

10:14:25 15      Cleveland area.  They were going to drive south to the park

16      in Brecksville where the Route 82 bridge crossed the

17      Cuyahoga River.  The plan was to drive down.

18                   They had already conducted a reconnaissance of

19      the bridge on April 20th.  After that reconnaissance they

10:14:44 20      had decided on which pillars of the bridge they wanted to

21      place these on.

22                   Once they drove down, all the men exited the

23      vehicle.  They then moved on the eastern walking trail down

24      to basically what would have been the center of the bridge.

10:14:59 25                   The two pillars next to the eastern walking

1    trail, they got off, placed both IEDs and departed the area.

2    Q.   When --

3               THE COURT:  Who was in the group at that

4    point?

10:15:10  5               THE WITNESS:  Your Honor, at that point it was

6    all five defendants, Douglas Wright, Brandon Baxter, Anthony

7    Hayne and Connor Stevens, and that day Joshua Stafford had

8    also joined them.

9               THE COURT:  Was that the first time you had

10:15:25 10   seen Joshua?

11              THE WITNESS:  On the 28th we had heard that

12   Joshua was briefed on the plan by Douglas Wright, but that

13   is -- the 28th was the first that Joshua Stafford's name

14   became apparent to us.

10:15:40 15  BY MR. BROWN:

16   Q.   And let me take you back.  Who came up with this plan

17   for the Route 82 bridge?

18   A.   Douglas Wright.

19   Q.   Okay.  And how was that plan presented?

10:15:48 20  A.   He initially told the -- told the source that the more

21   they thought about the downtown, he didn't like the bridge

22   downtown, there was too many cameras, too many eyes

23   downtown.

24              He had told him that he got online and he was

10:16:01 25  looking at potential new targets using an online, you know,

1    map.  And from that, he had seen the park in Brecksville and

2    saw the bridge and thought that would be a good spot to go

3    down and at least conduct a reconnaissance and see if that

4    would be a good spot for them to deploy the IEDs.

10:16:20  5    Q.    So this was around April 18th, 19th, 20th, somewhere

6    around in there?

7    A.    Yes.

8    Q.    So is it fair to say he did not consult the source

9    before coming up with this plan?

10:16:30  10    A.    Correct.

11    Q.    He just presented this plan as what they wanted to do?

12    A.    Yes.

13    Q.    Okay.  Who did the recon on the 20th?

14    A.    Reconnaissance was the CHS, Connor Stevens, and

10:16:40  15    Douglas Wright.

16    Q.    Okay.  And was that recorded?

17    A.    Yes.

18    Q.    And could you briefly describe what the reconnaissance

19    consisted of?

10:16:47  20    A.    We had -- we had FBI agents in the park conducting

21    surveillance along with recording devices on the CHS.

22                   They parked the vehicle.  They then entered

23    the park.  They went down the eastern walking trail.

24                   At this point they looked up and down the

10:17:04  25    bridge, but as previously stated the two pillars right next

1    to the eastern walking trail were very close to -- to the

2    path, so the discussion basically ended on because it was so

3    close, they could walk down this path and very easily just

4    take a few steps off the path, place the devices, and then

10:17:26  5    get out of the park relatively quickly.

6    Q.    And both Wright and Stevens participated in those

7    discussions?

8    A.    Yes.

9    Q.    Now, from April 20th until April 30th, had the source

10:17:37 10    recorded conversations with all of the defendants at various

11    points in time about the plan?

12    A.    For the three that were involved at that point that we

13    knew about, yes.

14    Q.    Okay.  And on the day they picked up the IEDs did he

10:17:52 15    talk to Anthony Hayne about the plan?

16    A.    Yes.

17    Q.    Okay.  And you had said that on the 28th Stafford

18    entered the picture and it was apparent from the

19    conversations he knew about the plan?

10:18:02 20    A.    Yes, Wright had -- Mr. Wright had told the CHS that he

21    had told Stafford about the plan and that he would like to

22    bring him into the group.

23                 He had then went on the next or on the day of

24    the actual buy, they brought Anthony Hayne in and again told

10:18:17 25    the source that they were going to bring him along

1    with -- to buy the actual devices.

2    Q.    Okay.  Now, did the source bring any of these people

3    into the group?

4    A.    No.

10:18:26  5    Q.    And, in fact, did the source or the FBI know any of

6    these individuals before they were introduced into the

7    group?

8    A.    No.

9    Q.    Okay.  Who was -- who brought all these people in?

10:18:34 10   A.    Mr. Wright.

11   Q.    Okay.  Now, I'd like to show you what's been marked as

12   Government's Exhibit Number 1.

13            MR. BROWN:  May I approach, Your Honor?

14   Q.    Do you recognize this CD or do you recognize this?

10:18:43 15   A.    Yes.

16   Q.    What do you recognize it to be?

17   A.    That is what is labeled as the bridge job, and it is a

18   recording of the pillars that -- the night of the placement

19   of the IEDs.

10:18:55 20   Q.    Okay.  And have you reviewed this?

21   A.    Yes.

22   Q.    Is this a sort of a three-minute edit of a longer

23   video?

24   A.    Yes.

10:19:04 25   Q.    And but is this video a fair and accurate

1   representation of what was filmed that night?

2   A.   Yes.

3   Q.   What happened that night?  And this was April 30th at

4   what we've been calling the Route 82 bridge.  Is that, in

10:19:18 5   fact, the Northfield-Brecksville high line bridge?

6   A.   Yes.

7              MR. O'SHEA:  Your Honor, can -- I don't know

8   if everybody, given the angle of the screen, can see it.

9              Is it all right if we move a little bit to our

10:19:41 10   left so we can get a good view of it, Judge?

11              THE COURT:  Absolutely.  Sure.

12              MR. BROWN:  Your Honor, my computer takes a

13   second to bring up the CDs.

14   BY MR. BROWN:

10:20:12 15   Q.   Now, Agent Taylor, Special Agent Taylor, is there a

16   pause in the middle of this CD?

17   A.   Yes.  This was a night vision camera.  The camera had

18   an internet live feedback to the FBI office.  Because in the

19   night there was rain and thunder and storms, so there are

10:20:28 20   parts where the signal just gets hung up and there's a short

21   delay.

22              (Tape playing)

23   Q.   Okay.  And could you describe what this is right now?

24   A.   This is the pillars on the eastern walking trail that

10:20:47 25   I had been previously talking about, and this is the back

1    side of those pillars.

2    Q.    So the sort of gray structure on the left is a pillar

3    of the bridge?

4    A.    Correct.

10:20:54  5    Q.    And sort of the lightness on the right is foilage?

6    A.    That's correct.

7    Q.    And this is in the Cuyahoga Valley National Park?

8    A.    Yes.

9    Q.    Okay.  In how do you call that Brecksville, sort of on

10:21:07 10    the Cuyahoga-Summit border?

11    A.    Yes.  The river's actually the dividing line between

12    the counties.

13    Q.    Okay.

14            (Tape playing).

10:21:21 15    Q.    And there's no audio on this, correct?

16    A.    Correct.

17    Q.    This is about where we get paused or so?

18            Okay.  Now, I'm going to pause this right now.

19            How many individuals are in the frame right

10:21:40 20    now?

21    A.    I believe, sir, it's a little dark from my side, but

22    at this point you have Douglas Wright and Joshua Stafford.

23    Q.    Okay.  Is Joshua Stafford the person crouched over on

24    the left?

10:21:49 25    A.    He'd be, yes, to the left of the screen.

1    Q.    Okay.  So Joshua or, I'm sorry, Douglas Wright has

2    light like a light-colored top and dark jeans or dark pants?

3    A.    Correct.

4    Q.    And is it fair to say they are standing by the pillar?

10:22:02  5    A.    Correct.

6    Q.    Okay.  Could you describe what the item in Douglas

7    Wright's hands is?

8    A.    That is the IED.

9    Q.    Okay.  And is it in a box or how is it packaged?

10:22:12 10    A.    Both IEDs were placed into a small, black toolbox.

11    Q.    Okay.

12              (Tape playing).

13    Q.    Now, has another individual come on the scene?

14    A.    That's Connor Stevens.

10:22:30 15    Q.    Okay.  And can you tell what's going on in this?  I've

16    paused it, but can you tell us what's going on in the scene?

17    A.    So at this point Douglas Wright is down by the one

18    pillar placing his device.  Joshua Stafford is kneeling down

19    with the other device.  And Connor Stevens is looking over

10:22:47 20    Stafford as they are placing the devices.

21    Q.    Okay.  Now, what is Mr. Stevens doing?  Can you tell?

22    A.    Yeah, at this point he's just kneeling over.

23    Q.    Stafford?

24    A.    Correct.

10:23:02 25    Q.    Okay.  And this is where we are paused for a short

1    period of time, correct?

2    A.    Yes.

3    Q.    Okay.

4             MR. O'SHEA:  Judge, I think I just took a

10:23:12 5   quick poll of the defense counsel sitting next to me.  We're

6    having a difficult time seeing what's on the screen, Judge,

7    and it may just be a lighting issue alone, but I can't -- as

8    an officer of the Court, I can tell you I can't see the left

9    half of the screen at all.

10:23:27 10            MR. BROWN:  I paused it for now.

11            THE COURT:  Neither can I.  I'm not sure what

12   you want me to do about it.

13            Is the entire screen part of what's being

14   recorded?

10:23:42 15            MR. BROWN:  Yes.  Yes, Your Honor.

16            THE COURT:  Is that the best you can do with

17   that technology?

18            MR. BROWN:  Maybe try the brightness.  Maybe

19   there's a brightness setting here as well.

10:24:15 20            Your Honor, I'm going to admit I went to law

21   school for a reason.  I'm not sure.  I think this is -- this

22   is about the best, unless the drapes are pulled, but I think

23   probably these overhead lights are washing out most of it.

24            THE CLERK:  I can turn the lights out.

10:24:31 25            THE COURT:  We can turn the lights off.

1          MR. BROWN:  Is that better?

2          MR. O'SHEA:  That's better, Judge.  Thank you.

3          THE COURT:  Well, I'm looking at the screen.

4     I see a person on the right portion of the screen and he

10:25:00  5     appears to be bent over.  Now, who is that individual?

6          THE WITNESS:  Your Honor, that's Douglas

7     Wright.

8          THE COURT:  Okay.  Now, is there somebody else

9     in this photograph?

10:25:10 10          THE WITNESS:  There is, Your Honor.  They're

11    blocked out by the pillar there, but to the left Connor

12    Stevens and Joshua Stafford are both kneeling over a second,

13    the second IED.

14          THE COURT:  Were you present when this was

10:25:23 15    being taken?

16          THE WITNESS:  I was not present on site, no,

17    Your Honor.

18          THE COURT:  Who was doing the filming?

19          THE WITNESS:  This was a -- this was video

10:25:30 20    equipment that was already pre-staged so that we didn't have

21    actual people with cameras in the park.  This is just

22    pre-staged cameras on those.

23    BY MR. BROWN:

24    Q.   Now, there are people in the park as well, correct?

10:25:40 25    A.   Yes.

1    Q.    Okay.  And there are people watching this live back at

2    the FBI, right?

3    A.    Yes.

4    Q.    Okay.

10:25:46  5              THE COURT:  Continue then, please.

6              MR. BROWN:  Thank you, Your Honor.

7    BY MR. BROWN:

8    Q.    Okay.  I'm going to pause this.

9              What is that glow in the right-hand corner

10:26:06 10   where Mr. Wright had been?

11   A.    As previously stated, this is a night vision camera so

12   it's ultrasensitive to light.  That bright light you're

13   seeing is the safety device or the safety switch on the

14   IEDs.  They were told once you flip that switch, the red

10:26:21 15   light will go on.

16              That red light is just illumination in the

17   camera there, but that's indicating that the safety switch

18   has been switched on that device and is now active.

19   Q.    Okay.  So is at this point, as they were instructed,

10:26:33 20   that device is armed and ready to explode?

21   A.    Yes.

22   Q.    Once the code is sent in?

23   A.    Yes.

24   Q.    Okay.  And what's going on to the left of the light

10:26:41 25   then?

1    A.    Now, they're all grouped around the second IED right

2    now.

3    Q.    Okay.

4              THE COURT:  When you say "They are all

5    grouped," who is "they"?

6              THE WITNESS:  Sorry, Your Honor.  That's

7    Douglas Wright, Joshua Stafford, Connor Stevens.

8              THE COURT:  All right.  Where -- are the other

9    two defendants anywhere close?

10             THE WITNESS:  The other two are back on the

11   walking trail.  They were, when the group left the vehicle,

12   they all had assigned roles, and so Mr. Baxter and Mr. Hayne

13   were lookouts.

14             THE COURT:  Was your confidential informant

15   still there?

16             THE WITNESS:  Yes, he walked down with them.

17   At this point he's on the front side with the lookouts.

18   BY MR. BROWN:

19   Q.    So at this point in time he's not involved with arming

20   the devices?

21   A.    Correct.

22   Q.    And was that supposed to be his role at all?

23   A.    His role was just to be the driver.  As they were

24   driving down, though, he had decided or told them that he

25   would be willing to walk down with them because there was

         1    just talk of, you know, the risk of actually walking down,

         2    so he said he would join them walking down.

         3    Q.    Okay.  Now, the light disappeared there.  Can you

         4    describe what happened?

10:27:44 5    A.    These were both in plastic black toolboxes so at this

         6    point the toolbox lid was just closed.

         7    Q.    Is it still, moving from left to right, Stevens and

         8    then Stafford kneeling down?

         9    A.    Correct.

10:28:01 10                   THE COURT:  Is this daytime or nighttime?

        11                    THE WITNESS:  This is nighttime, Your Honor.

        12                    THE COURT:  About what time?

        13                    THE WITNESS:  Approximately 9:00 p.m.

        14                    THE COURT:  But it's dark?

10:28:10 15   BY MR. BROWN:

        16    Q.    Were there thunderstorms going on at this time?

        17    A.    Yes.

        18    Q.    Okay.  And was there much lighting in the valley?

        19    A.    No.

10:28:17 20   Q.    Okay.  And this is, in fact, a National Park?

        21    A.    Correct.  At this point it was almost pitch black.

        22    Q.    Okay.  And what are they doing here?

        23    A.    At this point they are still getting the second device

        24    functioning.

10:28:57 25   Q.    Now, who is this new individual?

1    A.    The new individual is the CHS.

2    Q.    Okay.  Was he helping arm that, or what was he doing

3    at the scene?

4    A.    At this point he'd come back to see what they were

10:29:09  5    doing and how much longer was it going to take.

6    Q.    Okay.  At that point had both devices been armed?

7    A.    At that point I believe the first one was definitely

8    armed, and the second one I believe at this point was armed.

9    Q.    Okay.  And, in fact, could you see a little light

10:29:24 10    flash there about a second ago?

11    A.    Yes.

12    Q.    Okay.  And that light again, is that the arming light?

13    A.    Yes.  That's just he's lifting up the lid of the box

14    and so you're seeing that light.

10:29:38 15    Q.    And that's Doug Wright?

16    A.    Correct.

17    Q.    Okay.  And then what happened just there?

18    A.    At this point they -- both devices are now placed and

19    armed, and the group just rounds up and heads back to the

10:29:56 20    vehicle.

21              MR. BROWN:  Okay.  There are about 40 more

22    seconds just of wilderness, Your Honor.  Would you like me

23    to play that or --

24              THE COURT:  I don't need it played.

10:30:08 25              When did -- are these individuals arrested?

1          MR. BROWN:  Yes, Your Honor.  And what we're

2     going to be playing next is approximately a two hour tape of

3     the conversations going down to the bridge, after they

4     placed the devices and while they are detonating the devices

10:30:25  5     at the restaurant, which then it cuts off and after that

6     they leave the restaurant and are arrested.

7          THE COURT:  Thank you.

8          MR. BROWN:  Okay.  Now, this has really sort

9     of useless video but very good audio, so you can wheel back

10:30:46 10     around if that's more comfortable for everybody.

11     Q.    Special Agent Taylor, I'm going to show you what's

12     been premarked as Government's Exhibit Number 2.

13          Do you recognize this?

14     A.    Yes.

10:30:58 15     Q.    And what do you recognize it to be?

16     A.    That is a recording of the date when they placed the

17     devices.

18     Q.    Okay.  Did you write this, did you write the

19     identifications on the CD?

10:31:10 20     A.    Yes.

21     Q.    Okay.  And have you listened to this prior to coming

22     to court today?

23     A.    Yes.

24     Q.    Is it a fair and accurate representation of the

10:31:17 25     recordings made that night?

```
  1    A.    Yes.
  2                    MR. BROWN:  Okay.  This is for the record
  3    1-D-33 which has been turned over to the defendants.
  4                    THE COURT:  This is going to take a couple
  5    hours?
  6                    MR. BROWN:  It's approximately two hours and
  7    14 minutes, Your Honor.
  8                    THE COURT:  Well, I think we will give
  9    everybody a break at this point and we will resume in about
 10    ten minutes.
 11                    MR. BROWN:  Thank you.
 12                    THE COURT:  So you may take -- Marshals, you
 13    may take the defendants out so they can use the facilities.
 14                    (Recess taken).
 15                    THE COURT:  Please be seated.
 16                    And you may continue, please.
 17                    MR. BROWN:  Thank you, Your Honor.  This is
 18    the beginning of 1-D-33.
 19                    THE COURT:  Very well.
 20                    MR. BROWN:  Thank you.  And, Your Honor, just
 21    so you know, the video really is of no value.
 22                    THE COURT:  It's the sound we're going to
 23    listen to.
 24                    MR. BROWN:  Definitely the audio, correct,
 25    Your Honor.
```

BY MR. BROWN:

Q.    And before we listen to that, can I ask you a few
short summary questions about what we're about to hear?

A.    Yes.

Q.    Okay.  Now, during the evolution of this plan, was
safety to the public ever discussed?

A.    At one point when they were talking about the Detroit
Memorial Bridge, there was talk of possibly putting out
traffic cones and signs and trying to keep people off the
bridge, with the illusion that there was some sort of
construction.

Q.    Were those sort of safety plans ever discussed for
this plan?

A.    No.

Q.    Now, the night of this attempted bombing, was there
any attempt to close Route 82?

A.    No.

Q.    Had they carried traffic cones or, you know, utility
vests to look like construction workers?

A.    No.

Q.    You know, "Men Working" signs?

A.    No.

Q.    Did they try to divert traffic on the bridge?

A.    No.

Q.    Were there any attempts to close the footpath?

1    A.    No.

2    Q.    Were there any attempts to again put signs out on the

3    footpath, you know, "Bridge under construction," "Do not

4    cross," anything like that?

10:46:22 5    A.    No.

6    Q.    In fact, what was the purpose of the lookouts?

7    A.    The lookouts was just to make sure that there was

8    nobody coming down the path or coming close that could see

9    them placing the devices.

10:46:32 10    Q.    Okay.  Was the detonation site within sight of the

11    bridge?

12    A.    No.

13    Q.    Okay.  So they couldn't time their detonation for when

14    there's no traffic on the bridge?

10:46:41 15    A.    Correct.

16    Q.    They just pushed the button and whatever's on the

17    bridge was on the bridge?

18    A.    Yes.

19    Q.    Was there, in fact, any conversation which we'll hear

10:46:50 20    about that?

21    A.    There was.

22          At one point Mr. Baxter asked Mr. Wright,

23    "Well, how are we going to know if somebody's on the

24    bridge?"

10:46:58 25          And at that point Wright says "We're not going

1    to know.  Once they feel the bridge shaking, they'll just

2    have to speed up to get off."

3    Q.    What was Baxter's response, if anything?

4    A.    Nothing.  The conversation then moved on.

10:47:08  5    Q.    He didn't say "Stop"?

6    A.    No.

7    Q.    He didn't say "Let's think this out"?

8    A.    No.

9    Q.    He didn't say "Let's protect life"?

10:47:14 10    A.    No.

11    Q.    Okay.  Now, was there talk of any sort of future plans

12    after this bridge?

13    A.    Yes.  Mr. Stevens actually made the comment that --

14    the whole group was discussing this, but Mr. Stevens made

10:47:28 15    the comment that this will be a good learning or teaching

16    experience to see how much eight blocks of C-4, how much

17    damage it will do.

18    Q.    Did Mr. Wright make any comments in response to that?

19    A.    Yes.  Mr. Wright said that it would be good to have an

10:47:40 20    engineer in the group.

21    Q.    Okay.  Did anybody express any regret at what they had

22    done?

23    A.    No.

24    Q.    How would you characterize the conversation both going

10:47:49 25    down and coming back up from planting the devices?

1   A.    Everybody was pretty lucid, joking around.  A lot more

2   joking around, at ease after they had placed the devices.

3           There was an element of just being nervous

4   because I think they were all aware of the severity of what

10:48:04  5   they were doing, so there was a nervous component, but they

6   were still interacting and very loose with one another.

7   Q.    Again was there any talk about how the community or

8   the news would perceive this?

9   A.    Yes.  Mr. Wright actually said that he wouldn't be

10:48:19 10   surprised if the government tries to cover this up and make

11   it seem like it was just sort of a scheduled demolition of

12   the bridge.

13   Q.    Did Mr. Stevens say anything?

14   A.    At that point Mr. Stevens had made the comment that

10:48:34 15   the more -- and this is to effect, I don't have the exact

16   quote, but the more that he does things like this, the more

17   he's seeing that the Department of Homeland Security

18   people -- won't use the expletives that he used -- but, you

19   know, don't have their head in the game.

10:48:49 20   Q.    Okay.  Did he tell you anything describing how he saw

21   this action?

22   A.    I don't understand the questions.

23   Q.    How this would be perceived in the community or how he

24   understood this as part of, you know, this act, how this act

10:49:03 25   was -- could be considered by, you know, within Cleveland or

1    in the country?

2    A.    The whole group was under the -- the premise of the

3    whole taking down the bridge was to send a message.

4              They had all talked about eventually going to

10:49:20  5    Chicago so there was an element of based off of what

6    happened here, I don't know if you want to say bragging

7    rights or calling card, but there was a notion of we would

8    have this experience under our belt for further on down the

9    road.

10:49:37  10   Q.    Okay.  And as we'll hear on the tape, at approximately

11   9:00 o'clock, four minutes and six seconds, did Connor

12   Stevens say this is the greatest act of terrorism he knows

13   of in Cleveland history since the sixties?

14   A.    Yes.

10:49:50  15   Q.    Okay.  And did he believe that this was going to be

16   their legacy, this great act of terrorism?

17   A.    Yes.

18   Q.    Okay.  Now, you had mentioned something about going to

19   Chicago.

10:50:03  20             Was travel or flight discussed by the group?

21   A.    Mr. Wright had -- had stated that he was probably

22   going to hang low and that he was looking at getting to

23   Chicago pretty quickly.

24   Q.    Okay.  Did anybody else in the group echo those

10:50:20  25   sentiments?

|          | 1  | A.   Yeah, the whole group had -- there was already the |

1    A.   Yeah, the whole group had -- there was already the

2    talk of activities in Chicago, that Chicago, the Nato Summit

3    was coming in and so people were already looking at going up

4    to Chicago.

10:50:33  5    Q.   Okay.  Then I'll start playing, but occasionally I

6    might stop the tape just to ask a clarifying question.

7               (Tape playing).

8    Q.   This is April 30th at approximately 7:45?

9    A.   Yes.

10:51:36  10               (Tape playing).

11    Q.   Okay.  And who is that voice right now?

12    A.   I believe that one was Mr. Stafford.

13    Q.   Okay.  And so Stafford and Baxter were the first ones

14    picked up?

10:53:33  15    A.   Yes.

16    Q.   And where were they picked up?

17    A.   I believe the address, I don't have the address in

18    front of me, but it was downtown Cleveland.

19    Q.   Okay.

10:53:49  20               (Tape playing).

21    Q.   Is that Baxter asking how the C-4 devices would be

22    attached?

23    A.   Yes.

24    Q.   Okay.

10:56:50  25               (Tape playing).

1          THE COURT:  Is it possible to turn down -- I'm

2     not getting any -- it's just a waste of my time.  I,

3     frankly, can't hear what they're saying.

4          Is it possible to slow down or lessen the

10:58:47  5     volume?

6          MR. BROWN:  I can try, Your Honor.

7     Absolutely.

8          THE COURT:  Let's just let the witness

9     describe what he understood they were talking about.

10:59:01  10          MR. BROWN:  Your Honor, if I could ask him,

11    you know, to direct questions at such and such a time, if

12    that's good with the Court.

13          THE COURT:  I want to kind of speed things up,

14    so however you can do it, but playing this for me is not

10:59:16  15    working because I can't understand what they're saying.

16          MR. BROWN:  Thank you, Your Honor.

17    BY MR. BROWN:

18    Q.   Now, as they're driving, did there come a time

19    when --

10:59:25  20          THE COURT:  Let me ask you this, how is this

21    being taped?  How -- what process was used to tape this

22    discussion?

23          THE WITNESS:  There was actually -- there was

24    multiple recording devices.  This one is an audio and video

10:59:38  25    that is being worn by the CHS.

1          THE COURT:  He's in the vehicle?

2          THE WITNESS:  Correct.

3          THE COURT:  All right.

4          MR. BROWN:  Thank you, Your Honor.

10:59:46 5          And just for a minute, I have approximate time

6     stamps, and if I could just direct him to a time.

7          THE COURT:  Very well.

8          MR. BROWN:  And a comment if he remembers

9     hearing it.

10    BY MR. BROWN:

11    Q.    Did there come a time when at this time Baxter,

12    Stafford and the CHS were in the vehicle and they stopped at

13    a hardware store?

14    A.    Yes.

11:00:06 15   Q.    Okay.  And was that at approximately 8:00 p.m.?

16    A.    Yes.

17    Q.    Okay.  And what did Baxter do when they pulled into

18    the hardware store?

19    A.    At this point Baxter had already talked about buying

11:00:17 20   tape and bags to try to waterproof the explosive devices, so

21    when they pulled in, Baxter got out of the car and went in

22    to buy tape.

23    Q.    And did the source and Stafford stay in the car?

24    A.    Yes.

11:00:31 25   Q.    Conversation ensued?

1    A.    Yes.

2    Q.    And at about 2:50 while the source was playing with

3    his Smartphone, did he make a comment that there are 14

4    McDonald's in the immediate area?  He used his phone to find

11:00:42  5    14 McDonald's?

6    A.    Yes.  He got a new Smartphone and it had a device on

7    there where you can talk into it and it will answer your

8    questions, and he asked how many McDonald's are in the area

9    and the phone provided 14 in the area.

11:00:58 10    Q.    And what did Stafford reply to that?

11    A.    At this point he said "Maybe we should blow one of

12    them up."

13    Q.    Okay.  At approximately 6 -- 8:06:50 did the source

14    talk about the phone numbers on the cell phones?

11:01:14 15    A.    Yes.

16    Q.    And what was the sum and substance of that

17    conversation?

18    A.    He let everybody know that he -- he wrote down the

19    numbers for the cell phones and that the group, they were

11:01:25 20    talking about -- basically during this time he started

21    talking about what numbers they would need to call each

22    phone at.

23    Q.    Okay.  And were Baxter, Stafford, and the source all

24    involved in this conversation?

11:01:38 25    A.    Yes.

Q.    Now, at approximately 8:08:16 did they stop at another location?

A.    Yes.

Q.    And did the source and Connor Stevens talk at that time?

A.    Yes, they did.

Q.    What, if anything, was said?

A.    Once they got to the second location, this was to pick up the other members of the group which was Wright and Hayne, at this point Connor Stevens was not going to go with the group.

Stevens pulled the source aside and asked him whether or not helping with that operation that night would affect his ability to continue working with the source with other odd jobs and on the construction site.

Q.    And what was the response?

A.    At that point the source told him absolutely not. They were -- they were two separate issues, two separate things, and that the decision for him to come along was his alone.

And he said, you know, they have space for one more, if you'd like to join, but the decision was his and in no way was he -- did he need to go.

Q.    And in fact at about 14 -- 8:14:15 did, in fact, Doug start talking to Connor Stevens about getting in the car?

A.    Yes.  The group all got into the vehicle.  At this

point Wright rolled down his window, started making comments

that this was -- to the effect "This is the last time you

can join us.  Are you sure you don't want to join?"

                    Asked him again "There's still space if you

want to join," and at this point then Mr. Stevens then

joined the group.

Q.    Okay.  So who is in the car as they pulled away from

the second location?

A.    At this point all members of the group were there so

Wright, Baxter, Stevens, Hayne and Stafford and the CHS were

all in the vehicle.

Q.    Okay.  And at this point, this is April 30th, so based

on your recordings and your investigation, all of those

defendants knew what the plan was?

A.    Yes.

Q.    Now, at approximately 8:15:49, did Wright begin any

discussions about tasks when they get to the bridge?

A.    Yes.  He started asking who would be the joggers or

the people that would go down and be the lookouts.

Q.    Okay.  And did anybody volunteer or was anybody

assigned the phones or planting devices?

A.    As they continued, Mr. Wright said that he wanted the

green phone because green was his favorite color.  Stafford

took the other phone and was going to place the other

| | | |
|---|---|---|
| | 1 | device. |
| | 2 | At this point Hayne was going to be a lookout. |
| | 3 | The CHS was going to be the driver.  And the other two, the |
| | 4 | whole group had decided they will go down together. |
| 11:04:17 | 5 | Q.    Okay.  Now, is it fair to say as they are driving down |
| | 6 | they are making jokes about accidentally blowing themselves |
| | 7 | up and things of that nature? |
| | 8 | A.    Yes. |
| | 9 | Q.    Okay.  At 8:20:41, did Brandon Baxter talk about the |
| 11:04:34 | 10 | sort of order of events tonight -- of that night, |
| | 11 | April 30th? |
| | 12 | A.    Sorry, where is the time stamp again? |
| | 13 | Q.    Approximately 8:20:41, did he ask "Do we plant tonight |
| | 14 | and go boom tomorrow"? |
| 11:04:52 | 15 | Do you recall that conversation? |
| | 16 | A.    Yes, he asked were they going to place the devices and |
| | 17 | go boom as to detonate the devices the next day.  At that |
| | 18 | point Wright told him, "No, we're going to detonate these |
| | 19 | tonight." |
| 11:05:03 | 20 | Q.    So right after that was his response "So it will go |
| | 21 | boom tonight"? |
| | 22 | A.    Yes. |
| | 23 | Q.    Okay.  At approximately 8:27 and no seconds, did |
| | 24 | Stevens ask why Wright and Stafford were getting the phones? |
| 11:05:28 | 25 | A.    Yes. |

1   Q.    Okay.  And what was the response given to him for that

2   question?

3   A.    It was -- he said since Wright and Stafford were

4   taking all the risks of placing the devices, their lives

11:05:40  5   were in their hands so they get the phones.

6   Q.    Okay.  So the phones he was talking about were the

7   detonation phones?

8   A.    Yes.

9   Q.    Okay.  Was it your impression that he was interested

11:05:50 10   in getting one of those phones based on that question?

11                THE COURT:  I'm sorry, what was the question

12   again?

13   Q.    Based on that, based on Stevens' question, what was

14   your understanding of why he asked that question?

11:06:00 15   A.    I honestly don't know.  He just asked the question.

16   Q.    Okay.  Now, at approximately 8:30:08, did they start

17   talking about cover stories?

18   A.    Yes.  The group talked about if anyone were to ask,

19   they were a band traveling, CHS was their security guard,

11:06:19 20   and they joked around about who was going to be the drummer

21   and the guitar, but that was basically their cover was that

22   they were an out-of-state band.

23   Q.    Okay.  And at 8:33:30, did they talk about what would

24   happen if law enforcement picked up the phone?

11:06:34 25   A.    Yes.  At this point Wright made the comment that "I

1    guess if we call and the FBI picks up, we know it didn't

2    work."

3              And then he said, "You know, something like

4    that happens, I'm just going to swallow a razor blade"

11:06:47 5    because he wasn't going to go to Guantanamo Bay for life.

6    Q.    And what is Guantanamo Bay?

7    A.    It's a detention facility in Cuba where international

8    terrorists are sent for detention.

9    Q.    So he was talking about the penalties for committing

11:07:01 10   an act of terrorism?

11   A.    Yes.

12   Q.    Now, at 36 -- I'm sorry -- 38:00 did Stevens talk

13   about any operational consideration after detonation?

14   A.    They talked about make sure that nobody threw

11:07:22 15   cigarette butts down, spitting, any kind of evidence or any

16   kind of DNA evidence that could be later found.

17   Q.    Okay.  And at 39:52, did defendant Wright and Connor

18   Stevens and Anthony Hayne have a comment about thunder or

19   the sound of the explosions sounding like thunder?

11:07:39 20   A.    Yes.  And Wright, Wright made the comment that with

21   the thunder, people at least close to the bridge, when the

22   explosion went off, they would just think that it's thunder

23   and then jokingly made the comment "Except if you were

24   really close to the bridge."

11:07:53 25   Q.    And what was implied in that comment?

A.     That if you were close to the bridge you were going to

be killed.

Q.     Okay.  Now, at 8:47:30 did Connor Stevens make any

comments about the other bridge in the area?  There was

apparently another bridge in the area?

A.     Yes, when you pull into the park there's a parking

lot, and to get to the eastern walking trail there's a foot

bridge and so Mr. Stevens had made the comment that "We

should just blow up the foot bridge because then we would

know we would be able to destroy the whole bridge."

Q.     And did Wright make a comment at 47:57 about what else

they could blow up?

A.     Well, when they were down there after that comment was

made, they talked about the last time that they were out and

viewing, doing the recon of the bridge, and they were still

concerned about people in the area.

            And Wright had gone on to make the comment

that, you know, last time there were kids and people down

here whereas this time it didn't appear to be as many people

in the park.

Q.     But there was no further talk about safety?

A.     Correct.

Q.     Now, going down before they got out of the van --

because about this time they're at the van, correct, or at

the park?

1    A.    Yes.

2    Q.    Is it fair to say there's a lot of talk about the

3    explosives and the -- what happens when explosives explode?

4    A.    Yes.

11:09:10  5    Q.    Okay.  It was very clear from the recordings in your

6    mind that they were talking about an explosive or explosive

7    devices?

8    A.    Yes.

9    Q.    Okay.  Now, when they got out of the van, what was the

11:09:24 10    sort of tasking that they all took on?

11    A.    Again once they got out, Wright and Stafford had the

12    explosive devices.  They were going to go straight to down

13    the path and get to the pillars and go to the back side.

14         Hayne and Baxter had already gotten out and,

11:09:40 15    again their role as lookout, had gone down and placed

16    themselves along the path.

17         The CHS had walked down with the group and was

18    also at this point in front of the pillars.

19         And Connor Stevens then walked down with the

11:09:54 20    group and he went on the back side with Stafford and Wright.

21    Q.    Okay.  Now, at approximately -- we saw the video

22    that's Government's Exhibit Number 1.  At approximately what

23    would have been 8:58:27, does Stevens standing in the

24    proximity of the devices say anything to the source?

11:10:14 25    A.    Yes.  At the point where you saw on the video where

1    the source went back there, Stevens said that "One is good

2    to go.  We just got to do this one," referencing the one IED

3    that was -- already had been set up and was already

4    activated, and then referencing the other one where they

11:10:30  5    were still working on it.

6    Q.    Okay.  And then at one point in time at approximately

7    8:58:07, do you recall hearing somebody say "This is armed"?

8    A.    Yes.

9    Q.    And then approximately 20 seconds later, "Let's go,

11:10:46  10    let's get out of here"?

11    A.    Yes.

12    Q.    Okay.  At 9:01:01, did Wright make a comment about

13    arming the devices?  Do you recall if he said "I did both of

14    them.  They took forever to turn on"?

11:10:59  15    A.    Yes.

16    Q.    Okay.  And was there a discussion of how far away they

17    wanted to be?

18    A.    Yes.  As they got back to the vehicle, there was still

19    discussion on where they were going to go to set these

11:11:09  20    devices off.

21              Ultimately decided on going to the Applebee's

22    restaurant up closer to Cleveland approximately 20 to 25

23    minutes north.

24    Q.    Okay.  That's not near the site, correct?

11:11:21  25    A.    Correct.

1   Q.    Were they under the impression that they could hear

2   the explosion, however?

3   A.    Yes.

4   Q.    So they wanted to hear, correct?

11:11:27  5   A.    Yes.

6   Q.    They didn't care about seeing?

7   A.    Yes.

8   Q.    And they wanted it done?

9   A.    Correct.

11:11:31 10   Q.    Did Wright make a statement at approximately 9:03:02

11   about the importance of not getting found and nobody

12   talking?

13   A.    Yes.

14   Q.    Okay.  And did he have an idea of what he might do at

11:11:47 15   the day at 9:03:52, what his plan was?

16   A.    Yes, his plan was not to leave the house that much and

17   he might even leave town here for a few weeks.

18   Q.    Did he say he might jump on a bus and leave town?

19   A.    Yes.

11:11:59 20   Q.    And at that point at 9:04:06 did Stevens say anything

21   about what they had just done?

22   A.    Yes, this was the point where Stevens made the comment

23   "We just committed the biggest act of terrorism that I know

24   of since the 1960s."

11:12:12 25   Q.    And what did they say about that?

1    A.    The source replied back he hadn't thought about it

2    that way, and that they would be legends.

3    Q.    What did Stevens say to that?

4    A.    Stevens said "Hell, yeah," and they continued, the

11:12:25  5    more he's been doing things like that, he realizes the

6    Department of Homeland Security people, again some

7    expletives, don't know what they're doing and it's easy to

8    run around on them.

9    Q.    Okay.  At 9:06:23 did Brandon Baxter and Doug Wright

11:12:41 10    have a conversation about the bridge?

11    A.    Yes, this is the point where Mr. Baxter asked

12    Mr. Wright "How do you know if anybody's going to be on the

13    bridge?"

14    Q.    Okay.  And what was that conversation?

11:12:50 15    A.    And that's the point where Mr. Wright said, "We're not

16    going to be able to know if they're on the bridge," and "If

17    they feel the bridge shaking after the explosion, they're

18    just going to have to speed up and get off of it."

19    Q.    Is that when Baxter said "Okay"?

11:13:01 20    A.    He didn't say "Okay," but the conversation continued.

21    There was no --

22    Q.    Okay.  Now, at 9:09:33 did somebody say anything?

23    A.    This is the point, it's unclear who says it, but

24    basically somebody in the vehicle says, you know, they love

11:13:19 25    everybody in this car for doing this, and then Wright makes

1    the comment that "If you do this stuff together you're

2    basically family."

3    Q.    Okay.  At then at 9:11:08 did Doug Wright have any

4    aspirations of what he hopes happened?

11:13:35  5    A.    Yeah, he says he really hoped it at least takes out a

6    pillar or at least the column.

7    Q.    Okay.  At approximately 9:14 did they talk about what

8    to do with the detonation phones?

9    A.    Yeah.  At this point they were deciding what to do

11:13:51 10    with the phones after they detonated the devices.

11    Mr. Stevens made the recommendation of just smashing them,

12    then lighting them on fire.

13            Mr. Wright had talked about when he crossed

14    over a bridge, just throw them into the river.

11:14:05 15    Q.    Okay.  So they were planning on destroying the phones?

16    A.    Yes.

17    Q.    Okay.  Now, at 9:19:15 did Doug Wright talk about why

18    he wanted to blow this stuff up, type in the codes at

19    Applebee's?

11:14:19 20    A.    Yes, he wanted to be in there because he wanted people

21    to see them there and then the video to capture them inside

22    the restaurant.

23    Q.    Okay.  To create an alibi, ostensibly?

24    A.    Yes.

11:14:31 25    Q.    Okay.  And at 8 or, sorry, 9:20:30, did Baxter and

1    Stevens talk more about destroying the phones?

2    A.    Yes.

3    Q.    In fact, did they talk about burning them and crushing

4    them and various others?

11:14:42  5    A.    Yes.

6    Q.    At 9:21:24 did Doug Wright say anything to Connor

7    Stevens about his decision to come?  Did he, in fact, say

8    "I'm glad you came, Connor"?

9    A.    Yes.

11:15:01 10    Q.    And did Connor Stevens reply?

11    A.    Yes.

12    Q.    What did he reply?

13    A.    He said he was glad he came as well.

14    Q.    Okay.  At 9:25:00 did Connor Stevens say anything

11:15:13 15    about the purchase meeting?

16    A.    He said that he wished he had gone to that.

17    Q.    Okay.  Now, at 9:25:16, did Baxter give an opinion

18    about what he thinks will happen to this bridge once the

19    explosives go off?

11:15:37 20    A.    He thought that it would at least shut it down for a

21    while.  Even if it didn't blow up the bridge or take out a

22    column, it would do enough damage to at least shut it down.

23    Q.    Okay.  What was Connor Stevens' response to that?

24    A.    Mr. Stevens at this point said that the whole

11:15:50 25    operation would be a nice learning experience from a

1    researching perspective, just to understand how much damage

2    eight pounds of C-4 would do.

3                 Mr. Wright agreed and said at this point

4    that -- at least the talk about bringing in an engineer into

11:16:05 5    the group, and Mr. Stevens then replied that, "Yeah, it

6    would have been nice to have someone like that to confide

7    in," referencing the engineer.

8    Q.    Okay.  And at 9:30:40 had they stopped to buy

9    cigarettes and things?

11:16:18 10   A.    Yes.

11   Q.    Okay.  And had there been a problem with some of them

12   getting carded for cigarettes or beer and things like that?

13   A.    Yes.

14   Q.    And in response, did Stafford say "That's why I hate

11:16:29 15   this country"?

16   A.    Yes.

17   Q.    Okay.  Now, at 9:31:10, did Wright and Stafford have a

18   conversation about their roles as the detonators?  Did

19   Wright say that they were the most important people in the

11:16:44 20   group?

21   A.    Yes.

22   Q.    And did Stafford agree with that?

23   A.    Yes.

24   Q.    And then upon getting back into the van from the gas

11:16:55 25   station, do you recall hearing at 9:32:46 Baxter saying,

1    "All those people in there were unsuspecting"?

2    A.    Yes.

3    Q.    And was he making reference to what was about to

4    happen with the bridge blowing up?

11:17:06 5    A.    Yes.

6    Q.    Did the conversation turn to past instances of abuse

7    in the families?

8    A.    Yes.

9    Q.    Okay.  And do you recall if -- what Doug Wright

11:17:17 10    initially said about beating kids?

11    A.    He had talked about his own family life and some

12    actions that he had taken, I believe it was against his

13    stepfather.

14    Q.    Okay.  Did Baxter say anything?

11:17:29 15    A.    I believe he also talked about his home life and with

16    his sister.

17    Q.    Okay.  Now, did there come a time when they actually

18    arrived at Applebee's?

19    A.    Yes.

11:17:40 20    Q.    Okay.  At 9:38:36 did they check their phones to make

21    sure they worked?

22    A.    Yes.

23    Q.    And at 9:38:50 when a waiter appeared, did they in

24    fact put forth the rock band cover story?

11:17:53 25    A.    Yes.

1    Q.    Okay.  And did they go into detail about that?

2    A.    Yes.

3    Q.    About where they were playing?

4    A.    Yes.

5    Q.    Name of a band?

6    A.    Yes.

7    Q.    Where they were playing next, the next night?

8    A.    Yes.

9    Q.    Where they were based out of?

10   A.    Yes.

11   Q.    Okay.  Is it fair to say it was a pretty

12   well-thought-out cover story?

13   A.    Yes.  They referenced bars that actually exist in

14   Lakewood and areas that do exist and that they could have

15   been at.

16   Q.    Okay.  And at 9:42:30 does Doug Wright sort of scan

17   the area for cameras in Applebee's?

18   A.    Yes.

19   Q.    Okay.  And at 9:44:00 does Doug Wright start dialing

20   the detonation phone?

21   A.    Yes.

22   Q.    Okay.  And for the next couple minutes do Wright and

23   Stafford keep dialing the phones?

24   A.    Yes, they dialed.  Wright ended up getting a voicemail

25   so after a couple attempts they were concerned that the

1    phones were still picking up when they sent them the

2    messages.

3    Q.    Okay.  And did they try both calling and texting?

4    A.    Yes.

11:18:56  5    Q.    Did they try multiple codes?

6    A.    Yes.

7    Q.    Did they, in fact, call the FBI undercover who sold

8    them the explosives for the correct code?

9    A.    Yes.

11:19:05 10    Q.    And then did they enter that code?

11    A.    Yes.

12    Q.    Is it fair to say they entered the code in one form or

13    another on both phones three, four, maybe five times?

14    A.    Yes.

11:19:14 15    Q.    Okay.  Did -- at 9:48:20 did Connor Stevens laugh and

16    say "What kind of group did I get involved in"?

17    A.    Yes.

18    Q.    And at 9:49:00 did Doug say "This is serious,"

19    expletive, "We need to figure it out"?

11:19:31 20    A.    Yes.

21    Q.    Okay.  And then at 9:56:20 did they try to send the

22    codes together again, Stafford and Wright?

23    A.    Yes.

24    Q.    Okay.  And after they left Applebee's, what happened?

11:19:48 25    A.    After they left Applebee's, they left the parking lot

1    and at that point FBI and police arrested all five

2    defendants.

3    Q.    Now, Special Agent Taylor, you had said that you were

4    an assistant coordinator for the weapons of mass destruction

11:20:03  5    program?

6    A.    Yes.

7    Q.    What are your duties with that?

8    A.    Basically to respond to weapons of mass destruction

9    events and threats and to also help liaison with local and

11:20:18  10    state entities whenever they have similar investigations or

11    issues.

12    Q.    Have you received specialized training for this?

13    A.    Yes.

14    Q.    And have you made numerous responses to weapons of

11:20:26  15    mass destruction events?

16    A.    Yes.

17    Q.    Is, based on your training and experience, is C-4

18    considered a weapon of mass destruction?

19    A.    Yes.

11:20:38  20    Q.    Okay.  Is this IED that was devised of the four C-4

21    blocks considered a weapon of mass destruction?

22    A.    Yes.

23    Q.    Okay.  Based on your training and experience, what

24    would be the protocol for responding to a bomb site where

11:20:53  25    these first IEDs would be found?

1      A.      In very general terms, you would obviously show up on

2      the scene.  It would involve cordoning off the area.  It

3      would involve bringing in experts or bringing a specialist

4      in, whether it be state, local, or federal entities, or in

11:21:10  5      this case for an explosive it would be a special agent bomb

6      tech or also bomb techs from the area.

7              You would still do the same analysis from the

8      scene after you secured it and cordoned it off.  Then you

9      slowly progress forward to either determine the validity of

11:21:25  10     the threat or to eliminate the -- any active threat.

11     Q.      You don't just pick up the devices and move on?

12     A.      No.

13     Q.      It's a fairly involved process?

14     A.      Yes.

11:21:34  15     Q.      State and local and federal officials would be

16     involved?

17     A.      Yes.

18     Q.      Traffic would be closed?

19     A.      Yes.

11:21:38  20     Q.      You know, would a sort of an examination of the

21     structural soundness of the structure be determined?

22     A.      Yes.

23              MR. BROWN:  Okay.  Those are all the questions

24     I have at this time, Your Honor.

11:21:50  25             I don't know if you want the summary now or if

1    cross-examination.

2                    THE COURT:  We'll have if counsel wish to

3    cross, they may.

4                    MR. VEGH:  Now, Judge?

11:22:01  5                    THE COURT:  Whoever wants to go first.

6              CROSS-EXAMINATION OF RYAN TAYLOR

7    BY MR. VEGH:

8    Q.    Agent, would you agree with me that what you've shown

9    the Court and what you've testified to is, for all intents

11:22:19 10   and purposes, the last chapter of this case?

11   A.    Yes.

12   Q.    And would you agree with me that there are many hours

13   of recorded -- of recorded meetings between your informant

14   and my client?

11:22:41 15   A.    Yes.

16   Q.    Do you have any idea how many hours?

17   A.    Approximately 35 to 40.

18   Q.    And were there any recorded phone conversations

19   between my client and your informant?

11:22:53 20   A.    No.

21   Q.    Were there any recorded or memorialized e-mails

22   between my client and your informant?

23   A.    There were a few e-mails, yes.

24   Q.    And would you agree with me that in addition to the

11:23:11 25   meetings that were recorded by your informant, that my

1   client and your informant had other meetings as well?

2   A.    Yes.

3   Q.    Many meetings?

4   A.    Yes.

5   Q.    Do you have any idea how many times they met together

6   or with other co-defendants that were not recorded?

7   A.    Approximately -- I'd say approximately between 10 and

8   12, probably between that October 21st meet up until the

9   first mention of explosives.

10  Q.    What about afterwards?

11  A.    Recording, you mean meetings where they were --

12  Q.    Were there unrecorded meetings between my client and

13  your informant, unrecorded meetings?

14  A.    Any meeting that the source was meeting with them, we

15  were going through recording devices and giving them to.  If

16  there may have been an incidental, you know, driving

17  downtown because he was always going downtown to the

18  different sites.

19          But any substantive meeting when they were

20  going to meet and talk about this, anytime we knew of a

21  meeting, he had a recording device.

22  Q.    When you say "substantive," according to you, correct?

23  Substantive according to you?

24  A.    I would say anytime we knew of a meeting, we tried to

25  get the -- we gave the source a recording device.

1    Q.    Just so we're on the same track here, but you do agree

2    with me that my client had meetings with your informant that

3    were not recorded?

4    A.    Yes.

11:24:45  5    Q.    Okay.  Now, when this video was shown and this was the

6    day my client was arrested, is the informant wearing a

7    recording device on his person?

8    A.    Yes.

9    Q.    Okay.  And is there also a recording device in the van

11:25:10 10    that is fixed to a part of the inside of the van?

11    A.    Yes.

12    Q.    Okay.  And you chose to show the Court the portion --

13              THE COURT:  He didn't choose to do anything.

14    Counsel did; not the witness.

11:25:28 15              MR. VEGH:  Excuse me.  Sorry, Your Honor.

16    I'll withdraw the question.

17    BY MR. VEGH:

18    Q.    The portion that was shown to the Judge was

19    the -- from the recording device on the informant, correct?

11:25:39 20    A.    Yes.

21    Q.    Okay.

22              THE COURT:  Well, let me interrupt just to say

23    that this is not a discovery proceeding.

24              MR. VEGH:  I understand, Judge.

11:25:47 25              THE COURT:  The question is whether or not

1     there is sufficient evidence here to justify an order of

2     detention.

3               And I'm not going to sit here and listen to

4     hour after hour of discovery material.  So if you've got

11:26:00 5     something to say to the Court that would suggest that I

6     should not order your client detained, I'm glad to listen to

7     it.

8               MR. VEGH:  Very well, Judge.

9     BY MR. VEGH:

11:26:15 10     Q.    Early on in your testimony, you talked about a

11     complaint that the FBI received --

12     A.    Yes.

13     Q.    -- about the Occupy Cleveland movement, correct?

14     A.    Yes.

11:26:26 15     Q.    Was my client named in that complaint?

16     A.    No.

17     Q.    Okay.

18               THE COURT:  Well, let me interrupt.

19               What do you mean by "Complaint"?

11:26:34 20               "Complaint" to me means somebody's filed

21     something in the Court that started an arrest process.

22               I gather you think of complaint in a different

23     fashion.

24               THE WITNESS:  Yes, Your Honor.  In this term

11:26:47 25     it was that we had received a threat to the FBI office.  We

 1   received knowledge of a potential threat.

 2            THE COURT:  Did you know the source?

 3            THE WITNESS:  We did.

 4            MR. BROWN:  No.  I think there's some -- can I

11:27:02  5   just quickly?

 6            The threat you received or the information you

 7   received was not that Occupy Cleveland was doing something?

 8            THE WITNESS:  Correct.

 9            MR. BROWN:  But that there might be something

11:27:15 10   happening at an Occupy Cleveland or at an event that was

11   co-sponsored or co-populated by Occupy Cleveland?

12            THE WITNESS:  Correct.

13            MR. BROWN:  So it was just that there might be

14   some disruption downtown?

11:27:28 15            THE WITNESS:  Yes.

16   BY MR. VEGH:

17   Q.    And my client's name was not associated with that?

18   A.    Correct.

19   Q.    And at the time your informant met my client, was he a

11:27:38 20   suspect in any crime whatsoever?

21   A.    No.

22   Q.    Was he the object of an ongoing investigation of any

23   kind?

24   A.    No.

11:27:52 25   Q.    At the time --

1          THE COURT:  And for the record, your client is

2    which defendant?

3               MR. VEGH:  Douglas Wright, Judge.

4               THE COURT:  Thank you.

11:27:58  5    BY MR. VEGH:

6    Q.    Did there come a time when the informant employed my

7    client?

8    A.    Yes.

9    Q.    And how was he employed by the informant?

11:28:07 10   A.    He asked -- he knew that the source worked in

11   construction, worked at flipping houses, and at that point

12   because he knew that he had had these jobs and that he had

13   different houses where he employed people to do various odd

14   jobs, Mr. Wright was -- he asked him if he could start

11:28:27 15   working for him, and he said yes.

16   Q.    Okay.  Was that authorized by your office?

17   A.    Yes.

18   Q.    And did there come a time when the informant housed my

19   client?

11:28:36 20   A.    Yes.

21   Q.    And how -- where was he housed?

22   A.    This is one of the properties that the informant

23   owned.

24   Q.    Okay.  And do you know how long my client lived there?

11:28:50 25   A.    I think it was -- there was a time when he was given

1    the key and then I want to say probably the last two weeks

2    before his arrest, so one to two weeks before he was

3    actually living in the residence.

4    Q.    Was there ever a time where you received information

11:29:04  5    from your informant that my client was armed?

6    A.    No.

7    Q.    This fake C-4 was purchased, correct?

8    A.    Yes.

9    Q.    And who provided the funds?

11:29:24 10             MR. BROWN:  Objection, Your Honor.  And this,

11    I think, crosses the line to discovery.

12             THE COURT:  The question again?

13             MR. VEGH:  I was going to ask him who bought

14    the -- who provided the funds to purchase the C-4.

11:29:46 15             THE COURT:  I'm not sure it's relevant at this

16    point.

17             Objection sustained.

18             MR. VEGH:  Very well, Judge.  I'll move on.

19    BY MR. VEGH:

11:29:52 20    Q.    Is it your position that the -- is it your position or

21    your testimony that the informant played a passive role in

22    this case?

23             MR. BROWN:  Objection, Your Honor.

24             THE COURT:  Well, I don't know what "Passive"

11:30:09 25    means.

1                    You relied upon your informant as a part of

2       this investigation, is that correct?

3                         THE WITNESS:  Yes, Your Honor.

4                         THE COURT:  And he provided you with

11:30:16  5     information as the investigation proceeded?

6                         THE WITNESS:  Yes, Your Honor.

7                         THE COURT:  Did you ever instruct the

8       informant to advise these defendants to engage in a plan to

9       blow up a bridge?

11:30:28 10                    THE WITNESS:  No, Your Honor.

11                        THE COURT:  Next question.

12                        MR. VEGH:  Very well, Judge.

13      BY MR. VEGH:

14      Q.    Agent, do you recall a meeting between the informant,

11:30:41 15     Mr. Wright, and Mr. Baxter on March 31st?

16      A.    I'd have to check my records, but, yes, I mean, they

17      were meeting pretty regularly.

18      Q.    Do you recall the defendants or the co-defendants

19      discussing with the informant that they had done some

11:31:02 20     internet searches and had found items like gas masks and

21      items like that for prices less than your undercover

22      officers had quoted them?

23      A.    Yes.

24      Q.    Do you recall that?

11:31:25 25     A.    I do.

1    Q.    And the informant dissuaded them from buying them over

2    the internet, didn't he?

3                    MR. BROWN:  Objection.

4    A.    If I -- if I recall, the conversation was geared

11:31:43  5    around the pros and cons of buying it online as opposed to

6    not buying it online.

7    Q.    And the informant brought up the idea of what about

8    the C-4?

9    A.    I don't believe at that point they did, but I'd have

11:31:58 10    to check the record.

11                    MR. VEGH:  Your Honor, I have that

12    conversation.  I would like to play it for the Court, at

13    least a portion of it.  It's relevant as to the dangerous

14    element.

11:32:09 15                    MR. BROWN:  Your Honor, the government would

16    request the entire conversation be played for the Rule of

17    Completeness to be satisfied.

18                    THE COURT:  Well, this isn't a trial.

19                    This is a question of whether I should detain

11:32:18 20    your client.

21                    How will the tape persuade me that your client

22    should not be detained?

23                    MR. VEGH:  Well, Your Honor, if -- I've

24    listened to it and I would proffer to the Court that if the

11:32:32 25    Court were to listen to this, there was a meeting.  My

1    client and some of the other co-defendants discuss with the

2    informant the idea they can buy this defensive type

3    equipment over the internet for a price less than the

4    undercover FBI agents were quoting them through the

5    informant.

6            And the informant then essentially suggested

7    to them they should buy the C-4, "What about the C-4, we

8    need to buy the C-4, "and persuaded them to go that route.

9            MR. BROWN:  Your Honor, again the government

10   would object to this.  This is part of a negotiation ongoing

11   to commit a plan.  This is not about the ultimate

12   dangerousness.

13           This is -- if the Court were to listen to the

14   entire conversation, the entire conversations and the

15   conversations preceding and the conversations following --

16           THE COURT:  It sounds to me like what's being

17   suggested here is that in some fashion the government agent

18   entrapped this defendant to come up with the idea to blow up

19   this bridge.  Seems to me that's where we're headed.

20           MR. BROWN:  Your Honor, then if entrapment is

21   being raised --

22           MR. VEGH:  I'm not raising entrapment, Judge.

23           THE COURT:  Wait.  If you're not raising

24   entrapment, then I have no idea what it's for in this

25   particular hearing which is limited to is there sufficient

1    evidence to support the suggestion that the Court should

2    order these defendants detained.

3                     Now, what I've heard is that collectively they

4    arrive at the bridge and have implanted materials that they

11:34:14  5    believe will blow up the bridge or at least do it damage.

6                     Now, that's what I've gleaned from what's been

7    presented to me, and that seems to me to be sufficient to

8    justify an order of detention.

9                     Now, if you've got something to dissuade me

11:34:30 10    from that, that's what I'm prepared to listen to, which

11    might be your clients themselves, but I don't know where

12    this questioning is going to help me with that question.

13                     MR. VEGH:  Your Honor, then I will withdraw

14    the question.

11:34:41 15                     THE COURT:  Thank you.

16                     MR. VEGH:  Thank you.

17                     MR. PYLE:  Your Honor -- could you please turn

18    that off?

19                     MR. BROWN:  Sure.

11:35:02 20                     MR. PYLE:  It's distracting to me and may be

21    distracting to others.

22                     THE COURT:  And your client again is

23    Mr. Baxter?

24                     MR. PYLE:  Brandon Baxter, Your Honor.

11:35:19 25                     THE COURT:  Baxter, thank you.

1        MR. PYLE:  Could you turn the sound off, too?

2        MR. BROWN:  I've shut it off.  It's the fan.

3   I can't work internal --

4        MR. PYLE:  Your Honor, I try to be a bottom

11:35:30 5   line guy, and I think the Rules provide at these bond

6   hearings for submissions by way of proffer, so if the Court

7   will permit me to do that, I'll proffer to you in summary

8   manner.

9        THE COURT:  You may proceed.

11:35:42 10        MR. PYLE:  And the government can correct.

11        Your Honor, first of all, the evidence would

12   show -- and I don't think the government has a dispute of

13   this fact -- that Brandon Baxter, during virtually all the

14   times material here, was 19 years old.  He turned 20 on

11:35:56 15   April 27th.

16        Further, that he's never had a driver's

17   license.  He doesn't know how to drive.  He's lived in

18   Cuyahoga County all his life.  He's never had a passport.

19   The risk of flight here is minimal.

11:36:08 20        Regarding dangerousness, Your Honor, I think

21   what Mr. Vegh was intending to demonstrate through question

22   and answer is this:  And this relates particularly to my

23   client.  Your Honor, this group, this Occupy Cleveland

24   group, these were activists, these were young people, these

11:36:31 25   were idealistic people.

1            What happened, what was going on here in

2     February and April was that they wanted to go, a group of

3     them, to Chicago for this G-8 meeting, this kind of protest

4     of economics and NATO and so on and so forth.  And that

11:36:50  5     event in Chicago, that was kind of a combination of a Boy

6     Scout jamboree and a Nascar festival.

7            MR. BROWN:  Your Honor, I think this is

8     heading right towards the area of entrapment.

9            THE COURT:  Let him proceed, please.

11:37:03 10            Go ahead.

11            MR. PYLE:  Your Honor, the focus in these

12     conversations is "Chicago, Chicago, we're going to Chicago.

13     These things are going to happen."

14            And the focus is events in Cleveland and we're

11:37:13 15     going to have a general strike.  Grandiose sounding,

16     admittedly, but they were thinking that, thinking that,

17     thinking that.  And then along comes the person who they

18     identify as the informant.  I'm going to say he's a

19     provocateur.  But he enters the picture in these

11:37:31 20     discussions, and they are discussions about "While in

21     Chicago we're going to need these defensive things like

22     vests and gas masks because there may be police action," and

23     I guess there's a precedent for that in Chicago.

24            MR. BROWN:  Your Honor, this is not a correct

11:37:44 25     chronology, and it's also getting towards again an

1    entrapment.  He's saying --

2              THE COURT:  Well, I've listened for a

3    considerable period of time to your testimony.  I'm going to

4    listen to the proffer.

11:37:54  5              The fact I'm listening to it doesn't mean that

6    I'm finding there's a basis for -- to negate an order of

7    detention.  I'm giving counsel the opportunity to say what

8    he wants to say.

9              MR. PYLE:  And, Judge, please understand --

11:38:07 10              THE COURT:  I hope you can do it in the next

11    ten minutes.

12              MR. PYLE:  Well, I'm sure going to try.

13              I'm addressing the --

14              THE COURT:  Well, a proffer is a proffer.

11:38:16 15              MR. PYLE:  I'm addressing the element of

16    dangerousness, Your Honor.

17              So we get to this point where there's the

18    discussions back and forth about equipment, defensive

19    equipment for going to Chicago.  And the provocateur says,

11:38:30 20    "Well, I know a guy who can get us this stuff," and the guy

21    of course is an undercover FBI agent, and there's a meeting.

22              And this is important, Judge, I don't mean to

23    flood you with dates, but on March 28th the government's

24    agent, informant, provocateur, sets up a meeting to look at

11:38:48 25    equipment and, quote, order equipment at a place that's, I

1    guess, owned or rented by the provocateur.  And they go

2    there, the defendants or most of them, and they look at gas

3    masks and vests and so on, so forth.

4                And they say they want this because it will be

11:39:07  5    needed in Chicago and so forth.  There's a suggestion by the

6    provocateur about, "Hey, how about some C-4?  How about some

7    heavy stuff?"  They don't take the bait.  They don't take

8    the bait at all.  They leave that meeting with just buying

9    this defensive equipment.

11:39:23  10                Next very important point, Judge, is that in

11    two days the FBI undercover, arms dealer person calls back

12    Mr. Wright and says, "Hey, I can get you those Israeli gas

13    masks, and, and how about the C-4?"

14                Again Mr. Wright doesn't bite on that because

11:39:44  15    they are not thinking about blowing anything up because they

16    just want to go to Chicago for all that stuff there.

17                Next crucial thing, and finally the one I'm

18    going to leave you with, Judge, is that on March 31st the

19    provocateur is driving Mr. Wright around and the provocateur

11:40:08  20    drives everybody around because none of the defendants

21    drive, they don't drive, he's got to drive them everywhere.

22    Beginning of that conversation, and we can play it if you

23    want to, Judge, the provocateur says, "Hey, I've been

24    thinking, how about that C-4, how about that C-4?"

11:40:26  25                And Doug says, "You know, we don't have the

1   money to buy the other stuff let alone C-4."

2            And the provocateur says "I think we should

3   get it."

4            And Doug kind of blows him off, and the

11:40:43 5   provocateur says, "Well, you know, we might need it in the

6   future for something."

7            No target in mind.  No bridge, no nothing.

8   And that's the way that conversation is left.  And in the

9   subsequent days in April you've got the provocateur saying,

11:41:00 10   "Hey, you know, we're in line for that stuff" or "We've

11   committed to buy that stuff and we ought to start thinking

12   about something, and what about the Detroit Superior Bridge"

13   and all kind of crazy, fanatical talk all initiated by the

14   provocateur.  And of course this leads up to the herd

11:41:17 15   mentality that leads up to what you see on the screen, I get

16   that.

17            But in terms of analyzing the government's

18   evidence of dangerousness at this time for the purpose of

19   bond, Your Honor, I submit to you that these guys couldn't,

11:41:34 20   forgive me, they couldn't blow their noses let alone blow up

21   a bridge, were it not for what this provocateur did, what he

22   supplied to them, what he suggested to them, what he

23   encouraged them to do.

24            He, my client, is a post-adolescent young man.

11:41:54 25   Had some family history.  Had to go to Parmadale because of

1    that, yeah, I get all that.

2                But in terms of him being a danger, as long as

3    there are no provocateurs to get together with him while

4    he's out on bond, he should be on bond, he needs to be on

11:42:10  5    bond.  He's got to prepare for this case with me, and the

6    way things are set up now that's not going to happen.  I'll

7    leave that for another moment, Your Honor, but that's my

8    proffer.

9                Thank you.

11:42:19 10                THE COURT:  Thank you.

11                MR. HART:  Andy Hart for Josh Stafford.  Your

12    Honor, would the Court prefer I cross-examine the witness?

13    I didn't know if the government is done presenting its case.

14    Or would the Court prefer --

11:42:39 15                THE COURT:  You can do whatever you want to

16    do.

17                MR. HART:  Wonderful.

18          CROSS-EXAMINATION OF RYAN TAYLOR

19    BY MR. HART:

11:42:44 20    Q.    Agent Taylor, you described a series of events where

21    the informant first identified Mr. Wright, identified

22    additional members of the group, had discussions about smoke

23    bombs, had discussions about the Anarchist Cookbook, C-4 and

24    you described this evolution of events, correct?

11:43:00 25    A.    Yes.

1    Q.    Okay.  And this sequence of events began in October,

2    correct?

3    A.    Yes.

4    Q.    Okay.  And the initial conversations were from October

11:43:12 5    to February with Mr. Wright?

6    A.    Yes.

7    Q.    And then from February moving through April, other

8    members, Mr. Baxter, Mr. Stevens, Mr. Hayne, were also made

9    parts of different conversations?

11:43:26 10   A.    Yes.

11   Q.    Okay.  What was the first conversation in which Joshua

12   Stafford was actually observed as participating in with this

13   group of gentlemen?

14   A.    Observed by myself or the source?

11:43:38 15   Q.    By anyone.

16   A.    The first that Mr. Stafford's name came up was I

17   believe on the 28th which is where --

18                    THE COURT:  28th of what?

19                    THE WITNESS:  I'm sorry, Your Honor, 28th of

11:43:50 20   April, so two days before the actual event.

21                    THE COURT:  He's a Johnny-come-lately.

22                    THE WITNESS:  Yes, Your Honor.

23   BY MR. HART:

24   Q.    So in what context was Josh's name first known up to

11:44:02 25   April 28th?

1    A.    Mr. Wright had told the source that they'd like to

2    bring Joshua in and that they had told him what they were

3    planning on doing.

4    Q.    Who is "they"?

11:44:10  5    A.    Mr. Wright.

6    Q.    Mr. Wright had told Mr. Stafford what?

7    A.    Had told the informant he, Mr. Wright had told the

8    informant that Mr. -- that he had briefed Mr. Stafford on

9    their plan and would like to bring him in.

11:44:24 10    Q.    Okay.  Throughout different parts of different

11    conversations involving Mr. Hayne and Mr. Stevens, there

12    were some questions brought up by the informant as to

13    whether they, Mr. Stevens and Mr. Hayne, were fully aware of

14    all the details, correct?

11:44:37 15    A.    Yes.

16    Q.    Okay.  So when the confidential informant

17    tells -- when Wright tells the confidential informant that

18    he's talked to Stafford about it, what exactly does Wright

19    tell the confidential informant that he has advised Stafford

11:44:54 20    of; what details?

21    A.    He told him he advised him of using the explosives on

22    the bridge, the location of the bridge, and that

23    Mr. Stafford would like in on that.

24    Q.    According to the confidential source, did Wright

11:45:08 25    indicate at that point in time what Stafford's response was?

1   A.     I'd have to go back and check the source reporting,

2   but I believe it was to the effect of that Mr. Stafford

3   wanted to participate.

4   Q.     Okay.  And this conversation between Wright and the

11:45:24  5   confidential source in regards to Stafford, was this a phone

6   conversation; was this in person?

7   A.     This was in person.

8   Q.     Okay.  And was it recorded?

9   A.     I believe that was not recorded.

11:45:34 10   Q.     Okay.  Do you recall what explanation there would be

11   for this conversation not having been recorded?

12   A.     He was not going to meet with Wright that day.  That

13   was a very brief meeting.

14   Q.     Okay.  Did the confidential source have the recording

11:45:50 15   equipment available to him on the 28th?

16   A.     No, he did not.

17   Q.     Okay.  Apart from that interaction that you were made

18   aware of through the confidential source, what other

19   conversations were you aware of that Stafford was actually

11:46:04 20   involved in?

21   A.     The next interaction would be the actual day of

22   whenever they picked him up.

23   Q.     Okay.  So to the best of your understanding, you were

24   not provided with an indication from any source, whether

11:46:15 25   it's a co-defendant, an independent witness, a confidential

1    source, that Stafford had any involvement in any of these

2    events apart from the two events you described?

3    A.    Correct.

4    Q.    Okay.  As this was proceeding through the month of

11:46:30  5    April, were you made aware or in retrospect did you review

6    whether Stafford had been affiliated with this group through

7    Occupy in the time of March and April?

8              MR. BROWN:  Objection.

9    A.    I --

11:46:43  10              MR. BROWN:  The investigation's not of Occupy

11    Cleveland.

12              MR. HART:  I'll rephrase the question.

13              THE COURT:  Please.

14    BY MR. HART:

11:46:51  15    Q.    This is a conspiracy investigation, correct, you were

16    conducting?

17    A.    Yes.

18    Q.    Okay.  And you've offered testimony that Joshua

19    Stafford was part of this conspiracy, correct?

11:47:00  20    A.    Yes.

21    Q.    Okay.  Do you have any indication, testimony, or

22    evidence of any kind, other than what you've just described,

23    to indicate a relation between Joshua Stafford and any of

24    these other gentlemen here?

11:47:12  25    A.    Other than -- other than the day of placing the

1    explosives?

2    Q.    Correct.  Other than the video that we watched and the

3    conversation that the confidential informant relayed to you,

4    other than that, do you have any evidence linking Joshua

5    Stafford as being part of within a group or agreement with

6    these gentlemen?

7    A.    Yes.

8    Q.    And what's that?

9    A.    Just that he was -- he knew these individuals and

10   these individuals knew of him.

11   Q.    Okay.  And that information came from where?

12   A.    Through various interviews.

13   Q.    With?

14   A.    Through various interviews that were conducted on the

15   day of, between the other members.

16   Q.    Day of what?

17   A.    The day after the arrest.

18   Q.    Okay.  And that that information or that post-arrest

19   interview lead you to the conclusion that Joshua Stafford

20   knows these gentlemen, correct?

21   A.    Yes.

22   Q.    Okay.  Did it indicate in what capacity he knew them?

23         Was it dating back months, days, weeks, years?

24   A.    The indications were that they were -- they at least

25   knew of one another.  I can't testify to the extent of

1   their -- whether they were friends, whether they had known

2   each other for years, or if it was just recently in the last

3   couple months.

4   Q.    Okay.  So the information that you obtained after

5   their arrest did not give you any context of whether they

6   had known each other since April 28th or before April 28th?

7   A.    Correct.

8   Q.    Okay.

9            MR. HART:  Thank you.  I have no further

10   questions.

11           THE COURT:  Thank you.

12           You may proceed.

13           MS. SCHWARTZ:  Your Honor, I'd like to proceed

14   by way of proffer, also.

15           THE COURT:  Very well.  And your client is?

16           MS. SCHWARTZ:  My client is Connor Stevens --

17           THE COURT:  Thank you.

18           MS. SCHWARTZ:  -- who is 20 years old, has no

19   prior history of violence or abuse.

20           In fact, his most serious, most serious charge

21   for which he was ever convicted prior to the -- well, for

22   which he was ever convicted was underage alcohol, a first

23   degree misdemeanor.

24           Going back to the theme that Mr. Pyle was

25   discussing, I think and as it relates to dangerousness,

1     without the provocateur, there's no way this plan ever

2     happens.

3                    On numerous occasions the provocateur was

4     pushing the group to make a decision.  There were no plans.

11:50:02  5     There was nothing in place.

6                    On April 7th, he wants to know "What's the

7     thought, what's the plan?  We're not that far out from this

8     stuff."

9                    He says "What are we going to do with the

11:50:15 10     stuff we got?  We're on the hook for it."  Again he says

11     "We're on the hook for it.  I'm just trying to figure out

12     what do you guys want to do?"   There is no plan in place.

13     They've come up with nothing.

14                    On April 10th, again, the provocateur says

11:50:32 15     "Well, we're ten days, we're ten days away from -- if you

16     guys are going to do something, if we're going to do

17     something, let's put together the plan."  He's encouraging

18     them to make a specific plan where one does not exist.

19                    Also on the 10th he says, "Every time we meet,

11:50:49 20     we leave saying we're going to do some research and then we

21     get back together and we're back to square one."

22                    And he's pushing and he's encouraging them,

23     "Let's make a specific plan."  Left to their own devices,

24     there is no plan.  And that's why he's constantly after them

11:51:07 25     to continue and to do something.

1          On April 13th, he wants to know "Did you

2     follow-up on anything?  What are we doing?  Because as usual

3     you got me on a 'stupid ass' holding pattern."

4          And so he's just -- they're not doing

11:51:23  5     anything.  Time is going on, nothing's happening, and he

6     wants something to happen.

7          So I would submit to the Court that

8     Mr. Stevens is not a danger.  Without the encouragement of

9     the provocateur, none of this would have happened.

11:51:38 10     There are plans in place for him.  He has a

11     place to go.  Electronic monitoring could be used to ensure

12     that he is not a harm to the community.

13          Thank you.

14          THE COURT:  Thank you.

11:51:50 15     MR. O'SHEA:  Judge, I did not file a motion

16     for bond, but I did file this motion to -- with respect to

17     their current detention location at CCA.

18          I have a question of the agent about that, if

19     you can believe it, Judge, that I'd like him to answer.

11:52:05 20     THE COURT:  Go ahead.

21          MR. O'SHEA:  All right.

22          CROSS-EXAMINATION OF RYAN TAYLOR

23     BY MR. O'SHEA:

24     Q.    Good morning, sir.

11:52:09 25     A.    Good morning.

1    Q.    As I understand it, there are approximately 40 to 50

2    hours' worth of tapes, audio and video, that you've already,

3    through your investigation, been able to supply to the U.S.

4    Attorney's Office which has been turned over to us, is that

11:52:21  5    about right?

6    A.    Yes.

7    Q.    Okay.  And in addition to that, I think it was last

8    week we got another five to seven hours' worth of

9    documentation, audio and video, as well, does that sound

11:52:32  10    right?

11    A.    Yes.

12    Q.    Okay.  Now, if during the course of your

13    investigation, Agent Taylor, some company that you were

14    utilizing said to you "We can only work with you one hour a

11:52:44  15    day and it's between 8:00 and 9:00 p.m. at night or, say,

16    10:00 a.m. and 11:00 a.m.," that would essentially make your

17    investigation functionally impossible, am I right about

18    that?

19    A.    Yes.

11:52:57  20    Q.    Okay.  And you'll agree with me that each of these

21    audio and video recordings have proprietary software?

22              And by that I mean it's software that the FBI

23    or a federal agency has utilized in order to record these

24    conversations, and that you need this very -- this very

11:53:20  25    software in order to listen to those audio and video

1    recordings, am I right about that?

2    A.    The device -- yeah, the recording has a certain -- I

3    don't know what you want to call it but, yeah, you

4    basically -- once it's placed on the CD, though, you just

11:53:34  5    pop the CD into any computer and it can play it.

6    Q.    All right.  And you have to -- you can't burn those

7    files onto a hard drive and then play them off the hard

8    drive; you have to play them off the CD every time, correct?

9    A.    I believe -- I don't know the exact mix, but I believe

11:53:49 10    half of them are in a wave format that could be burned over.

11    Q.    Okay.  And the control of that and the software

12    vendors, do you even know the names of them?

13    A.    I do not.

14    Q.    But there's a number of them, am I right about that,

11:54:01 15    in the context of this case?

16    A.    I would assume so.

17    Q.    Including a different software vendor for the very

18    film we saw this morning of the night vision, am I right

19    about that?

11:54:10 20    A.    I would assume so.

21    Q.    Okay.  The affidavit that you provided to the criminal

22    justice system in this case as well as your grand jury

23    testimony, you stand behind the accuracy of that, I assume?

24    A.    Yes.

11:54:24 25    Q.    Okay.  And you'll agree with me that as it relates to

1    Mr. Hayne, that Mr. Hayne comes in around, if you can

2    recall -- I know you probably don't have the affidavit with

3    you -- around Paragraph 98 of about 120 paragraphs, right?

4    A.    I would have to refer to it, but if that's what you

11:54:42 5    say it's at, then yes.

6    Q.    Well, earlier I heard the Judge refer to this phrase

7    Johnny-come-lately.

8         Would you agree that Mr. Hayne was a

9    Johnny-come-really-really-really-lately, using that same

11:54:55 10    analogy and using the paragraphs in the chronology that you

11    set forth in the affidavit?

12    A.    He was mentioned early on, but his actual presence

13    with these individuals and involvement came the day before

14    and the day of.

11:55:10 15    Q.    Did you testify a little bit earlier this morning

16    about Mr. Hayne wanting to walk down with the group when it

17    came to that night vision stuff?

18         MR. BROWN:  Your Honor, may I inquire?

19    Because we shifted from the subject of the motion now to a

11:55:22 20    whole other field.

21         THE COURT:  We're past it.  I'm not sure

22    what -- go ahead, let him ask the question.

23         MR. BROWN:  Okay.

24         MR. O'SHEA:  I just want to ask this one

11:55:30 25    question because, quite frankly, it surprised me a little

1    bit this morning, Your Honor.

2    BY MR. O'SHEA:

3    Q.    You testified this morning that Mr. Hayne discussed

4    that he wanted to walk down with these individuals and place

11:55:40  5    the devices on the bridge.

6              Do you remember saying that this morning?  Did

7    I hear that right?

8    A.    Yeah, I mean, all five individuals along with the CHS

9    walked down to the pillars, yes.

11:55:48  10    Q.    Okay.  But you don't have any of this business about

11    Mr. Hayne wanting to walk down either in your affidavit or

12    in your grand jury testimony, am I right about that?

13    A.    Those were the events the day of the arrests so the

14    affidavit was actually submitted before they had committed

11:56:03  15    the offense.

16    Q.    Okay.  But nothing about that in your grand jury

17    testimony that you can recall about Mr. Hayne wanting to

18    walk down with the individuals and plant devices?

19    A.    I'd have to go back and check it, but I believe I just

11:56:14  20    testified to the individuals behind the pillar placing the

21    devices.

22    Q.    Okay.  That would be on the recording then, right,

23    Mr. Hayne saying that term, "I want to walk down"?

24    A.    Yes, there's to that effect, yes.

11:56:24  25    Q.    Okay.  Now, have you given us this morning, as it

1    relates to Mr. Hayne at least, all evidence that you know of

2    about his serious risk of flight, obstruction of justice,

3    and safety to the community, to the best of your

4    understanding?

11:56:37  5    A.    I believe so, yes.

6              MR. O'SHEA:  All right.  A moment, please,

7    Judge.

8              Nothing further.  Thanks, Judge.

9              THE COURT:  We're going to take the noon

11:56:51 10    recess.

11              I'm informed that the Marshal has the basis to

12    feed the defendants while we're in recess, so we'll

13    hopefully resume at 1:00 o'clock.

14              Court will be in recess.

15              (Luncheon recess taken).

16                    - - - - -

17

18

19

20

21

22

23

24

25

|   |   |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | THE COURT:  Please be seated. |
| 3 | Well, have I heard from all the defendants? |
| 4 | Is there anything else defendants want to say? |
| 13:06:47 5 | Do you want to make your argument? |
| 6 | MR. BROWN:  Yes.  Thank you, Your Honor. |
| 7 | I'll try to be as brief as possible.  I know |
| 8 | we have taken up all of the morning so far. |
| 9 | I just wanted to briefly summarize.  There was |
| 13:07:02 10 | a question with Mr. Pyle's chronology and time line with |
| 11 | some of these recordings, and I just wanted to run down the |
| 12 | chronology as they had been recorded, statements on the |
| 13 | respective recordings. |
| 14 | 1-D-4 which was March 22nd of 2012, at |
| 13:07:28 15 | 10:45:29, defendant Wright says "This is a perfect time to |
| 16 | do something separate from the Occupy movement." |
| 17 | At 46:50 he says he wants to make explosives. |
| 18 | That's the first time that explosives were mentioned, and |
| 19 | that was Doug Wright mentioning them, not the source. |
| 13:07:45 20 | THE COURT:  Now, where is that information? |
| 21 | MR. BROWN:  1-D-4 at 10:46:50. |
| 22 | THE COURT:  And 1-D-4 I haven't heard? |
| 23 | MR. BROWN:  No, Your Honor.  These are some of |
| 24 | the recordings mentioned by Mr. Pyle in passing, but I |
| 13:07:59 25 | wanted to correct the dates and the chronology. |

1              At 10:48:00 Doug Wright then talks about how

2     he wants to use household materials to evade detection.

3              At 10:52:50 the CHS says "What's the target?"

4              Doug Wright says "Baxter, you and I will

5     schedule it out."

6              He then goes on to talk about at 10:54:55 that

7     Chicago will be a civil war; that -- and pardon my

8     language -- shit will hit the fan; that he wants tear gas to

9     attack police.

10              So this is more than a Boy Scout jamboree that

11     they are planning.

12              At 11:11:07 he wants batons to "F up" cops,

13     and he doesn't hold back on what the F means, Your Honor.

14              And at 11:17:50 he wants -- they discuss the

15     cost of making explosives.

16              THE COURT:  He's having this discussion with

17     who?

18              MR. BROWN:  With the source.

19              And they discuss the costs.

20              On March 28th, 2012 at 19:13:00 Doug Wright

21     and Baxter say they want to beat the F out of cops.  Again

22     there's an expletive in there.

23              At 19:20 Doug Wright again talks about the

24     civil war that's going to start in Chicago during the G-8

25     and NATO summits.

 1          At 27:58 -- and this is again on March 28th,

 2     2012 -- Brandon Baxter is the first one who mentions blowing

 3     up a bridge.  He says, as they are driving over the Valley

 4     View bridge, "How much explosives would it take to blow up

13:09:28 5     this bridge?"

 6               THE COURT:  He's still talking to the

 7     informant?

 8               MR. BROWN:  Yes, but he brings up this topic.

 9     The informant is not saying, "Hey, what about this bridge?"

13:09:35 10    He brings this up.

 11              At 19:34:40 he talks that the Detroit Memorial

 12    Bridge is actually in the business district.

 13              And then at 19:39:45 Baxter says "I'm in for

 14    the bridge."

13:09:52 15              1-D-10 is April 1st, 2012.  At 19:52 Brandon

 16    Baxter says he's in for buying C-4.  In session four on that

 17    1-D-10 at, my notes say 35:40, Doug says if Brandon Baxter

 18    wants the Detroit Memorial Bridge.

 19              1-D-11 Brandon Baxter talks about Klan

13:10:18 20    rallies.  They talk about -- Brandon Baxter says targeting a

 21    bridge wouldn't interfere with one percent but blowing up a

 22    train might.  They talk about driving armored trucks into

 23    the Fed.

 24              This is not the lack of intent or desire.

13:10:34 25    They are targeting their locations.  They are talking about

1    what they want to do.  There's no cajoling or pressure by

2    the source.  In fact, in fact, he's being bombarded with so

3    many different ideas he's saying "What are we going to do?"

4              They talk about the Justice Center.  They talk

13:10:50  5    about the Fusion Center in downtown Cleveland.

6              And 1-D-12, April 10th at 15:45:30 Brandon

7    Baxter says if the plan is feasible he's willing to do it.

8              15:48:48, Doug Wright says "The cargo ship,

9    we're all in agreement."

13:11:07 10    Brandon Baxter says he's in no opposition.

11             And then at 00:40 of that he says -- Brandon

12   Baxter says -- they are now talking about the bridge plan --

13   he could create a diversion rally downtown to get the police

14   downtown while they are blowing up the bridge or the ship at

13:11:29 15   that point.

16             Your Honor, to sum up, because we've heard a

17   lot of tapes, we've heard a lot of arguments, it does come

18   down, as you rightfully identify it, to the risk of flight

19   and dangerousness.

13:11:40 20             Relevant to risk of flight is the Guideline

21   calculations.  And, you know, as they heard at arraignment,

22   the period of incarceration statutorily is any term of years

23   up to life.

24             However, if we look at the Guidelines, for

13:11:57 25   2332(a), which was the first charge they are charged with,

1   the relevant Guideline is 2M6.1.  The base offense level is

2   42 because the offense is committed with the intent to

3   injure citizens of the United States.

4              The government would argue that their

13:12:16 5   discussions about Guantanamo Bay, Connor Stevens saying that

6   this is the greatest act of terrorism, the biggest act of

7   terrorism in Cleveland since the 1960s, pervasive

8   discussions about the one percent, that would apply.  42

9   even if we applied a criminal history one, is 360 to life,

13:12:33 10   360 months to life.

11              If they were convicted with the 844(i), you'd

12   fall under base offense level 2K1.4 which is base offense

13   level 20.  However, there's the terrorism enhancement which

14   is a 30, which makes it a 32.  Everybody under the terrorism

13:12:55 15   enhancement would have a criminal history six which would

16   start at 210 to 262 months.

17              However, it should also be pointed out that if

18   the weapons of mass destruction charge was sustained on

19   conviction and the terrorism enhancement applied, that would

13:13:13 20   be a life sentence.  There would be no range.

21              So, Your Honor, we are dealing with extremely

22   significant periods of time of incarceration.  And that goes

23   directly to risk of flight for all of these individuals.

24              They all have, I believe, to some degree a

13:13:31 25   history of criminal convictions.  As Ms. Schwartz, I think,

1    correctly points out, Mr. Stevens only has a misdemeanor.

2    However, he does have outstanding warrants on that.  In her

3    motion she points out that they are for monetary fines.

4    However, a warrant is a warrant, and there are two

13:13:50  5    outstanding there.

6                Mr. Wright has crimes of violence in his past

7    as does Mr. Hayne.  And they all have notable criminal

8    history.

9                In their interviews they all stated that they

13:14:05  10    did not have stable homes so they are transient, Your Honor.

11    We would say that aids to risk of flight.

12                None of them are employed.  Like I said,

13    they're all facing at least, you know, 30 to life and with

14    that 42 without any enhancements that's a 30 to life, 30

13:14:21  15    years to life.

16                The government would argue that Oriana House

17    is no way, shape, or means appropriate for anybody.  Oriana

18    House is not secure.  I've talked to Probation or Pretrial

19    earlier, your predecessor in your chair.  She said it's not

13:14:34  20    secure at all.

21                We would -- the government would argue that

22    electronic monitoring is not feasible.  These are cases

23    where electronic monitoring is not an instant reaction if

24    they leave the house, and again given the amount of time

13:14:49  25    they're facing, I think there would be motivation to try and

1    get out of that.

2                Specifically, Doug Wright, the defendant --

3    the government would argue living with his girlfriend is not

4    appropriate, also.  We would argue that in his statement on

13:15:06   5    the night of arrest he said that they had broken up, so

6    again we would think that on top of everything else that's

7    not an appropriate living situation.

8                Brandon Baxter on the recordings on 1-D-33

9    talks about abuse that he had suffered at home, so we don't

13:15:22  10    think introducing him into that home situation would be

11    appropriate in any way, shape or form.

12                Shame with Connor Stevens, we just don't think

13    there's any supervision that would be appropriate.

14                And of course with Mr. Stafford, we do have

13:15:36  15    that outstanding motion for evaluation.

16                We're joining in Pretrial's assessment that

17    there are no conditions that would secure the return or the

18    likely return of the defendants.

19                And honestly, Your Honor, for danger to the

13:15:53  20    community, these five defendants planted bombs, what they

21    thought were bombs, at the base of a bridge.  They didn't

22    care about the traffic going overhead.  They didn't care

23    about people in the park underneath.

24                They detonated the bombs.

13:16:08  25                THE COURT:  The argument has been advanced

1    that who they call the provocateur, who you call the

2    informant and provided information to you, that the

3    informant put the idea of the explosive, the type of

4    explosive in the mind of the defendants; that they had no

13:16:30  5    idea what that was until the government agent, so to speak,

6    is telling them what they need to blow up the bridge.

7              Do you have any reaction to that?

8              MR. BROWN:  Your Honor, the recordings are

9    very clear.  Doug Wright was the first one to mention making

13:16:44  10    explosives.  Douglas Wright was the first one to talk about

11    C-4.  Douglas Wright talked about bringing Brandon Baxter,

12    Connor Stevens and Anthony Hayne into the group.  Brandon

13    Baxter unsolicited talked about blowing up a bridge and what

14    it would take to blow up a bridge.

13:16:59  15              THE COURT:  Can you -- let me interrupt.

16              Can you provide for me a transcription of what

17    he said?  I don't need to listen to it now.  Can somebody

18    just type it up for me?

19              MR. BROWN:  Your Honor, it will take a little

13:17:12  20    bit of time.

21              THE COURT:  You don't have to do it today, but

22    I would like to have it.

23              MR. BROWN:  And we are providing or we're

24    creating the transcripts as we're going along, Your Honor.

13:17:19  25              THE COURT:  Very well.

1              MR. BROWN:  As the --

2              THE COURT:  I'd like to have that transcript.

3              MR. BROWN:  Absolutely, Your Honor.

4              THE COURT:  All right.  And I'm probably going

13:17:25  5    to delay any ruling until I have the opportunity to see it.

6              Obviously the defendants are being held

7    without bond.  I'm not going to suddenly release them on

8    bond, but I haven't yet decided what I want to do, and I

9    want to write on it fairly extensively and against the

13:17:43 10    background of the fact that one or more defendants has the

11    right to challenge the decision on appeal.

12              So I'm in no hurry to get that out, but I

13    would like to have the transcript if you could get that

14    prepared for me.

13:17:57 15              MR. BROWN:  We will work on it.

16              THE COURT:  Yeah.

17              And then I interrupted you.

18              Is there anything else you want to say?  I'm

19    going to give them an opportunity to respond.

13:18:05 20              MR. BROWN:  Your Honor, Douglas Wright brought

21    everybody into the group.  The source did not.  Douglas

22    Wright was the one who mentioned and started talking about

23    explosives.  The source did not.

24              Brandon Baxter is the one who started talking

13:18:16 25    about the bridges.  The source did not.

1      Douglas Wright was the one who planned the

2      idea for the Route 82 bridge.  The source did not.

3      Connor Stevens, Brandon Baxter, Douglas Wright

4      all came up with multiple ideas, some which were almost

13:18:29  5      carried out to fruition.  The source did not participate in

6      that in one bit.  He was, perhaps, a listening post, but he

7      did not forward or advance ideas.

8      And, Your Honor, you know, honestly, Mr. Pyle

9      mentions entrapment in his detention hearing motion.  We're

13:18:50 10      getting into a very dangerous territory with entrapment

11      which is a jury issue.  The Sixth Circuit --

12      THE COURT:  Well, I understand it's a jury

13      issue.  As a matter of fact I'm getting ready to sit at the

14      Sixth Circuit, and I've got an entrapment issue I'm dealing

13:19:08 15      with with the Sixth Circuit so I'm getting up to speed on

16      entrapment.  It's a fairly narrow defense.

17      MR. BROWN:  It's a very high standard, as the

18      Court is aware, in *U.S. versus Silva*, and they've adopted

19      the five standards in *United States versus Nelson,* which

13:19:23 20      even if you were to entertain the entrapment here, they

21      failed because the defendants introduced these ideas and

22      advanced these ideas.  There's just no entrapment, but the

23      government hesitates to get -- to go too far down that road

24      because of a lot of pretrial implications that arise with

13:19:41 25      raising entrapment for the defendants.

1    But in looking at the facts as a whole and the

2    33 recordings --

3    THE COURT:  Let me interrupt also to say that

4    as I visualize the trial and the issue of entrapment, a

5    defendant or a couple that may have a better entrapment than

6    other defendants maybe.  If the case is going to be tried,

7    each defendant has to be considered by himself.  There's no

8    such thing as joint responsibility.

9    MR. BROWN:  And, Your Honor, there are

10    multiple theories of entrapment for each case, and that's

11    the problem, too.  You have different crimes charged for all

12    defendants, and entrapment for all defendants, which the

13    entrapment for one charge certainly does not fit the other

14    charges.

15    So it's, like I said, it's fraught with peril

16    for the defense to cavalierly bring up entrapment at this

17    point.

18    THE COURT:  Well, entrapment to some extent is

19    confession and avoidance.  "I did it, but you talked me into

20    it."  That's essentially the entrapment defense.  "I did it,

21    but you persuaded me to do it."

22    MR. BROWN:  And if we're looking at

23    dangerousness to the community, Your Honor, I think the

24    video speaks for itself that they were willing participants

25    who placed an armed bomb at the base of a bridge and went to

1    dinner to blow up the bridge.

2                And it was a situation where they wanted to

3    blow up the bridge and laughing about it on the way up and

4    on the way down.  They wanted to do it and they thought they

13:21:07  5    had done it.

6                I don't know, if that's not dangerousness to

7    the community, Your Honor, I don't know what would be.

8                Thank you very much.

9                THE COURT:  Thank you.

13:21:12 10                Now, I'll give counsel the opportunity to

11    respond, if you wish.

12                MR. VEGH:  Briefly, Judge.

13                THE COURT:  Sure.

14                MR. VEGH:  I did not raise the issue of

13:21:23 15    entrapment.

16                THE COURT:  Excuse me?

17                MR. VEGH:  I did not raise the issue of

18    entrapment.  I'm not here to argue that my client was

19    entrapped.

13:21:30 20                THE COURT:  Like I said, I think entrapment is

21    essentially confession and avoidance.

22                MR. VEGH:  Your Honor, what I'm asking this

23    Court to take into consideration is that what the government

24    has chosen to show you is one bit of a continuum, and

13:21:46 25    without -- without the rest of the story, it's -- I would

1    hazard a guess it's a difficult decision to make.

2                    I'm asking the Court to at least listen to

3    1-D-10 which I think goes to the issue of dangerousness; not

4    to the issue of entrapment, because there was no group to

13:22:16  5    begin with.  There was no anything to begin with.  And then

6    this plan evolved over time into something else.  And unless

7    the Court is able to listen to some of this, it's very

8    difficult to put it altogether.

9                    So to the extent that I can do that, I will,

13:22:36 10    Judge.  If you're interested, I don't -- I can find

11    someone --

12                    THE COURT:  Do you have a transcript?

13                    MR. VEGH:  I do not have a transcript, Judge.

14    I have a recording on a disk.

13:22:46 15                    THE COURT:  Well, if you can get somebody to

16    prepare a transcript, I'd be anxious to look at it.

17                    MR. VEGH:  I will do that.

18                    THE COURT:  It's hard for me to listen.

19                    You know, I don't have the best ears in the

13:22:57 20    world.

21                    MR. VEGH:  Welcome to our world, Judge.  None

22    of the recordings are particularly easy to understand.

23                    THE COURT:  Okay.  Well, if you have the

24    opportunity to prepare a transcript and submit it to me,

13:23:07 25    I'll consider it.

1          MR. VEGH:  I will, Judge.  Thank you.

2          THE COURT:  I don't have to rule on this

3     today.

4          MR. VEGH:  I understand that, Judge.

13:23:11  5     Thank you.

6          THE COURT:  Yeah.  Anybody else have anything

7     they want to say?

8          MR. PYLE:  I do, Your Honor.

9          THE COURT:  Yeah, go ahead, John.

13:23:17 10          MR. PYLE:  Your Honor, as Mr. Vegh said, when

11     the Court sits down with the papers and analyzes and writes,

12     the Court is going to have to view the context of these

13     events and these conversations in the continuum in which

14     they occurred.

13:23:50 15          You know, I can throw out tape numbers and

16     line numbers.  For example, Mr. Duncan -- Mr. Brown refers

17     to March 22nd.  And the context of that is that the

18     provocateur is talking to Doug about, "Hey, let's look at

19     this Anarchist Cookbook," and it goes on at the

13:24:12 20     provocateur's suggestion and it reaches the point at 10:48

21     where the provocateur says "Do you want to do it if I" -- I

22     the provocateur -- "get the stuff?"

23          Another example, on 3/28 --

24          THE COURT:  Well, what's the point?  I guess

13:24:40 25     that's --

1          MR. PYLE:  Well, Judge, here's the point and I

2    propose this:  That the government submit a brief with the

3    transcript portions they believe supports their positions,

4    and that we have the opportunity to respond to it in writing

13:24:54  5    with the transcript portions that support our position

6    because, Your Honor, the issue here is whether there is a

7    dangerous issue, whether the evidence supports this

8    dangerousness claim.

9          I'm saying that absent the government

13:25:09 10    provocateur, Brandon Baxter has shown, demonstrated no

11    danger to the community.  And it's the extent of this

12    provocateur's activities which ranges from buying

13    everything, buying the explosives, buying -- gas money,

14    giving these guys monies, proposing to pay for tattoos so

13:25:29 15    they have a group tattoo, all this, all this is his work.

16    It doesn't implicate whatsoever on their dangerousness until

17    they reach this point after months and months and months of

18    talking.

19          So if you would allow for that protocol, it

13:25:44 20    would be much appreciated.

21          THE COURT:  Very well.  You can present

22    anything you want to.

23          I'm not going to make a ruling until I've got

24    everything that's been produced.

13:25:56 25          MR. PYLE:  I understand, but we would like to

1    be responsive to the government's submission.

2                    MR. BROWN:  Your Honor, if Mr. Pyle wants to

3    produce something in writing, I think we should produce it

4    on the same day.  I don't see why we have to take turns and

13:26:10 5    he gets to respond and I don't.

6                    If he wants to submit something, the normal

7    course --

8                    THE COURT:  Let's do it this way.  Let's set a

9    date for the production, and then if somebody feels wounded

13:26:24 10    and wants something else to do, then you have to apply to me

11    for some relief.

12                    So what date can we have all this information

13    put together by?  Today is -- what's the date? -- today's

14    the 29th of May.

13:26:49 15                    MR. BROWN:  Yes, Your Honor, let me just look

16    at my calendar.

17                    THE COURT:  Can you get this information to me

18    by the 8th of June?

19                    MR. BROWN:  Your Honor, that's no problem for

13:27:04 20    the government.

21                    THE COURT:  How about you, John?

22                    MR. PYLE:  It -- Judge, the backdrop to all of

23    this is that the budgeting officer of the Sixth Circuit has

24    not even begun the process of approving our budget, so if we

13:27:20 25    were to send the tapes out for stenographic transcription,

1    we might have to eat that cost, which would be substantial.

2                    MR. BROWN:  Your Honor, I -- you can listen to

3    the tapes and take notes on the tapes and include those

4    notes in the motion.

13:27:35  5                    I mean, that's what the government was going

6    to do.

7                    THE COURT:  Well, I wanted to see a transcript

8    of what's on the tapes is what I wanted to see.  You were

9    both talking about it.

13:27:45 10                    MR. BROWN:  The FBI is working on them, but

11   they have a number of them done so far.

12                    THE COURT:  John, you tell them what you want

13   in your transcript and maybe they can help you out.

14                    MR. PYLE:  Okay.  I'll do that, Judge.

13:27:56 15                    THE COURT:  Okay.  Because it may be by the

16   time we get to trial, those transcripts will become

17   important anyhow so you might as well get it done.

18                    MR. BROWN:  Part of our transcription is

19   quality control.  It's not just send them out to a guy with

13:28:10 20   a pair of headphones and a tape recorder.

21                    THE COURT:  Okay.  Let's try for the 8th of

22   June, and I'll take the matter under advisement.

23                    John, I know you were trying to organize some

24   machinery for the purpose of discovery, and I don't know

13:28:29 25   where we are on that.

1          MR. PYLE:  Your Honor, I will speak to that if

2     the Court wants me to.

3          THE COURT:  Yeah, I want to hear about that.

4          MR. PYLE:  Okay.  After we appeared on the

13:28:43  5     17th for a status conference, it was up to me to contact the

6     appropriate people and get it done.  And I traded a couple,

7     three dozen e-mails back and forth, phone calls back and

8     forth, between the people at CCA, the Marshal's Service, the

9     U.S. Attorney's Office, talking through different

13:29:06 10     combinations of things that would allow our clients the

11     opportunities to listen to these tapes and help us assist

12     them in their defense.

13          And the latest, and I guess the final offer

14     from CCA, is an e-mail under date of May 28th from Mr. Shawn

13:29:27 15     Dougherty which says "inmates will be scheduled daily in

16     one-hour increments to view CDs and visitation.  Inmates can

17     be restrained in front with approval of the Chief of

18     Security.  If more time allows due to inmates not signing up

19     for legal calls, then we can possibly afford them more

13:29:48 20     time."

21          Now, the way I read this in the context of

22     previous e-mails and phone calls is at most individual

23     defendants would have an hour a day to listen to and watch

24     the tapes, and that's it.  And if we're talking about 50

13:30:06 25     hours of tape, that would take them 50 days to listen to

1      everything.

2                        And I know you don't like lawyers bellyaching

3      about discovery, Judge, and I appreciate that, but we are

4      trying to get this done.

13:30:19  5                        THE COURT:  No, I don't consider it

6      bellyaching.  I -- I don't know if we send all the

7      defendants to Milan, whether Milan, Michigan would do a

8      better job of making them available.  At least they would be

9      in a federal prison.

13:30:39 10                        Right now at CCA, I feel like CCA could care

11      less about what I think.  When it comes to cooperating with

12      the Courts, they are a private group, aren't they?

13                        MR. PYLE:  They are a corporation, Judge.  And

14      I'm not trying to beat up on every -- on anybody, but this

13:30:56 15      is where we stand.

16                        THE COURT:  Well, we have a problem and so

17      their interests in accommodating the Court I think is

18      somewhere between zero and one.  They could care less.

19                        So maybe I should move everybody to Milan.  My

13:31:11 20      guess is Milan would accommodate a lot more.

21                        MR. PYLE:  I'll explore that, Your Honor.

22                        MR. HART:  Your Honor, I can speak to that

23      issue right now.  My office, most of my clients are housed

24      in Milan, and Milan does not allow people to have sort of

13:31:26 25      access to computers, CDs and whatnot.

1          In fact, the attorneys are generally

2     prohibited from bringing computers and CDs --

3          THE COURT:  Well, I'm going to ask the

4     government to find a solution.  If you don't find a

13:31:35 5     solution, I'll dismiss the case for want of prosecution.

6          There's got to be a way to give the defendants

7     an opportunity to hear this.

8          MR. BROWN:  Your Honor.

9          THE COURT:  Yeah, but I think it's your

13:31:44 10     problem.

11          MR. BROWN:  Your Honor, the government has

12     taken calls from the defense.  We've called the U.S.

13     Marshals.  We have no control over CCA, Your Honor.

14          THE COURT:  Well, then get ahold of the Bureau

13:31:55 15     of Prisons, see what they'll do for you.  The government

16     is -- we have what we call separation of powers.  I'm the

17     judiciary.  You're the -- part of the executive branch of

18     the government, and I don't have any control over you,

19     except to dismiss the case for want of prosecution.

13:32:11 20          MR. BROWN:  Your Honor, we have provided them

21     with the discovery.  We are working with them to try and

22     find the solution.

23          Your Honor, I'm not sure that's --

24          THE COURT:  Well, are they entitled to listen

13:32:25 25     to the tapes or aren't they?

1          MR. BROWN:  Yes, Your Honor.  And we're not

2     preventing them from doing it.  The government --

3          THE COURT:  One hour a day.

4          MR. BROWN:  Your Honor, that was not my

13:32:33 5     decree.  If it was up to me, I would give them access.

6     There is no problem with me or the U.S. Attorney's Office.

7          THE COURT:  Maybe I should put them out on

8     bond, make it easier.

9          MR. BROWN:  Your Honor, I don't think that

13:32:42 10    would be appropriate.

11         THE COURT:  Well, I don't know.  I'm thinking

12    about it.  I want to move this case to the date, and looks

13    to me like we're in dead center as far as any kind of

14    meaningful discovery.

13:32:53 15         MR. BROWN:  Your Honor, we are -- the

16    government is not obstructing.  This is CCA.

17         THE COURT:  Do you have a transcript of every

18    interception?

19         MR. BROWN:  What do we have right now?

13:33:06 20         THE AGENT:  Probably about halfway.

21         MR. BROWN:  We're about halfway, Your Honor.

22    We'll have full transcription services as of today, Your

23    Honor.

24         THE COURT:  No, when will you be able to be

13:33:20 25    done to give counsel the transcripts?  That's what I'm

1    asking.

2                        Can we get done by the middle of June?

3                        MR. BROWN:  Middle of June is no problem, Your

4    Honor.

13:33:35  5              THE COURT:  Okay.  Let's get that done and

6    then deliver the transcripts of all discussions to counsel.

7    They can review it with their clients.  And then you come

8    back and tell me what more you need, if anything.

9                        But you want to know what's on those

13:33:48 10   discussions and you're going to have to, I guess, rely upon

11   their honesty in the way they prepare the transcripts.  At

12   least you'll have something to go over with your clients.

13                       So let's work toward July -- or June 15th to

14   have the transcripts available for counsel to review with

13:34:07 15   their clients, and then go from there.  Okay?

16                       MR. BROWN:  Okay.

17                       THE COURT:  I appreciate that cooperation.

18                       MR. PYLE:  Judge, if you'll indulge me on one,

19   one related issue.

13:34:18 20              THE COURT:  Sure.

21                       MR. PYLE:  At the May 17th hearing, the Court

22   inquired of the government -- well, of everybody -- if we

23   knew of any reason why there shouldn't be separate trials.

24                       At that time we did not know that our clients

13:34:30 25   made audio/videotape statements.  I guess they all did.  And

1    since then --

2             THE COURT:  Are you saying there's a <u>Bruton</u>

3    problem?

4             MR. PYLE:  Sure looks like it.

13:34:45 5             THE COURT:  Well, you know, I can't address

6    that until I guess I have a motion.

7             I'm not aware of statements that your clients

8    made.  I haven't seen those, so I'm not aware of what they

9    said.

13:35:00 10             Are they incriminating statements?

11             MR. PYLE:  They are.  At least the one, my

12    client's statement tends to incriminate others.

13             But I think under Rule 14, when we do file the

14    motion, that triggers the government's obligation to provide

13:35:20 15    you with their statements.

16             THE COURT:  Of course, we've also -- isn't the

17    first count conspiracy?

18             MR. BROWN:  Yes, Your Honor.

19             THE COURT:  So conspiracy sets up a whole new

13:35:30 20    separate -- well, I think you've got to get this to my

21    attention fairly soon.

22             I don't -- I don't want to think about trying

23    to rule on it today so you've got to get it in front of me.

24    And it may well be we need separate trials.  I don't know.

13:35:46 25    I just work here.

1          Anything else that we need to talk about

2     today?

3          MR. PYLE:  Nothing for defendant Baxter, Your

4     Honor.

13:35:57  5          THE COURT:  Anything from any of the other

6     defendants?

7          MR. VEGH:  On behalf of Mr. Wright, no, thank

8     you, Judge.

9          THE COURT:  Well, I appreciate your patience.

13:36:03 10          Yes.

11          MS. SCHWARTZ:  Yes, Your Honor.

12          With regard to --

13          THE COURT:  Why don't you identify yourself

14     for the record?

13:36:20 15          MS. SCHWARTZ:  I'm sorry, Jennifer Schwartz

16     for Connor Stevens.

17          With regard to the issue of bond, Mr. Brown

18     argued essentially that the charges alone were sufficient to

19     establish flight risk and that, therefore, bond should not

13:36:31 20     be granted.

21          However, there are precedence both from the

22     Northern District of Ohio and in *United States versus*

23     *Mozloom* and out of the Eastern District of California in the

24     *United States versus Weiner* where there were either similar

13:36:47 25     or more serious charges such as the ones facing Mr. Stevens

1    in which bond was granted.

2              In Mr. Mozloom's case, he was facing charges

3    of conspiring with others to kill or maim persons outside

4    the United States and undertaking to support terrorism

13:37:03  5    overseas.

6              In granting bond to him despite those charges,

7    the Court found that he was not an initiator or implementer

8    of the conspiracy's purpose; that the government's informant

9    had introduced or encouraged elaboration of the subjects

13:37:19 10    that resulted in the charges, the defendant's prior

11    unfamiliarity with weapons and his ignorance of them, and

12    determined that his risk of flight was not that strong

13    because he had no resources and no place to go and that,

14    therefore, all of the conditions -- all of the concerns

13:37:36 15    could be adequately addressed by the conditions of release.

16              Mr. Mozloom was granted bond.  He was put on

17    home detention.  He appeared for all of his court hearings

18    and there were no issues.

19              In Ms. Weiner's case in California, she was

13:37:50 20    charged with conspiracy to destroy United States property by

21    explosion or fire and conspiracy to destroy buildings used

22    in interstate commerce.  At the detention hearing, there was

23    evidence of recorded conversations that included debates on

24    the best target, the discussion of acceptability of human

13:38:08 25    casualties, how to create explosive devices, and plans to go

1    underground afterward.

2           The Court found that some of her actions had

3    included reconnaissance, coming up with bomb-making recipes,

4    cooking of materials and purchasing bleach.  Despite that,

13:38:29 5    Ms. Weiner was also granted bond based upon in part her

6    close family ties, her lack of a criminal record, the fact

7    that she had no history of substance abuse other than

8    marijuana.

9           The Court in that case specifically found that

13:38:43 10   detention for alleged terroristic crimes is not de jure or

11   de facto automatic.  Ms. Weiner was granted bond, she

12   appeared for all of her hearings, and there were no issues.

13   So I think the charges alone clearly do not justify

14   detention.

13:39:02 15          Mr. Brown indicated that he did not believe

16   Mr. Stevens would have appropriate supervision at home.

17   However, no details were provided and I proffered to the

18   Court evidence that there would be someone home with him at

19   all times, so I would ask the Court to consider those things

13:39:17 20   in making its determination.

21           THE COURT:  Thank you.

22           MR. HART:  Andy Hart on behalf of Joshua

23   Stafford.

24           Your Honor, I think some of the issues are

13:39:29 25   being blurred in this case.  The discussions about what

1    involvement the confidential informant have I do think are

2    relevant in the sense that we all acknowledge that a

3    presumption in favor of detention does exist because of, I

4    think, Counts 1 and 2.

13:39:45  5         If you read the Sixth Circuit's opinion in

6    *Stone* which was a case that dealt with a similar type of an

7    issue, it described in large part why that presumption

8    exists, and it basically says that if certain identified

9    offenses, of which Counts 1 and 2 are listed, that there

13:40:05  10   exists a presumption because if there's probable cause to

11   believe a person committed that offense, that that person is

12   effectively predisposed to be a risk to the public, whether

13   they're incarcerated, whether there's conditions or anything

14   else like that.

13:40:20  15        So the question in the wake of dangerousness

16   in this case really relates to exactly the facts and

17   circumstances leading from the beginning of the government's

18   involvement up until the arrest.  And what's interesting is

19   that if you read the case in *Stone* which involved the

13:40:40  20   Hutaree militia, all of which were ultimately acquitted, the

21   Circuit detained them for almost two years pending the

22   outcome of the case.

23        But if you read factually what they relied

24   upon wasn't the weight of the evidence against them or

13:40:53  25   whether or not the government's informant had an impact on

1   it, they relied on the fact that prior to the government

2   informant, most of the people in the *Stone* case already

3   possessed the instrumentalities of violence.  They possessed

4   weapons.  They already had a well-defined structure within

13:41:10  5   their organization.  They had well-defined principles which

6   could very easily be described as being violent,

7   anti-government-type principles.

8          All of those elements were in place before the

9   investigation in that matter, before the government's

13:41:25 10   involvement.

11          This case is different in the sense that the

12   discussions about who brought up the explosion, who

13   identified that there is a source who can provide C-4, who

14   provided the money, who provided the operational

13:41:41 15   functionality for the device itself, all these things, the

16   arguments that counsel's tried to offer here today relate to

17   the fact that it was the informant who played a large part

18   in the dynamics of identifying "Hey, I have a source who can

19   provide this.  If you guys don't have any money, I can

13:42:02 20   provide the money.  If you guys are concerned about how this

21   works, I'll go ahead and make it fully functional."

22          And there obviously was an involved dynamic in

23   terms of the government's paid informant in this case

24   because if you take a big step back and you stop parsing

13:42:18 25   through bits and pieces of conversations, the one thing that

1      is true is that the informant was present with all of the

2      defendants throughout all of the conversations.  And

3      obviously he would not have been present throughout all the

4      conversations if he was not actively advocating for criminal

13:42:36  5      conduct.

6                Had he just been sitting there through

7      February, March and April and saying "I don't know what you

8      guys are doing, I don't approve of this, I don't know what's

9      going on," he obviously would not have been allowed to be a

13:42:48 10      participant and would not have been able to record some of

11      these conversations.

12                So logically you have to assume that he did

13      play an active role in the dynamics of the instrumentalities

14      of some of the allegations that the government has offered.

13:43:03 15                THE COURT:  So what?

16                MR. HART:  So the difference is that if you

17      remove that forest from this case, you find five people who

18      did not possess the financial resources, the background

19      understanding, the operational capability to do anything

13:43:18 20      that's related to the allegations in this case.

21                And I think that --

22                THE COURT:  Except show up at the bridge with

23      what they thought was a bomb ready to set it off, and being

24      happy about it?

13:43:28 25                MR. HART:  That's true, Your Honor.

1          THE COURT:  Well, where does that leave the

2     Court?

3          MR. HART:  Your Honor, it leaves the Court in

4     the sense that the Court has to begin this hearing with the

13:43:36  5     concept that if Congress had intended for every person

6     charged with this offense to be detained, it would have

7     written it into the Bail Reform Act.

8          You have to begin this process with --

9          THE COURT:  No, the Court decided Article III

13:43:50 10     Judges were smart enough to figure it out themselves.

11          MR. HART:  Your Honor, I know this sounds like

12     a basic concept, but the Court has to begin this process by

13     accepting the fact that people charged with attempted use of

14     a weapon of mass destruction can, as a matter of law, be

13:44:05 15     released on bail.

16          If we begin this process by saying simply the

17     fact that a grand jury has returned probable cause that the

18     offense has occurred is always going to be sufficient, then

19     no person charged with this offense ever has any legal

13:44:21 20     standing to ever apply for release.  And that's not the way

21     that the law -- there has to be --

22          THE COURT:  Let me interrupt.

23          I didn't hear anybody wanting to testify from

24     your side.

13:44:30 25          Do you want to put -- do the defendants want

1    to testify?  They've got every opportunity to testify in

2    this hearing.

3                    MR. HART:  Your Honor, with the timing of the

4    hearing and the discovery issues, my client hasn't even

13:44:41  5    reviewed the discovery yet.

6                    THE COURT:  He doesn't want to testify?

7                    MR. HART:  Your Honor, and from my perspective

8    I would never allow any client in any case to even consider

9    testifying until he's reviewed the discovery.  It's really a

13:44:55 10    matter of timing on that regard.

11                    THE COURT:  So I'm supposed to have discovery

12    take place and then rule?

13                    MR. HART:  Your Honor, I'm only offering that

14    in response to the Court's concern as to why my client

13:45:03 15    wouldn't have offered testimony here today.

16                    So I do think that I want to at least urge the

17    Court conceptually to have a broader perspective on this and

18    the fact that --

19                    THE COURT:  Well, you're telling me that the

13:45:18 20    government's agent is the one who's responsible for all this

21    without any testimony from the defendants.

22                    You're theorizing that he's the one that did

23    it, with no testimony from the defendants suggesting that

24    was what happened.

13:45:30 25                    MR. HART:  Well, Your Honor, the recordings

1    that have been submitted to date do describe the informant's

2    position on this, encouragement, things of that nature.

3               I understand that there's always going to be

4    factual disagreements about was the February 22nd

13:45:47  5    conversation the first time the word "C-4" was used and by

6    whom, but the tapes that the government has provided are,

7    you know, 35, 50 hours of tapes in which the informant is

8    involved in every single one, and he's a participant.

9               You know, I don't want to get caught up in the

13:46:06  10   semantics of --

11              THE COURT:  It's pretty hard to tape them if

12   he's not there.

13              MR. HART:  My point is I don't want to get

14   caught up in the semantics of was he responsible for

13:46:17  15   precipitating this, was he responsible for encouraging this

16   or does he have no responsibility.  These are all factual

17   questions.

18              What I'm asking the Court to take into account

19   is if he did play a role in the dynamics which lead to the

13:46:30  20   inception of the plan, the monetary basis for the plan, the

21   implementation of the plan, the encouragement for the group,

22   the encouragement for all the agreements, that weighs

23   against whether or not you should hold the conduct of these

24   five defendants as being the paradigm of the attempt to use

13:46:49  25   a weapon of mass destruction rather than something that

1    should be differentiated from the Congressional paradigm of

2    the offense which carries a presumption against release.

3                    I'm just offering the Court that perspective.

4    I don't think that for this limited purpose it's practical

13:47:04  5    that we're going to arrive at some sort of a factual

6    agreement as to who bears which responsibility.  I think

7    it's ultimately a complicated dynamic.  It's not anything

8    that's going to reduce itself to a simple conclusion of the

9    government's witness was responsible or, alternatively, the

13:47:24 10   defendants are entirely responsible.

11                    So I would ask the Court, at least in

12   reviewing this matter, to try and maintain a broad

13   perspective in terms of what we are trying to discuss at

14   this point in the proceedings.

13:47:34 15                    THE COURT:  Thank you.

16                    MR. HART:  Thank you.

17                    THE COURT:  Anybody else?

18                    MR. O'SHEA:  Judge, again, Mike O'Shea on

19   behalf of Anthony Hayne.

13:47:43 20                    Your Honor, just one comment on the, I think,

21   the implicit understanding that was just made a moment ago

22   with Mr. Pyle and the U.S. Attorney's Office and perhaps

23   with your acknowledgment, Judge.  The idea that a transcript

24   will be provided for each of these tapes is a great starting

13:47:59 25   point, Judge, but I can tell you based upon some preliminary

1    discussions that I've had in this case that there are

2    disagreements about whose voice appears on certain parts of

3    what is clearly just an audible-only tape.

4                 And if that's the case, Judge, then we're

13:48:17  5    back -- and even if we have the transcripts, we're kind of

6    back on square one again about the idea of one hour a day

7    per defendant to listen to these tapes to even go along with

8    the transcripts, Judge, excuse the expression, is simply

9    ludicrous.

13:48:32 10                 I think the United States government's own

11    agent just agreed a moment ago if his investigation were

12    compromised to one hour a day based upon some third party's

13    time constraint, that would make it literally impossible for

14    him to do his job.

13:48:48 15                 All we're asking is that some mechanism, be it

16    transfer out of CCA -- and I know you don't have any

17    ability, I guess, to control what CCA dictates, but if CCA

18    is going to continue to dictate to this courtroom, to you,

19    Judge, and to the United States government and the defense

13:49:03 20    lawyers what the time constraints are going to be, then the

21    idea of being able to try this case in September is

22    incredibly impractical, Judge.  Incredibly impractical.

23                 So all I'm asking the Court to do is to the

24    extent the Court can, please give us the opportunity to get

13:49:18 25    more than one a day.

1          Again, Judge, if we travel, I mean CCA for all

2    of us Cleveland lawyers is an hour and a half each way, and

3    if you get that hour they give you, assuming they give you

4    ten minutes on each end to set up and take down, you're

13:49:34 5    dealing only really with about essentially 40 minutes.

6          And for essentially four hours of work you're

7    getting 40 minutes of tape review time doesn't make

8    practical sense.  There has to be another way, there just

9    simply has to be.

13:49:47 10          That's all, Judge.

11          THE COURT:  Let me ask the government.  There

12    are five defendants in this case.  Is their voice captured

13    on -- is each defendant's voice captured in some kind of a

14    recording?

13:50:02 15          MR. BROWN:  Your Honor, in the initial

16    discovery and then again in the second round that went out

17    last week, there is a spreadsheet that has each CD and who

18    was on each CD.

19          They're identified by initial just for space

13:50:19 20    reasons, but you can see, you know, 1-D-2 has A, B and C on

21    it.  You know, 1-D-3 has A, D and F or whatever.  So there

22    is -- we have provided the mechanism to identify the 1-Ds,

23    going forward at least, who's on which.

24          MR. O'SHEA:  But that's -- and I appreciate

13:50:39 25    that that the government has been that helpful and it has

1    been helpful as far as a preliminary review, and I've had an

2    opportunity to see some of the video, some -- and hear some

3    of the audio, Judge, but that doesn't get us beyond the fact

4    that some of these audio transcriptions or, excuse me, audio

13:50:55  5    files are like an hour-plus long.

6                    So simply putting, identifying that your

7    client is somewhere on there in an hour and providing the

8    transcript, I can tell you from some conversations I've had

9    with my client that he says the government's idea of who

13:51:10 10    spoke what is not completely accurate so we need to go

11    through it.

12                    So all I'm saying is even if what I'm saying

13    didn't occur or wasn't an issue in the case, the idea of one

14    hour a day -- and that's assuming we're working on Saturday

13:51:23 15    and Sunday, too, Judge, by the way -- so it gets a little

16    impractical after awhile, Judge.

17                    Thank you.

18                    THE COURT:  Anybody else, anything you want to

19    offer?  What's the date set for the transcripts?

13:51:35 20                    MR. BROWN:  June 15th, Your Honor.

21                    THE COURT:  If, if any lawyer for any

22    defendant wants to file a post-hearing brief in this case

23    with respect to any cases I ought to look at or think about,

24    I'd ask that you have your briefs filed by the 8th of June.

13:51:58 25                    MR. VEGH:  What was the date, Judge?

1          THE COURT:  8th, June 8th.

2          Anything further to come before the Court

3  today?

4          MR. BROWN:  Not from the government, Your

13:52:11  5  Honor.  Thank you.

6          THE COURT:  Very well.  The Court will take

7  the matter under advisement.

8          Thank you.

9              (Proceedings concluded).

10                - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           C E R T I F I C A T E

2                I certify that the foregoing is a correct

3      transcript from the record of proceedings in the

4      above-entitled matter.

5

6

7

8      **/s/Susan Trischan**

9      /S/ Susan Trischan, Official Court Reporter

10     Certified Realtime Reporter

11

12     7-189 U.S. Court House

13     801 West Superior Avenue

14     Cleveland, Ohio 44113

15     (216) 357-7087

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

3    **<u>WITNESSES</u>:**                                            **<u>PAGE</u>**

4      DIRECT EXAMINATION OF RYAN TAYLOR                        17

5      BY MR. BROWN

6      CROSS-EXAMINATION OF RYAN TAYLOR                         74

7      BY MR. VEGH

8      CROSS-EXAMINATION OF RYAN TAYLOR                         90

9      BY MR. HART

10     CROSS-EXAMINATION OF RYAN TAYLOR                         98

11     BY MR. O'SHEA

12

13                              * * * * *

14

15

16

17

18

19

20

21

22

23

24

25