1

1                     UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                        EASTERN DIVISION

3   UNITED STATES OF AMERICA,     Case No. 1:12cr238
                           Akron, Ohio
4          Plaintiff,       Tuesday, August 7, 2012

5      vs.

6   BRANDON BAXTER,

7          Defendant.

8
                  TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE DAVID D. DOWD
            UNITED STATES DISTRICT JUDGE
10

11                 MOTION TO SUPPRESS

12

13  APPEARANCES:

   For the Government:       Thomas E. Getz
14                    Justin E. Herdman
                     Assistant United States Attorneys
15                  Northern District of Ohio
                     Suite 400
16                  801 Superior Avenue, West
                     Cleveland, Ohio  44113
17                  (216) 622-3840

18
   For the Defendant:        John S. Pyle, Esq.
19                  Gold & Pyle
                     1140 Leader Building
20                  526 Superior Avenue, E
                     Cleveland, Ohio  44114
21                  (216) 696-6122

22

23

24

25

1

2

3    Court Reporter:              Lori Ann Callahan, RMR-CRR
                                  United States District Courthouse
4                                 Room 568
                                  2 South Main Street
5                                 Akron, Ohio  44308
                                  (330) 819-8676
6

7

8

9

10   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              P R O C E E D I N G S

2                        -   -   -

3

4              THE COURT:  The court calls the case of United

10:00:27 5  States of America versus Brandon Baxter, Case Number

6  12:cr238.

7              Counsel for the defendant, Brandon Baxter, has

8  filed a motion to suppress his post-arrest statements, or in

9  the alternative, to exclude the statement based on recording

10:00:53 10  defects.

11              Let the record show that counsel are present,

12  as well as Mr. Baxter.

13              In the memorandum, the statement is made that

14  Mr. Baxter's statements should be suppressed because under

10:01:16 15  federal constitutional standards, the statements were given

16  involuntarily, because the Miranda warnings were misleading

17  and because the warning failed to advise Mr. Baxter of the

18  essential components of the Fifth Amendment privilege.

19              In the alternative, counsel urges the court to

10:01:39 20  exclude the statement based on technical defects in the

21  recording of the statement.

22              Mr. Pyle, are you prepared to go forward in

23  support of your motion?

24              There's also a question of who goes first.

10:02:08 25  Have counsel discussed the question of order here?

                    Lori A. Callahan, RMR-CRR      (330) 252-6022

1           MR. HERDMAN:  We haven't, Your Honor.  The

2    government is prepared to call its witness to the extent

3    that the court would entertain that, just start hearing the

4    evidence.

10:02:21  5           THE COURT:  Proceed on that basis.

6           MR. HERDMAN:  Before I do, Your Honor,

7    Mr. Pyle and I talked before Your Honor took the bench.

8    With respect to this audibility issue, this screeching that

9    Mr. Pyle has heard in his version of the audio/video, I have

10:02:43 10   not been able to detect that in the video that I reviewed.

11   I've spoken to the agents as well, and none of us could

12   detect it.

13           I think it might, unfortunately, be a problem

14   in the copying of the version that went to Mr. Pyle.  We're

10:02:57 15   going to provide him with another copy today.  I think for

16   purposes of this hearing, I think if it's going to be with

17   respect to Miranda issue and the voluntariness, I just don't

18   know that that is something that the court would need to

19   consider today.  The video I'm going to play does not have

10:03:11 20   any of those -- any of that screeching noise in it.

21           THE COURT:  Well, we have kind of a similar

22   issue in one of the earlier motions to suppress.  I don't

23   remember anymore which defendant it was, but the agent

24   testified as to his recollection of the statements that he

10:03:32 25   contended were made by that particular defendant.  And I

1     held that he can testify about that at the time of trial.

2              So this question of the audibility of the

3     recording, whether or not it's available, I'm not quite sure

4     I track what the position of counsel for Mr. Baxter is about

10:04:04 5     that particular recording, because if the agent is prepared

6     to testify about those statements, in my view, that's

7     admissible whether the recording is ineffective or not.  The

8     testimony of the agent trumps whatever is in the video.

9              Now, it might be available for impeachment

10:04:22 10     purposes, but certainly the agent would not be forbidden

11     from testifying even if there's something defective about

12     the recording.

13              So I'm prepared to listen to what counsel has

14     to say on that issue.

10:04:41 15              Mr. Pyle, do you want to address that?

16              MR. PYLE:  Your Honor, again, the copy of the

17     tape of my client's audio and video recording contain

18     excessive, I will call, periods of screeches where you can't

19     hear what was said.  And, moreover, the little line that is

10:05:07 20     shown at the bottom of the video jumped, and naturally, it

21     gave us cause for concern.

22              If the government says that there was a

23     problem in copying and they are going to give us a copy

24     without the screeching or jumping of the lines, maybe the

10:05:25 25     court can defer ruling on any question about the technical

1    problems with the recording until I hear a, quote, "clean

2    copy."

3                    THE COURT:  But you still have your motion to

4    suppress based upon the arguments that you advance in your

10:05:39  5    memorandum.

6                    MR. PYLE:  Correct.  That doesn't mean --

7                    THE COURT:  That's not affected by -- about

8    the nature of the recording, correct?

9                    MR. PYLE:  Correct.

10:05:51 10                    THE COURT:  Do you want to proceed with your

11    agent?

12                    MR. HERDMAN:  Yes, Your Honor.

13                    THE COURT:  Very well.  Let's do that.

14                    MR. HERDMAN:  The United States will call

10:05:55 15    Special Agent Daniel Molina to the stand.

16                              DANIEL MOLINA

17    of lawful age, a witness called by the United States, being

18    first duly sworn, was examined and testified as follows:

19                    THE COURT:  You may proceed.

11:01:51 20                    DIRECT EXAMINATION OF DANIEL MOLINA

21    BY MR. HERDMAN:

22    **Q.**  Good morning.  Could you state and spell your name for

23    the record?

24    **A.**  My name is Daniel Molina.  D-A-N-I-E-L, last name

11:02:04 25    M-O-L-I-N-A.

1    **Q.**  Where are you currently employed?

2    **A.**  Employed by the FBI, Federal Bureau of Investigations.

3    Currently assigned to the Cleveland division in Cleveland,

4    Ohio.

11:02:15   5    **Q.**  And how long have you been -- you're a special agent

6    with the FBI?

7    **A.**  Yes, I am.

8    **Q.**  How long have you been employed as a special agent with

9    the FBI?

11:02:22  10    **A.**  For just over 15 years.

11    **Q.**  I would like to direct your attention to the night of

12    April 30 of this year into the early morning hours of May 1

13    of this year.

14        Did you have cause to be part of an interview team of

11:02:40  15    some individuals who were arrested on the night of April 30?

16    **A.**  Yes, I did.  I was assigned -- the scope of my

17    assignment was to help with the interviews as they came in

18    to interview.  I knew in advance the defendant Brandon

19    Baxter was one of my assignments to conduct an interview,

11:02:59  20    and I had one other assignment as well.

21    **Q.**  So you did interview Brandon Baxter that evening?

22    **A.**  Yes, I did.

23    **Q.**  And approximately what time did you begin the interview

24    of the defendant?

11:03:12  25    **A.**  It was about 12:30 in the morning on May 1, I believe.

1    **Q.**  And what was -- did you have any other assignments that

2    night other than conducting interviews?

3    **A.**  No, that was it.  I just prepared for the interview and

4    that was it.

11:03:33  5    **Q.**  And how would you describe your familiarity with the

6    criminal investigation into the defendant prior to

7    interviewing him on May 1, 2012?

8    **A.**  I'm assigned to a counter-terrorism squad, so I sit in

9    close proximity to the agents on the other squad that were

11:03:50  10    involved in this investigation.  So other than, you know,

11    light discussion I would overhear, I was aware that this

12    type of investigation was going on.  Until my assignment,

13    which was late in the week before the arrests were made,

14    that I would be doing one of the interviews, I became much

11:04:10  15    more familiar with the case, primarily through the reading

16    of an affidavit that was used to -- as background for the

17    arrests.

18    **Q.**  And that was an affidavit that was eventually used to

19    support a complaint and an arrest warrant?

11:04:25  20    **A.**  That's correct.

21    **Q.**  On the morning of May 1, can you describe the interview

22    room in which you conducted the interview of the defendant?

23    **A.**  It's a carpeted room.  There are no windows.  It's an

24    interior space.  It actually parallels several other

11:04:50  25    interview rooms where we conduct interviews of the general

1  public as well when they come in.  But it's plain walls, and

2  it's 15 feet maybe by 10 feet in size.

3  It's got -- it had a normal government-style desk in it

4  and I believe about three chairs in it that were -- the way

11:05:11  5  we had things arranged on that day, we basically -- the

6  other agent that conducted the interview with me and I sat

7  with our sides near the desk and the defendant sat more or

8  less near the door or by the -- against the wall where

9  another chair was arranged.  Excuse me, where another chair

11:05:32  10  was arranged.

11  **Q.**  How would you describe the lighting in that room?

12  **A.**  It was normal office lighting.  It's fluorescent

13  lighting, I believe, in that room, and it's just nothing

14  special.  It was just a normal office room.

11:05:47  15  **Q.**  How would you describe the temperature or what you

16  remember of the temperature on the night of April 30 into

17  the morning of May 1?

18  **A.**  In the room itself?

19  **Q.**  Yes.

11:05:57  20  **A.**  Normal temperature, between 75 and 79 degrees,

21  somewhere in there.  It was comfortable.

22  **Q.**  Could you please briefly describe for the court the

23  circumstances under which you first came into contact with

24  the defendant on the morning of May 1?

11:06:12  25  **A.**  Yeah.  I guess it was about 12:30, like I said, when

1    the interview started, so it would have been about that time

2    that another agent would have brought him up to the

3    interview room.  That's how the operations were planned for

4    that evening.

11:06:27  5        So my first encounter with him was when he was brought,

6    he was restrained with his hands -- with handcuffs to the

7    rear of his body.

8        He was brought into the room, and I started to talk to

9    him, asked him if he could -- giving him some orders on what

11:06:47  10   to do as I uncuffed him, because we didn't want him to be

11   handcuffed while we were conducting the interview.  And he

12   was very compliant and agreed to all the orders as we gave

13   them to him, basically, as we took the handcuffs off and

14   allowed him to sit in a chair and started to introduce

11:07:05  15   ourselves to him.

16   **Q.**  Soon after he came into the room, did he make a request

17   of you?

18   **A.**  He did.  It was -- his appearance, he was a little bit

19   cold.  It was obvious that he was cold.  I am not sure he

11:07:19  20   was wet, but he expressed he was wet, and he was shivering a

21   bit.  So I asked him myself whether he needed anything,

22   would he like a cup of coffee or something to help him warm

23   up, because I didn't want to start the interview with him

24   being so uncomfortable.

11:07:33  25       So I wanted to give him a chance to warm up and collect

1    himself a little bit.  So he sat in the chair.  He did

2    accept an offer, he asked for some coffee, which I had

3    arranged for another agent to go pick up.

4        And then he asked to use the restroom as well, which I

11:07:50 5    had to re-apply his handcuffs to the front so that he could

6    then be taken by another agent to the restroom, which is

7    down the hall, before being brought back into the room and

8    be allowed to drink his coffee and for a ten-minute period

9    where he just tried to warm up.

11:08:08 10   **Q.**  During that time period, did you ask any questions of

11   the defendant that you thought were designed to elicit some

12   sort of incriminating response?

13   **A.**  No, no.  It was very light talk, if any, mostly

14   about -- regarding his comfort and whether -- as we observed

11:08:27 15  him warming up.

16       I may have asked him questions like, "Say, you live

17   around here," and that kind of thing, but nothing -- that

18   was kind of the point of the interview, was really to elicit

19   any information that he had regarding the crime he was being

11:08:40 20  accused of.  We didn't get into any of that kind of

21   questioning at all.

22   **Q.**  Now, prior to the interview with the defendant on May

23   1, 2012, were you aware of an alleged suicide attempt by the

24   defendant in February of that year?

11:08:56 25  **A.**  No, I was not.

1    **Q.**  Are you aware of it now?

2    **A.**  I am.

3    **Q.**  How are you aware of it?

4    **A.**  I had a chance to review the motion filed by the

11:09:04  5    defense counsel, and that was the first I had read it.  So

6    it was not a surprise to me, but it was new information to

7    me that that had occurred.

8    **Q.**  When the defendant came back from the bathroom, you

9    said you gave him an opportunity to get comfortable.  Did

11:09:25  10    you do something else after he came back from the bathroom

11    with respect to continuing the interview?

12    **A.**  I started to -- once he was in a position where he

13    seemed comfortable and ready and not, you know, distracted

14    by other things, because I knew it was a pretty serious

11:09:44  15    thing we were about to engage in, which is this interview,

16    so I wanted -- once I assessed on my own, I guess, that he

17    seemed more clearheaded and not distracted by the other

18    issues of being cold and things like that, I started to

19    explain to him the reason for the interview and pertaining

11:10:04  20    to the events of that night and what the accusations were,

21    went through that with him at length.

22        I told him I did not want him to, you know, talk for

23    now, I just wanted to explain, give him a little bit of

24    background about what we're going to do, and I explained

11:10:20  25    those charges, what he was accused of.  And I wanted to do

1    that just to prepare him so that he would be fully

2    knowledgeable about what we were about to discuss before

3    then engaging and advising him of his rights before

4    proceeding with the substantive portion of the interview.

11:10:38  5    **Q.**   How did you advise the defendant of his rights?

6    **A.**   We have a standard form, an FBI -- I think it's called

7    FD-395.  But it's a standard advice of rights form, and it

8    contains what people normally refer to as Miranda warnings,

9    advising him of all his rights.  I handed it to him and I

11:11:02 10    explained what that form was, and I handed it to him to

11    allow him to read on his own, which he did.

12    **Q.**   Okay.  It was your belief that the defendant understood

13    what was on the paper?

14    **A.**   Yes.

11:11:14 15    **Q.**   And how did you come to believe that?

16    **A.**   Normally, my normal procedure, if I don't read them

17    aloud to a defendant, if they're able to read on their own

18    or if I ask them sometimes if they're able to read on their

19    own, I will let them read it.  But my normal procedure would

11:11:32 20    be to ask him to read the last line, just so that we have a

21    good knowledge that he did know how to read even if he

22    just -- not that he just said he knew how to read.

23        But in this case, he got about two-thirds of the way

24    through the form, and he asked -- he read a part of the line

11:11:49 25    and then asked a short question regarding that line, so I

         1   knew he was able to read acceptably, so that's how I knew he

         2   was okay reading through the form.

         3     Q.   You said you -- your normal practice would be to have

         4   the subject read the last line.  Did you mean read that

11:12:07  5   aloud?

         6     A.   Yes.

         7     Q.   So the defendant asked a question about the form.  What

         8   is your best recollection of what that question was?

         9     A.   My best recollection is that he got to the part about

11:12:20 10   an attorney being appointed, if you couldn't afford one, and

        11   he kind of started reading through the middle of the line

        12   that said, "Attorney appointed, where would that be from," I

        13   think was his question.

        14     Q.   And what's your best recollection of your response at

11:12:35 15   that time?

        16     A.   My response was that the AUSA and -- United States

        17   Attorney and the judge would appoint -- appoint an attorney

        18   for him if he couldn't afford one.

        19     Q.   And what informs the response you gave the defendant?

11:12:56 20   What were you thinking?

        21     A.   I think as I went back through my response, and even at

        22   the time, I recall thinking, for me, of course, I'm not

        23   really a part of the process of obtaining an attorney for a

        24   defendant.  If they asked for one, I would just at that

11:13:11 25   point terminate my interview and then inform the United

1    States Attorney, chief prosecutor on it, that or the

2    Assistant United States Attorney that's working with us, and

3    I would inform them and they would relay -- I'm not even

4    sure what the process exactly would be on their side of

11:13:29  5    relaying that through to follow-on judicial hearings.

6         But I knew that -- you know, the point was that the

7    judge would ultimately appoint an attorney for him, if he

8    needed one.

9    **Q.**  And just to back up for just a second, did you ask the

11:13:46 10    defendant whether he could read before you handed him the

11    form on that night, that morning?

12    **A.**  I'm not sure if I did or not, but I could -- I could

13    maybe make reference to the transcript, if you would like me

14    to review that.

11:13:58 15    **Q.**  We might get to that in a minute.

16         Was there a recording of the interview with the

17    defendant?

18    **A.**  There was.

19    **Q.**  Was all of your interaction on the morning of May 1,

11:14:09 20    2012 -- I should say, was all of your conversation with the

21    defendant on the morning of May 1, 2012, on the video

22    recording?

23    **A.**  Yes.  It was all on at least the audio recording.

24    Sometimes we stepped out of the view as he was getting up,

11:14:24 25    coming into the room and things like that are not on the

1    video portion.  But all of my interaction with the

2    defendant, except for a small portion, which I can explain

3    if you would like me to, but all of the interview itself was

4    all recorded.

11:14:36  5    **Q.**  What was that additional interaction that was not

6    recorded?

7    **A.**  I think it was later that evening, I saw the subject

8    downstairs again where he was being fingerprinted where we

9    do the normal processing of people that were arrested, and I

11:14:52 10    saw him sitting in a chair being held until -- I think they

11    were waiting on a van to take him over to the jail where

12    they would spend the night.

13        So I saw him at that point.  We didn't really exchange

14    information or any dialogue.  It was more or less -- I

11:15:07 15    believe he saw me, but I definitely saw him.

16    **Q.**  I'm going to show you, Agent Molina, what's been

17    premarked as Government's Motion Exhibit 1.

18                    MR. HERDMAN:  May I approach, Your Honor?

19                    THE COURT:  Yes.

11:15:32 20    BY MR. HERDMAN:

21    **Q.**  Do you recognize that?

22    **A.**  Yes.  It appears to be the copy of advice of rights

23    form.

24    **Q.**  Does it have a signature on that?

11:15:38 25    **A.**  Yes.  It says, "Brandon Baxter."

1    **Q.**  Did the defendant affix any additional notation of

2    something after the signature?

3    **A.**  He did.  He put the initials "TM" above his last --

4    just above and to the right of his last name.

11:15:50 5    **Q.**  What does that seem to indicate to you?

6    **A.**  You know, at first -- I actually noticed him make the

7    mark then.  It wasn't until later I looked at it again later

8    that evening and I thought, "Well, I wonder what that

9    means," and I thought -- trademark came to mind.  It was

11:16:04 10   that he might be -- consider his name trademarked.

11   **Q.**  Was there an additional portion of that form below the

12   portion that the defendant signed by "Signature" that was

13   added to the form?

14   **A.**  Yes.  But just immediately below where his signature is

11:16:22 15   are spaces where the witnesses would sign it.  That would

16   have been me and the other interviewer.

17       We also included a time when that signed signature

18   occurs.

19       I wrote in with my own hand, after explaining to him

11:16:36 20   that we would be video recording and audio recording the

21   interview, asked him if that was okay.  I asked him to place

22   his initials next to the words "Authorization to record,"

23   which is what I wrote, which -- so it was something I added

24   to the form just to have some record of his affirmation that

11:16:55 25   it was okay to record the interview.

1      Q.   Okay.

2                    MR. HERDMAN:  Your Honor, I would offer

3      Government's Motion Exhibit 1.

4                    THE COURT:  It's admitted.

11:17:05  5          MR. HERDMAN:  Your Honor, at this time, I

6      would propose playing a portion of the video recording of

7      the interview of the defendant and the portion that Agent

8      Molina just testified to.  I think it will go about 12 to 15

9      minutes.

11:17:19 10                  THE COURT:  You may proceed.

11                   MR. HERDMAN:  Thank you.  This would be --

12     this disc will be provided to the court as Government's

13     Motion Exhibit 2.

14                   I am also providing the court with a

11:17:30 15     transcript of the relevant portion that's being played.

16     It's 11 pages long.  Counsel has already been provided a

17     copy.

18                   Again, so the record is clear --

19                   THE COURT:  For the record, I am going to have

11:18:03 20     the court reporter transcribe the discussion that's on this

21     transcript, so in the event there's any appellate review,

22     they will have that transcript as part of the record.

23                   MR. HERDMAN:  Okay, Your Honor.  And also for

24     the record, the videotape, which this is going to be --

11:18:21 25     denoted as session number 6 on the disc, that will be

1    provided to the court, and the start time is in the lower

2    right-hand corner, 23:32:59, and there's a date there before

3    that.  It says "4-30-2012."

4              Your Honor, could I ask a brief question of

11:18:39  5    the witness before I start the video?

6              THE COURT:  Would you repeat again what

7    you're --

8              MR. HERDMAN:  On the video itself, Your Honor,

9    that I'm about to play, on the actual screen here, there is

11:18:51 10    a date and timestamp marking.  That will indicate where we

11    started playing it, if there is appellate review, for

12    purposes of appellate review where we can mark where we

13    started playing the video.

14              THE COURT:  Well, you're going to start with

11:19:04 15    the question, "Are you going to -- are you going to be

16    transporting later too, or --" is that what you're going to

17    start with?

18              MR. HERDMAN:  Yes, Your Honor.  That's the

19    portion of the video that is transcribed in the transcript.

11:19:19 20              THE COURT:  Very well.

21              MR. HERDMAN:  If I may briefly inquire of the

22    witness just one question.

23              THE COURT:  Go ahead.

24              MR. HERDMAN:  Thank you, Your Honor.

11:19:25 25    BY MR. HERDMAN:

                    Lori A. Callahan, RMR-CRR        (330) 252-6022

1    **Q.**  Agent Molina, on the videotape, there's -- I don't know

2    if you can see this or not, but it says that the date and

3    time -- it says "April 30, 2012," and the time is 23:32:59

4    military time.

11:19:42  5    What is your understanding of the time marker that is

6    on this video?

7    **A.**  I noticed after the interview was conducted when I was

8    reviewing the video that the time was off by one hour, and

9    it turned out it was a technical problem that either the

11:20:00  10   time wasn't adjusted for daylight savings or something like

11   that, so it was off -- the entire video recording, the times

12   were recorded one hour earlier than the actual event

13   happened.  So this would have been May 1, at 12 -- I guess

14   it would have been 1 -- 12:23 in the morning.

11:20:17  15   BY MR. HERDMAN:

16   **Q.**  Okay.  All right.

17   **A.**  Sorry.  12:32 in the morning.  That's right.

18   (Thereupon, the video was played as follows:

19   "MOLINA:  Are you going to be transporting

11:20:35  20   later too, or --

21   PRESLEY:  I'm going to hang.  I probably will

22   be I would guess.

23   MOLINA:  Do you want us to just keep those

24   then?  Okay.  Thanks.  (UI conversation in background.)

11:20:44  25   You're Brandon?

Lori A. Callahan, RMR-CRR        (330) 252-6022

                      1              BAXTER:  Uh-huh.

                      2              MOLINA:  You're shaking, brother.

                      3              BAXTER:  I'm cold, man.

                      4              MOLINA:  Is it pretty wet out there?

11:20:53              5              BAXTER:  Yeah.

                      6              MOLINA:  Listen, I'm gonna uncuff you.

                      7              BAXTER:  Okay.

                      8              MOLINA:  Is that going to be all right for me?

                      9              BAXTER:  Yeah.

11:20:59             10              MOLINA:  All right, that way you can get more

                     11       comfortable.  If I can get these off, okay, just put your

                     12       hand kind of up by your head once I undo this.

                     13              BAXTER:  My head?

                     14              MOLINA:  Oh, yeah, just put it up on top of

11:21:11             15       your head for now.

                     16              BAXTER:  Okay.

                     17              (Pause.)

                     18              MOLINA:  (UI).  Warm up a little bit, so (UI)

                     19       there we go.  Okay.  Go ahead and why don't you have a seat.

11:21:47             20       You want a cup of coffee or something?

                     21              BAXTER:  Something warm, whatever.

                     22              MOLINA:  Warm coffee would be good?  Hot

                     23       chocolate or whatever?

                     24              (UI).  Here's some change.  There's a coffee

11:22:00             25       machine in there.  You know where that is?

1          STARK:  You take anything in it?  Just black?

2          BAXTER:  Black (UI).

3          MOLINA:  All right.  We'll get you something,

4    man.  If there's hot chocolate or something, would you

11:22:13  5    prefer that if there is that?

6          BAXTER:  (Shakes his head no.)

7          MOLINA:  No.  Coffee black.

8          (Pause.)

9          MOLINA:  I feel for ya, man.  Sorry.  Is there

11:22:24  10   anything you want to do to try to warm up?  I don't know

11   what else would help?  Other than get something warm to

12   drink, to drink so --

13         BAXTER:  I don't know.

14         (Pause.)

11:22:33  15         MOLINA:  Where were ya before ya came up here?

16   Were you just down in the basement or --

17         BAXTER:  They -- they kept calling it the

18   cage.

19         MOLINA:  Oh, the cage.  Yeah, it's kinda cold

11:23:03  20   down there.

21         STARK:  It's not the best setup down there at

22   all.

23         MOLINA:  No.  Especially if you're coming in

24   wet, like you.

11:23:12  25         STARK:  I had a coat on so (IU).

```
 1                    (Pause.)

 2                    MOLINA:  You got family here in town?

 3                    BAXTER:  Yeah, Lakewood.

 4                    STARK:  Is this where they live?

 5                    BAXTER:  Yeah.

 6                    STARK:  1522 Lane Avenue.

 7                    BAXTER:  Yeah.

 8                    STARK:  Is that where you live too?

 9                    BAXTER:  I'm couch surfing.

10                    STARK:  What's that?

11                    BAXTER:  I'm couch surfing.

12                    MOLINA:  Couch surfing.

13                    (Pause.)

14                    MOLINA:  My name is Dan Molina.  I'm agent --

15     you probably met a bunch of agents already tonight, with the

16     FBI.  This is -- this is Mike.  Okay?

17                    They asked us to, uh, to talk to you; okay?

18     But I want you to have some, uh, some coffee, try to warm up

19     a little bit before we do that.  Okay?

20                    BAXTER:  Think I could use the bathroom, too?

21                    MOLINA:  Yeah, sure, sure.  Do you want to do

22     that before you drink the coffee?

23                    BAXTER:  Yeah.

24                    MOLINA:  Really?  That important?  Okay.  This

25     is what I'm gonna do, I'm gonna, uh, just to make it easier
```

11:24:01 — line 5
11:24:07 — line 10
11:24:39 — line 15
11:25:00 — line 20
11:25:15 — line 25

1    on us, I'll put those cuffs back on, but I'm gonna put them

2    on in the front, okay?  And then that way you can -- you can

3    handle yourself.  Do you just have to go -- do you just have

4    to go pee or --

11:25:36    5                   BAXTER:  Yeah.

6                   MOLINA:  Stand up, and we'll do this."

7                   (Video stopped.)

8                   MR. HERDMAN:  Your Honor, there's a period of

9    the video, this would be in evidence, where the defendant

11:25:42   10    actually is taken to the bathroom, so there's an empty

11    chair.  So I'm going to fast forward to when he returns to

12    the room, and that's approximately two to three minutes

13    later.  And this video starts at time stamp 23:40:59.

14                   THE COURT:  Thank you.

11:26:01   15                   (Thereupon, the video was played as follows:

16                   "MOLINA:  All right.  I'll leave it up to you.

17    You want those on or off?

18                   BAXTER: (UI).

19                   (Removes handcuffs.)

11:26:27   20                   MOLINA:  I'll get that coffee.  You said you

21    have family in Lakewood?  Is that parents?

22                   BAXTER:  My dad.

23                   MOLINA:  Any siblings?  Do you have a sister?

24                   BAXTER:  I don't (UI) anymore.

11:26:50   25                   MOLINA:  You just had a birthday?  So you get

to party at all? Celebrate?

BAXTER: (Shakes his head no.)

MOLINA: No?

BAXTER: No. Went to eat, about it.

11:27:02 MOLINA: All right. Is the coffee doin' better for ya? All right. It's late. All right. I understand that. And I just, uh, I guess we'll just start by just tellin' ya why you're here. I don't know what anyone's told ya, but let's just start from scratch, okay? 11:27:21 Um, because I'm sure it was kinda a surprise, uh, when you guys got pulled over today, all right?

The reason that you're here and the reason we want to talk to you is because, um, there's, uh, um, there's a reason for -- for them to arrest you because they -- they 11:27:35 were, uh, thinkin' that you were involved in, uh -- with some other people in a plan, uh, to blow up that bridge out there in Sagamore Hills, okay?

And we got a lot of information to support that. So, um, it's kinda, uh, important moment for you 11:27:56 right now because the charges that you might be facing, um, may, uh, potentially put you, uh, in a bad position where you can go to jail for a long time. All right?

And what we are here for is just because we want to talk and give you a chance to tell your side of the 11:28:08 story and to, uh, uh, to be truthful with us. Because we

1    know that, if you're truthful with us, that that -- we can

2    pass that on to the prosecutors and they can take that into

3    consideration, um, as they're trying to process, uh, the

4    prosecution.  Okay?

11:28:28    5        When they -- they, uh, they'll take whatever

6    it is you can tell us about the other parties that are

7    involved and things like that, and they're take that into

8    consideration.  All right?

9        Um, right now, the charge, even the charges

11:28:46    10    that they are considering charging you with, um, you're

11    looking at, we're talking 20 years, um, additional charges

12    up to 30 years in prison, okay?  And this is not, uh, you

13    know, the FBI, the way we do things, we don't, we don't,

14    just, uh, uh, find something out and look at it for a week.

11:29:03    15    Okay, this is, we've had this investigation going on for

16    several months, so we kinda know quite a bit, uh, between

17    different places that we have, uh, available to us to get

18    information about it.  Okay?  Do you understand that?

19        All right.  So, um, we'd like to know as many

11:29:21    20    details as you are willing to, uh, talk to us about it, um,

21    but the way our process is set up, we also want to make sure

22    that you understand what your rights are before you talk to

23    us.  Okay?

24        If you think you want to talk to us, we'll be

11:29:35    25    happy to read that to you and you can -- you can, uh, talk

1    to us, ask us questions, whatever you feel comfortable with

2    and at any time, you can, uh, decide you don't want to talk

3    to us, um, we can do that too.  All right?

4              BAXTER:  I'm very aware that I have no rights,

11:29:56  5    so I'm going to stick with good cop right now.

6              MOLINA:  Okay.  Well, when you read, uh, we

7    have a standard form, make sure you go through these things.

8    Can you read okay?

9              BAXTER:  Yeah.

11:30:09 10              MOLINA:  Wanna read through that?  It just

11    starts here, goes down to here.

12              (Pause while Baxter reads.)

13              BAXTER:  Cannot afford a lawyer, where would

14    one be appointed from?

11:30:25 15              MOLINA:  Uh, the, uh, U.S. Attorney's Office

16    and the, uh, the judge would appoint an attorney for you.

17    'K?  All right.  So before we can proceed, um, getting your

18    story, if you don't mind, I would like you to write down

19    some things at the top here.  Today is the 31st now --

11:30:45 20              STARK:  30th.  Well, no, it's May 1st.

21              MOLINA:  Is it 5-1?

22              STARK:  It's May 1st.  You understand

23    everything that is on there?  And are you willing to talk to

24    us?

11:30:58 25              (Nods yes.)

```
 1              Okay?  If you could, don't mind signing right
 2     where it says sign and we will sign as witnesses.  All
 3     right.  And we're also, uh, we're gonna record this, uh,
 4     this interview just so that you know what you are saying is
 5     exactly what's recorded for posterity.
 6                   BAXTER:  Okay.
 7                   MOLINA:  So you don't have to rely on what we
 8     say you said, it's exactly what you say.  All right?
 9                   (Pause.)
10                   MOLINA:  This is just authorization to record.
11     If you could initial right there for me, I'd appreciate it.
12                   (Pause.)
13                   MOLINA:  Warming up?  You look better.  Now,
14     why don't you, uh, take your time and I'm gonna start with,
15     uh, wherever you want to start, okay?  Because, you know,
16     you know the people that were involved in this, you know
17     when, you've been planning, and -- and what your involvement
18     is."
19                   (Video stopped.)
20                   MR. HERDMAN:  I'm going to stop the video at
21     this point at 23:49:08.
22                   THE COURT:  Well, we're right in the middle
23     of -- Molina is saying -- you don't want to complete that?
24                   MR. HERDMAN:  I'm sorry, Your Honor?
25                   THE COURT:  Why are we stopping?
```

1          MR. HERDMAN:  I stopped -- this was the

2    portion that I thought was relevant to the actual advisement

3    of the rights.  Agent Molina had not yet testified with

4    respect to any incriminating statements made by the

11:34:49  5    defendant.

6          THE COURT:  Well, you interrupt where Molina

7    was saying, "Warming up?  You look better," and I wanted to

8    hear that entire statement by Molina.

9          MR. HERDMAN:  Okay, Your Honor.  I will

11:34:57  10    continue playing through the end of that paragraph by the

11    agent.

12          (Thereupon, the video was played as follows:

13          "MOLINA:  So I want to hear it in your own

14    words what you think, uh, uh, well, exactly what happened

11:35:13  15    with relation to, uh, what ended tonight."

16          (Video stopped.)

17          MR. HERDMAN:  Your Honor, would now be an

18    appropriate place to stop the video?

19          THE COURT:  Did we get where he said, "What

11:35:18  20    ended tonight"?

21          MR. HERDMAN:  Yes, Your Honor.

22          THE COURT:  All right.  Now, you want to stop

23    the video for what purpose?

24          MR. HERDMAN:  To re-inquire of the witness as

11:35:26  25    to --

            1                    THE COURT:  Very well.  Go ahead.

            2                    MR. HERDMAN:  Thank you, Your Honor.

            3       BY MR. HERDMAN:

            4       Q.  Now, Agent Molina, we've just played a portion of the

11:35:47    5       video relating to what you just testified to with respect to

            6       the advice of rights.

            7            Following that advice of rights, approximately how long

            8       did you speak to the defendant for?

            9       A.  A total, it was about two hours.  This is, I would

11:36:07   10       say -- from the beginning of the interview itself, I'm not

           11       sure exactly -- advice of rights was probably completed by

           12       15 minutes in, so it was probably another hour and 45

           13       minutes.  The main portion of my interview of him took

           14       another hour or 45 minutes to an hour before we took a break

11:36:25   15       and another interviewer, Ryan Taylor, came in and

           16       interviewed him for about 35 minutes at the end of the

           17       interview.

           18       Q.  Were you still present throughout that second part of

           19       the interview where Agent Taylor was doing the questioning?

11:36:38   20       A.  I was.  I was not present for about 15 minutes in the

           21       middle of the interview when we took a break from the

           22       interview, actually, and Special Agent Michael Stark, who

           23       was my co-interviewer at the beginning of the interview,

           24       stayed with him while I went into the hallway for a break

11:36:54   25       and to talk to Special Agent Taylor.

1    **Q.**  And during the course of that roughly two hours that

2    you were speaking to the defendant or in close proximity to

3    the defendant, did you smell an alcoholic beverage on him at

4    all?

11:37:06  5    **A.**  No.

6    **Q.**  Did he appear to you to be intoxicated at all?

7    **A.**  No.

8    **Q.**  To you, did he appear to be under the influence of any

9    sort of substance or medication?

11:37:17  10    **A.**  No, he did not.

11    **Q.**  Did he appear to you to be confused, have a lack of

12    mental understanding as to what was going on?

13    **A.**  No, not at all.  Other than when we first came in, he

14    was agitated because he was cold.  But once that period was

11:37:32  15    over, he seemed very coherent and clear-thinking during the

16    interview.

17    **Q.**  Could you please briefly describe for the court what

18    the purpose of the interview was from your perspective as

19    the interviewing agent that night?

11:37:46  20    **A.**  It's kind of -- there are two prongs to what I had

21    thought that I would be trying to get to during the course

22    of the interview.  One, primarily during some point in the

23    interview, I wanted to address any outstanding threats that

24    were still potentially planned or that he was aware of.

11:38:07  25        There were other events happening around the U.S. in

1    the coming days, and there was some concern that because of

2    what -- we thought he was involved with, that he would know

3    about other plots.  And there were some other equipment that

4    was purchased and things like that.  We weren't sure whether

11:38:25  5    that was going to be applied to other plots.

6        So the primary reason was a public safety reason.  I

7    had to get to some questions along those lines to make sure

8    he was not knowledgeable of something that could be an

9    imminent threat.

11:38:43 10        But the majority of the interview revolved around just

11    obtaining truthful information from him, regarding to fill

12    in the gaps or to corroborate what we believe we already

13    knew had occurred regarding the conspiracy or the group

14    getting together and planning to plant the explosives under

11:39:02 15    the bridge.

16    **Q.**  And, I guess, regarding that criminal portion of the

17    investigation or the investigation into the conspiracy, as

18    you put it, during the course of your interview of the

19    defendant, did he make any incriminating statements with

11:39:15 20    respect to that conspiracy?

21    **A.**  He did.  Pretty early on, I pretty much just allowed

22    him to tell the story starting with the night of the arrest,

23    and pretty early on, he started talking about his -- what

24    his role was, that he was supposed to be kind of a scout for

11:39:36 25    the others while the explosives were planted and placed.  He

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    knew where they were going to be placed, but he would stay

2    more along the road and watch for people that would come.

3         He talked about early on, although he changed what he

4    said later on, early on, he said the intent was to bring the

11:39:53 5    bridge down, and although later, he said that he didn't

6    think it really was enough explosives to bring down the

7    bridge totally, but he wanted to have some kind of an

8    economic impact by stopping traffic on the bridge for a

9    while.

11:40:10 10        He talked about thinking that they were just going to

11   plant the explosives today and they would be detonated the

12   next day or another time, and so -- and then toward the end,

13   he talked about how the detonation was supposed to occur, it

14   was through a cell phone, calling another cell phone that

11:40:30 15   was in the device itself and causing the detonation.

16   So those are just a few examples of things he said.

17     Q.   Did the defendant express a knowledge or belief as to

18   what type of explosives were in the devices?

19     A.   He did.  He mentioned that it was C-4.  I believe it

11:40:45 20   was four pounds of C-4 in each device.

21     Q.   Did the defendant make any statements that you

22   considered to be incriminating of his other conspirators?

23     A.   Yes, he did.  He identified, in addition to himself, at

24   the early part of the interview, he said -- he referred to

11:41:07 25   the others as, you know, "The other guys that were arrested

1    with me."

2       He wouldn't actually express who they were by name, but

3    as the interview went on, he talked about Doug, who I

4    believe is Douglas Wright, and he talked about meeting

11:41:27 5    another individual who had sold them the explosives, and a

6    meeting in the hotel that he -- where he met with Doug and

7    that other person who sold the explosives and an FBI

8    informant that he was not aware was an informant at the

9    time, but he was an FBI informant employee at the hotel.

11:41:46 10       He also named Doug, Connor, Skully and Stafford and

11    other names that were involved, and those were the

12    individuals that were arrested that night, we believe.

13    **Q.**  At any point in time during your interaction or

14    conversation with the defendant, did you ever threaten him

11:42:04 15    in any way?

16    **A.**  No.

17    **Q.**  Did you ever make any promises to the defendant?

18    **A.**  No, nothing -- I mean, only thing we do pass on, as you

19    saw in the -- early in the tape is that the information

11:42:20 20    provided to us is passed on to the United States Attorney

21    and that, of course, if he's truthful, that would be looked

22    at as helpful to him, especially if he provided information

23    on others.

24    **Q.**  Did you ever -- was there any sort of complaint by the

11:42:37 25    defendant of his treatment by you or by any of the other

```
          1    agents that you're aware of?
          2    A.   No.
          3              MR. HERDMAN:  Just a moment, Your Honor, if I
          4    may.
11:42:46  5    BY MR. HERDMAN:
          6    Q.   At any point during the two hours, did he ever ask to
          7    cease or stop the questioning?
          8    A.   No, not that I recall.
          9    Q.   Did he ever request an attorney?
11:43:18 10    A.   No.
         11              MR. HERDMAN:  I have nothing further, Your
         12    Honor.  Thank you.
         13              THE COURT:  The answer "not that I recall" is
         14    what I call a limp leg.  You don't recall whether he asked
11:43:30 15    to stop?  That's my question to you.
         16              THE WITNESS:  I can revise my statement.  He
         17    did not ask to stop the interview.  I think that would have
         18    stuck in my mind, so --
         19              THE COURT:  All right.  Does that conclude
11:43:47 20    your direct?
         21              MR. HERDMAN:  It does, Your Honor.
         22              THE COURT:  You may cross-examine.
         23                   CROSS-EXAMINATION OF DANIEL MOLINA
         24    BY MR. PYLE:
11:43:52 25    Q.   Good morning.
```

1    **A.**   Good morning.

2    **Q.**   I want to start by asking you a few questions to

3    reconfirm the information you had about Brandon Baxter

4    before you started the interrogation.  Okay?

11:44:15  5    **A.**   Okay.

6    **Q.**   First of all, you knew he just turned 20 years old,

7    that's reflected in what we've seen already?

8    **A.**   Yes.

9    **Q.**   His birthday was April 27?

11:44:27 10    **A.**   You're asking if --

11    **Q.**   I'm asking you.

12    **A.**   I'm not -- I can't recall, but -- I can look at some

13    information and try to verify that.  I knew it was within

14    recent days.

11:44:40 15    **Q.**   Recent days?

16    **A.**   Yes.

17    **Q.**   So you know that in terms of the events that led up to

18    his arrest, he had been 19 years old; am I right?

19    **A.**   Yes, that would be true.

11:44:52 20    **Q.**   Now, in terms of background gathering you did before

21    the interrogation, are you telling the court that you, you,

22    meaning the FBI, never checked his arrest records, never

23    checked his background?

24    **A.**   Yes, I did.

11:45:09 25    **Q.**   You did?

1    **A.**   Yes.  I'm sure the case agents also did.  But in my

2    preparations, I did review his criminal history.

3    **Q.**   And what criminal history did you learn about?

4    **A.**   Boy, I can't recall, but I do -- I have a folder that I

11:45:24  5    used at the time, and it does include a tab with his

6    criminal history.  I could review it now and --

7    **Q.**   Would you?

8    **A.**   I know for sure during the interview, I talked to him

9    about a restraining order that had shown up in the criminal

11:45:42 10    history, and we mentioned that during the course of the

11    interview.

12    **Q.**   Would you refresh your recollection from whatever

13    documents you have available concerning the background, both

14    criminal and otherwise that you knew about?

11:47:08 15    **A.**   Okay.

16    **Q.**   Again, my question was, what information did you have

17    about his background, including his criminal history

18    background?

19    **A.**   I knew that he had been arrested on a couple of

11:47:20 20    occasions.  I would have known at the time that the --

21    according to these documents, Rocky River, Lakewood,

22    Cleveland PD, that he had some involvement with them, but --

23    from what I could tell, there's -- from what I could tell,

24    no -- there was not in the end prosecuted for that one.

11:47:46 25        And I knew that there was some kind of a restraining

1    order, which I mentioned earlier, with regard to another

2    individual, and I didn't know who that individual was

3    exactly, but he was able to clarify that during the

4    interview.

11:48:00   5    **Q.**   That was his stepfather?

6    **A.**   Yes, that's right.

7    **Q.**   Now, in regard to the Rocky River arrest, do the

8    records reflect that that arrest was February 16, 17, 18 of

9    2012?

11:48:14   10    **A.**   Has a case filing date of February 15, 2012.

11    **Q.**   Okay.  And did you follow up with that to confirm that

12    that had to do with his attempted suicide?

13    **A.**   No, I did not.

14    **Q.**   Did you do any follow-up to see what that related to?

11:48:35   15    **A.**   No, I did not.

16    **Q.**   Did you have any records available in front of you

17    concerning his stay in Parmadale until his 18th birthday

18    pursuant to a juvenile court order?

19    **A.**   I'm not familiar with Parmadale, but that would have

11:49:03   20    rung a bell.  I had no -- nothing that indicated to me in my

21    review that he was involved in the juvenile court system.

22    **Q.**   I want to ask you some questions now about the events

23    immediately at the time of his arrest before he came to your

24    office for this interrogation.

11:49:28   25    **A.**   Okay.

1    **Q.** You were part of the arrest team?

2    **A.** I was not.

3    **Q.** Did you have information from other agents before you

4    began the interrogation about what happened shortly before

11:49:41 5    his arrest? I am referring specifically to what happened at

6    that restaurant.

7    **A.** I was aware that they went to a restaurant. I was

8    present in the command post that we had set up for the

9    arrest that evening, and so I was aware through just the

11:49:58 10    different sources of information that we had that they went

11    to the restaurant, it's an Applebee's restaurant, after

12    planting the explosives, what they thought to be explosives,

13    so, yes, I was aware.

14    **Q.** And you knew that you -- I guess everybody has to call

11:50:15 15    him the CHS, had bought the men, meaning the defendants'

16    meals that night at the restaurant?

17    **A.** I was not aware of that when I did the interview.

18    **Q.** Were you aware that the CHS had bought them alcoholic

19    drinks?

11:50:33 20    **A.** I was not aware of that.

21    **Q.** Were you aware from the debriefings of the CHS that he

22    had previously supplied Brandon Baxter with a narcotic drug,

23    a pill?

24    **A.** No, I was not aware of that.

11:50:44 25    **Q.** Were you involved in any debriefings of the CHS either

1    that night or on previous nights?

2    **A.**  No, I was not.

3    **Q.**  Had you met the CHS?

4    **A.**  No.

11:50:53  5    **Q.**  Now I want to ask you questions about what was

6    happening there at the interrogation room immediately before

7    questioning Brandon.

8    **A.**  Okay.

9    **Q.**  Now, it's not entirely clear from the video here that

11:51:14  10   when Brandon Baxter came in, he was wet?

11   **A.**  Yeah.  It wasn't entirely clear to me either, but I

12   think during the course of the interview, at some point he

13   mentioned being wet.  He definitely mentioned being cold.

14   **Q.**  You certainly know the background that the men -- the

11:51:30  15   defendants had been standing around this bridge with fake

16   explosives and so on and so forth and it had been raining?

17   **A.**  Actually, I wasn't aware that it was raining when they

18   were planting the explosives, but I was aware during the

19   arrest that it was raining outside, yes.  So they would have

11:51:45  20   been wet.

21   **Q.**  They were fake explosives?

22   **A.**  Yeah.  What they pur- -- what they thought were

23   explosives.

24   **Q.**  So you grudgingly admit that he was wet; yes?

11:52:00  25                  MR. HERDMAN:  Judge, I object to the

1    characterization.

2                    THE COURT:  Sustained.

3    BY MR. PYLE:

4     **Q.**  He was definitely cold?

11:52:08 5     **A.**  He appeared to be cold, yes.

6     **Q.**  He was shaking, or so it appears, in the video?

7     **A.**  Yes.

8     **Q.**  It was 12:30 at night, right?

9     **A.**  That's correct.

11:52:14 10     **Q.**  You don't know how much sleep or lack of sleep he had

11    received the previous night?

12     **A.**  No, I don't.

13     **Q.**  You don't know what, if anything, he had to eat that

14    day?

11:52:24 15     **A.**  That's correct, I don't know what he had to eat that

16    day.

17     **Q.**  You didn't -- as I understand it, you didn't inquire

18    about whether the CHS had bought alcohol for them at the

19    restaurant?

11:52:36 20     **A.**  I definitely did not inquire as to whether the CHS

21    bought alcohol for them.

22     **Q.**  And then you began your interrogation?

23     **A.**  As I described, yeah, I didn't begin my interrogation

24    immediately, but we took some time to make sure that he was

11:52:58 25    warm and in more of a state where he would be receptive to

1    questions.

2    **Q.**  But the -- I'm going to backtrack for a question or

3    two.  You knew that the arrest team consisted of multiple

4    officers?

11:53:14  5    **A.**  That's correct.

6    **Q.**  Couple dozen at least, right?

7    **A.**  I'm not sure the total number, but it's possible.

8    **Q.**  They had -- they were all wearing, you know, flak

9    vests, you know, weapons of different kinds, side arms,

11:53:30  10    rifles, heavily armed?

11    **A.**  Yes, sir.

12    **Q.**  Okay?

13    **A.**  Yes.

14    **Q.**  So he was arrested by this team of heavily armed men,

11:53:38  15    brought to your office, and how long did he wait there

16    before the interrogation began?

17    **A.**  I don't know exactly when, but I can estimate that it

18    was probably in the order of an hour to an hour and a half.

19    **Q.**  Okay.  In your office, wet, cold, you bring him in and

11:53:56  20    you did give him coffee?

21    **A.**  Yes.

22    **Q.**  And you were talking to him, and you described the

23    penalties, potential penalties, 20, 30 years; you told him

24    that?

11:54:08  25    **A.**  Yes.

1    **Q.**  You told him that what he said could help him with the

2    U.S. Attorney's Office or with the prosecutor?

3    **A.**  I would have to refer to the transcript again to be

4    sure, but I know that I said that we would relay the

11:54:21  5    information to the prosecutor and that truthful information

6    could only benefit him.

7    **Q.**  Okay.  Next, I want to invite your attention to page --

8                THE COURT:  Of the transcript?

9                MR. PYLE:  Yes, sir.

11:54:51  10                THE WITNESS:  I'll need a copy of the

11    transcript with the page numbers, please.

12                Thank you, sir.

13    BY MR. PYLE:

14    **Q.**  You have page 7?

11:55:08  15    **A.**  Yes, I do.

16    **Q.**  Top of the page, to set the context, you had given him

17    a copy of the rights form before you get to this point or

18    not?

19    **A.**  At the top of the page, I don't believe I have given

11:55:34  20    him the form until about midway through the page.

21    **Q.**  Okay.  Going back to page 6, just briefly to set the

22    context, you say, "But the way our process is set up, we

23    also want to make sure that you understand what your rights

24    are before you talk to us.  Okay?  If you think you want to

11:56:03  25    talk to us, we'll be happy to read that to you and you

1    can -- you can talk to us, ask us questions, whatever you

2    feel comfortable with and at any time, you can, uh, decide

3    you don't want to talk to us, we can do that too.  All

4    right?"

11:56:24  5    **A.**  Yes.

6    **Q.**  That's the lead-up.  And he says, "I'm very aware that

7    I have no rights, so I'm going to stick with good cop right

8    now."

9    **A.**  Yes.

11:56:34  10    **Q.**  Is that what you heard him say?  Because it wasn't

11    clear to me.

12    **A.**  That is what I heard him say.

13    **Q.**  And instead of saying, "No, you're wrong, you have

14    rights," you went right into the, "Well, we have a standard

11:56:54  15    form"?

16    **A.**  I actually mentioned that we had a standard form, and I

17    asked him to make sure he went through those, which were a

18    list of his rights.  So even if his -- my perception was

19    that even if he felt he had no rights, I was about to show

11:57:12  20    him that he did indeed have rights.

21    **Q.**  Were you aware that it was approximately this time when

22    there was legislation pending to the effect that people

23    arrested for certain crimes were not to be given Miranda

24    rights, that they essentially had no rights?

11:57:31  25                   MR. HERDMAN:  I would object to the relevance

1     of that question.

2                     THE COURT:  It's cross-examination.

3     Overruled.

4                     THE WITNESS:  Will you repeat the question?

11:57:39  5     BY MR. PYLE:

6      **Q.**  Were you aware that in approximately April of 2012,

7     there were congressional inquiries, national discussion, if

8     you will, about not giving, quote, unquote, "terrorists"

9     advice of rights forms of any kind?

11:57:55 10                     THE COURT:  The question is, were you aware of

11    that?

12                     THE WITNESS:  I'm not sure I was aware of

13    something specifically in that time frame, but I think

14    that's been discussed over the last several years, and I was

11:58:08 15    aware of that, yes.

16    BY MR. PYLE:

17     **Q.**  Did it strike you -- did it strike you as unusual that

18    he would say, "I'm very aware that I have no rights"?

19     **A.**  No.  My perception when he said that was -- it was kind

11:58:31 20    of a defiant attitude toward police, and that, in effect, he

21    really didn't have rights.  It was his way of just stating

22    something that I thought that he even knew wasn't true, and

23    that's why I proceeded to make sure that he understood what

24    his rights were.

11:58:53 25     **Q.**  Well, then you -- what you proceeded to do was just

                     Lori A. Callahan, RMR-CRR      (330) 252-6022

1    give him this form and have him read it; am I right?

2      **A.**  That's correct.

3      **Q.**  And he's reading it and it says, according to the

4    transcript, "Cannot afford a lawyer, where would one be

11:59:09 5    appointed from?"

6      **A.**  Yes.

7      **Q.**  And there's no question the first words out of your

8    mouth were, "Uh, the U.S. Attorney's Office," and I realize

9    you continue, but that was the first thing you said?

11:59:25 10      **A.**  Yes.

11      **Q.**  And the U.S. Attorney's Office is the federal

12    prosecutor's office?

13      **A.**  Yes.

14      **Q.**  And that's not true?

11:59:31 15      **A.**  That's correct.

16      **Q.**  And you never -- other than saying, "Uh, the judge

17    would appoint an attorney for you," I mean, you never

18    clarified that remark you made about the U.S. Attorney's

19    Office being involved in the process?

11:59:44 20      **A.**  I think the reason for my pause was because I

21    immediately knew that what I had just said, the U.S.

22    Attorney's Office, was more for me, because that's where I

23    would go to make sure that he got -- that the U.S.

24    Attorney's Office was aware that he needed an attorney, and

11:59:59 25    I paused and rephrased it as, "The judge would appoint an

1    attorney for you."

2    **Q.**  Now, for sure, you never told him that at his trial,

3    that the prosecutors would not be allowed to comment in any

4    form whatsoever if he failed to answer your questions or

12:00:21  5    asserted his right to counsel?  You never told him that, did

6    you?

7    **A.**  That's correct.

8    **Q.**  And then the interrogation continued, you said, for two

9    hours, plus?

12:00:38 10    **A.**  It was under that.  But from this point on, it was

11    probably an hour and 50 minutes.

12                    THE COURT:  Can I interrupt and ask what

13    instructions you receive from your superiors at the FBI as

14    to how to respond to the question, "Where would one be

12:00:59 15    appointed for me?"

16                    When the person you want to interview talks

17    about the right to a lawyer, do you have any instructions as

18    to how to respond to that question, if you recall?

19                    THE WITNESS:  I can't recall.  It would have

12:01:19 20    been some time ago.  But our practice would be just to make

21    sure that they're aware that they can -- they can have

22    access to a lawyer if they wanted to before --

23                    THE COURT:  How are they going to get access

24    to a lawyer?  You're interviewing him now, you've got him in

12:01:35 25    the FBI office and they say, "I want a lawyer."

1          What are you going to do next?

2              THE WITNESS:  I would terminate the interview

3    and he would be -- I would terminate the interview.  I

4    wouldn't proceed.

12:01:47  5              THE COURT:  You don't have the power to get

6    him a lawyer, do you?

7              THE WITNESS:  I do not.

8              THE COURT:  Why do you tell him that the judge

9    would -- U.S. Attorney's Office or the judge would appoint

12:01:57  10    an attorney?

11          Why do you give him that statement?

12              THE WITNESS:  My perception at the time was

13    that he would then be processed through the rest of his

14    booking.  He would go for -- his next judicial process would

12:02:12  15    be an initial appearance of some sort where he would --

16              THE COURT:  First he's got to be arrested,

17    doesn't he?

18              THE WITNESS:  He was -- at that point, he had

19    already been arrested.

12:02:19  20              THE COURT:  All right.  So did you have a date

21    when he was going to appear before a judicial officer?

22              THE WITNESS:  I did not.  But the standard

23    process, as I understand it, is that he would be afforded an

24    opportunity in front of a judge where he would be told about

12:02:40  25    his charges formally and would be able to express whether or

1    not he could afford an attorney, those kinds of things, and

2    one may be appointed for him.

3                    So I just -- that is what I expressed to him

4    and said the judge -- a judge would appoint an attorney.  He

12:02:58  5    would have access to an attorney whenever he wanted to.

6                    THE COURT:  We will take the noon recess at

7    this time.  We will resume at 1:00.

8            (Thereupon, a luncheon recess was taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Afternoon Proceedings.)

2                  THE COURT:  Can the witness take the stand

3      again, please?

4                  You may continue.

13:03:15  5    By MR. PYLE:

6      **Q.**  You organized there?

7      **A.**  Yes, I am.

8      **Q.**  I just have one follow-up question.  This morning I was

9      asking you about an act of Congress concerning suspected

13:03:29 10    terrorists being advised of rights to remain silent and so

11     forth.

12          What I was intending to ask about was something called

13     the National Defense Authorization Act.

14          Do you know the law to which I am referring to?

13:03:49 15    **A.**  Yes, I do.

16     **Q.**  That was a law that was in effect at the time of this

17     interrogation, was it not?

18     **A.**  I'm not sure if it was or not.

19     **Q.**  But you know that the law, as you understood it,

13:04:02 20    provided that suspected terrorists would have no rights --

21     to be advised of no rights?

22     **A.**  No, I wasn't aware of that even.

23     **Q.**  What was your understanding about the impact of that?

24     **A.**  I think I had just -- I may have read in papers or

13:04:18 25    something like that, again, over the course of years, but

                    Lori A. Callahan, RMR-CRR        (330) 252-6022

1    leading up to the act, you're referring to -- I think the

2    only thing I looked at in detail to that was in the -- there

3    was some controversy over the military being able to --

4    there being a lot of assessment as to whether or not the

13:04:43  5    military would take them into custody or domestic law

6    enforcement.

7                    MR. PYLE:  Those are my questions.  Thank you.

8                    THE COURT:  Any redirect?

9                    MR. HERDMAN:  Briefly, Your Honor.  Thank you.

13:04:54 10              REDIRECT EXAMINATION OF DANIEL MOLINA

11   BY MR. HERDMAN:

12    **Q.**  Agent Molina, you referred to a document on your

13   cross-examination that referenced the defendant's arrest

14   record, I believe?

13:05:05 15    **A.**  Yes, sir.

16    **Q.**  And there was a particular arrest that Mr. Pyle asked

17   you about.  It took place on February 15, or at least I

18   think your testimony was the case was filed February 15,

19   2012?

13:05:15 20    **A.**  That's correct.

21    **Q.**  What was the criminal violation that's outlined on that

22   criminal history there?

23    **A.**  I don't see any criminal violation listed there.  The

24   closest it gets is the case -- sometimes is a misdemeanor,

13:05:55 25   and it's an undisposed case.

                    Lori A. Callahan, RMR-CRR        (330) 252-6022

1    **Q.**  And just to briefly redirect your attention back to

2    that transcript, that 11-page portion of the transcript.  If

3    I could direct your attention to page 7.

4        The defendant said, "Cannot afford a lawyer, where

13:06:20  5    would one be appointed from?"

6        Then it says, "Molina:  Uh, the U.S. Attorney's

7    Office," and how did you finish that sentence?

8    **A.**  Transcript says, "and the judge would appoint an

9    attorney for you."  Just the sentence or the paragraph?

13:06:40  10    **Q.**  Just that sentence.

11    **A.**  "The judge would appoint an attorney for you."

12    **Q.**  You stated on your direct testimony, I think also on

13    cross, that you were aware that the defendant had

14    acknowledged that statement from you?

13:06:54  15    **A.**  Yes.

16    **Q.**  Do you remember seeing something on the video that

17    indicated that defendant having acknowledged that particular

18    statement?

19    **A.**  Yes.  He kind of looked back to the form after I had

13:07:04  20    told him those words, and then did a subtle nod and handed

21    it back as though he was fine with the rest of what was

22    written there.

23        Also, Agent Stark had pointed out to him after he'd

24    done that, before he signed it, he said, "Do you understand

13:07:22  25    everything that's on there, and are you willing to talk to

1      us?"

2        **Q.**  And Mr. Baxter nodded?

3        **A.**  Yes.

4                 MR. HERDMAN:  I have nothing further, Your

13:07:34  5    Honor.  Thank you.

6                 THE COURT:  Are you suggesting to a defendant

7      that if they cooperate, they may be entitled to more relief

8      in connection with their conduct?

9                 THE WITNESS:  In what context, sir?

13:07:59  10             THE COURT:  Well, at the bottom of page 5, top

11     of page 6 of the transcript, "And what we are here for is

12     just because we want to talk to you and give you a chance to

13     tell your side of the story and to be truthful with us.

14     Because we know that if you're truthful with us, that we can

13:08:28  15   pass that onto the prosecutors and they can take that into

16     consideration as they're trying to process the prosecution."

17                So it sounds to me like you're saying, "If

18     you're truthful with us, then it will be to your benefit,"

19     and is that the impression you were attempting to relay to

13:08:55  20   the defendant?

21                THE WITNESS:  I think the impression I was

22     trying to leave with him was that this was an opportunity

23     for him to answer our questions, and that we would relay

24     our -- our job, as we're instructed, is to simply relay the

13:09:13  25   information that we get from the defendant to the prosecutor

1      to document.

2                      THE COURT:  You don't think you were

3      suggesting to him that it would be for his benefit if he

4      were to respond to your questions?

13:09:28   5                      THE WITNESS:  It wasn't the intent of my --

6      what I said there was to --

7                      THE COURT:  Why do you tell him you would pass

8      the information to the prosecution if it will not be for his

9      benefit?

13:09:49  10                      THE WITNESS:  Because that's what I plan to

11      do.  I mean, sir, when we interview someone, our job is to

12      document the facts as they present them to us to the

13      prosecutor.  That's what I plan to do and that's what I was

14      telling him what I planned to do.

13:10:08  15                      THE COURT:  So you're not attempting to leave

16      the impression that if he talks to you, that it's somehow

17      going to be to his benefit?

18                      THE WITNESS:  I could understand how he might

19      take that from it, but that's not my only intention.  My

13:10:27  20      intention is to relay to him what I plan to do.

21                      THE COURT:  Why do you delay reading him his

22      rights?  Why isn't it the first thing you do?

23                      THE WITNESS:  My intent --

24                      THE COURT:  No.  I am asking you, why do you

13:10:42  25      delay reading him his rights?

1              THE WITNESS:  Because my understanding of

2    advice of rights and Miranda is they have to be relayed

3    prior to questioning the subject or doing something that

4    would elicit some kind of substantive response from him.

13:10:58 5   And so my intent is to just relay the seriousness of what we

6    were about to talk about and, therefore, I didn't see the

7    need for Miranda warnings to be read until I had a feeling

8    that we were going to proceed with the interview.

9              THE COURT:  Do you have the transcript in

13:11:13 10  front of you?

11             THE WITNESS:  I do, sir.

12             THE COURT:  Well, look at page 5.  It says,

13   "Let's just start from scratch," "the reason we want to talk

14   to you."

13:11:40 15             Why did you not initiate that discussion with

16   his constitutional rights?

17             THE WITNESS:  Again, my intention is to make

18   sure he understood his rights.

19             THE COURT:  My question is, why don't you

13:11:50 20  advise him of his constitutional rights at the beginning?

21             THE WITNESS:  Because it's -- may be flawed,

22   but my understanding of Miranda is that it doesn't attach

23   until I am trying to elicit a comment back from him that

24   might be substantive.

13:12:07 25             THE COURT:  Why do you go through all these

1    comments if you're not trying to elicit a response from him

2    when you talk for more than a page about all the information

3    that you have?

4                THE WITNESS:  No.  My purpose was to elicit

13:12:23  5    deep thought about the seriousness about what we were about

6    to discuss.

7                THE COURT:  And after he says to you, "I'm

8    very aware that I have no rights, so I'm going to stick with

9    good cop right now," so you don't tell him, "Yes, you do

13:12:34 10    have rights, these are your rights"?

11                THE WITNESS:  I followed that comment with

12    advising him of his rights.  That was my intention, was to

13    let him know that he does have rights.

14                THE COURT:  Where did you come up with the

13:12:49 15    idea that the judge will appoint counsel for him?

16                THE WITNESS:  Well --

17                THE COURT:  I've never appointed counsel for

18    anybody who's being interrogated.  I've been on this bench

19    for almost 30 years and nobody has come to me and said, "We

13:13:03 20    tried to interview the suspect and we want a lawyer.  Will

21    you please appoint a lawyer?"

22                Have you heard that to happen?

23                THE WITNESS:  No.

24                THE COURT:  When you were in the interrogation

13:13:16 25    phase?

1                    THE WITNESS:  No.

2                    THE COURT:  Why do you tell him that?

3                    THE WITNESS:  Our interview would have

4        terminated at the point he said he wanted an attorney,

13:13:23 5       couldn't afford one.  At that point, my -- what I was trying

6        to relay to him was that if he can't afford one, because he

7        wasn't asking, "Where can I get an attorney from," he was

8        asking, "If I can't afford one, where would I get one?"  At

9        that point, the next phase of getting an attorney would be a

13:13:39 10      judge would appoint one for him.

11                   THE COURT:  Have you ever heard of counsel

12       being appointed for somebody who's being interrogated?  I've

13       never heard that to happen.  During an investigative stage

14       of the case, when have you ever asked a judge to appoint

13:13:55 15      counsel for somebody so you can continue with the

16       interrogation?

17                   THE WITNESS:  My understanding of his question

18       was not where would he get an attorney before he gets

19       interrogated.  My understanding of his question was when he

13:14:08 20      gets to that point, where would he get an attorney if he

21       can't afford one.

22                   THE COURT:  Any more cross-examination?

23                   MR. PYLE:  Thank you, Your Honor.  No.

24                   THE COURT:  Any more redirect?

13:14:18 25                  MR. HERDMAN:  No.

1          THE COURT:  Does that complete your testimony?

2          MR. HERDMAN:  It does, Your Honor.

3          THE COURT:  You may step down.  Thank you.  Do

4     you wish to put on any testimony?

13:14:27   5          MR. PYLE:  We call Brandon Baxter for a

6     limited purpose of this hearing on this motion.

7          THE COURT:  Very well.  Thank you.

8                    BRANDON BAXTER

9     of lawful age, the defendant herein, being first duly sworn,

13:15:00  10     was examined and testified as follows:

11          DIRECT EXAMINATION OF BRANDON BAXTER

12     BY MR. PYLE:

13     **Q.**  Like every other witness, you've got to start by

14     telling us your full name and spell it.

13:15:14  15     **A.**  Brandon Baxter, B-R-A-N-D-O-N, B-A-X-T-E-R.

16     **Q.**  How old are you now?

17     **A.**  Right now I am 20 years old.

18     **Q.**  What's your birth date?

19     **A.**  4-27-92, April.

13:15:27  20     **Q.**  So as of April 30, you had just turned 20 three days

21     earlier?

22     **A.**  Correct.

23     **Q.**  I want to invite your attention to the time of your

24     arrest on April 30.  Are you with me?

13:15:44  25     **A.**  Uh-huh.

```
         1    Q.  Tell us the circumstances of your arrest.

         2    A.  The group, along with the provocateur, we were inside

         3    of Applebee's.  We had had a meal there.

         4              THE COURT:  Did you know him as the

13:16:02 5    provocateur?

         6              THE WITNESS:  That is how I view him.

         7              THE COURT:  Did you know him at the time to

         8    be?

         9              THE WITNESS:  No.

13:16:11 10             THE COURT:  Why don't you give us his name at

        11    the time.  Provocateur, that's your lawyer's word.

        12             THE WITNESS:  Is it okay for me to use his

        13    name?  Okay.

        14             THE COURT:  Yes.

13:16:21 15             THE WITNESS:  All right with the government?

        16             THE COURT:  Don't worry about the government.

        17    I said you could use the name.

        18             THE WITNESS:  Shaquille was there.  He paid

        19    for the majority of the meal.  He informed me that he didn't

13:16:37 20   have enough to cover it, so I chipped in, I think, 5 or $10

        21    for the meal.  He had purchased me a tallboy, which is a

        22    large beverage, alcoholic beverage, I believe, of the brand

        23    Yuengling, a glass about yea tall.  And I had finished

        24    another one of my codefendant's who didn't want to finish

13:17:09 25   theirs.
```

1    As we left the restaurant, we entered into an

2    SUV.  I was in the very back seat.  There were two front

3    seats, middle row and then there was a second row in the

4    back.  I was in the very back.

13:17:27    5    And as we were pulling out of the parking lot,

6    we were surrounded by federal agents, local law enforcement.

7    This is according to the affidavit that were --

8    **Q.**  Well, what did you see?

9    **A.**  What I saw first were about two SUVs right in front,

13:17:52    10    two more on each side coming in with spot beams, like bright

11    blue lights and spot beams.  There were officers -- keep in

12    mind, these are paramilitary officers.  They're all in head

13    to toe bulletproof vests.  There was a Shepherd, German

14    Shepherd, and they were making -- the officers were making

13:18:23    15    weird noises.  (A noise made by witness.)  I think that was

16    a command to make the dog bark and act vicious.

17    There was what appeared to be a tank.  And from what I

18    thought was -- I really do believe to be some sort of a tank

19    or military APC style, and that was carrying what I later

13:18:49    20    found out to be FBI SWAT.

21    At the time they -- they appeared to be very militant.

22    They were in olive green uniforms.  The leader had a P90

23    submachine gun, which to my knowledge has a 50-round

24    magazine, and all the federal agents that surrounded us,

13:19:14    25    which appeared to be somewhere between 75 -- 50 or 75

1     agents, all of which were carrying, I believe, M16 assault

2     rifles, they converged upon the vehicle.

3          They had a loud megaphone and they ordered -- they

4     ordered the driver to stop the vehicle and for everyone to

13:19:39  5     put their hands out of the window.  At that point, the

6     informant ordered -- he didn't order.  He told everyone in

7     the vehicle to act cool.  "Act cool, guys, just play it

8     cool."

9          The agent on the megaphone then proceeded to order all

13:20:00 10     of us individually out of the vehicle.  During this point,

11     it's pouring rain.  It's pouring rain.  It's coming down

12     hard.  It was a torrential downpour.  And we were ordered

13     down with our hands behind our heads and walk backwards

14     toward the FBI, and I'm the last one to be called out of the

13:20:29 15     vehicle.

16          I'm ordered to lay on my stomach with my -- just flat

17     on the ground in the soaking -- on the soaking wet pavement

18     and guns drawn on me.  The scene was completely unreal.

19     I've never experienced anything like this in my life.  I

13:20:53 20     mean, I have -- I've been arrested by the police before.

21     This was a completely different level.

22     **Q.**  Okay.  So you -- I'm going to try to get you focused

23     here, Brandon, if that's okay.

24     **A.**  Okay.

13:21:06 25     **Q.**  You were laying face down, wet ground.  Eventually you

1    were ordered up.  What happened then?

2      A.  I was put into a sedan, unmarked federal agent's

3    vehicle, and I was taken to the FBI headquarters, downtown

4    Cleveland.

13:21:30  5      Q.  What time of day or night were you arrested?  What time

6    did you get off the ground?

7      A.  I want to say approximately -- approximately 9:30 p.m.

8      Q.  So they got you in the sedan, they drove you someplace.

9    Where did they drive you?

13:21:51  10      A.  Drove me to the FBI headquarters in downtown Cleveland.

11      Q.  Were you the only one of the group of the defendants in

12    that vehicle?

13      A.  In that vehicle.  They took us all to the same location

14    in separate vehicles.

13:22:02  15      Q.  You got to the FBI office about what time; do you

16    remember?

17      A.  I don't know.  I was in a state of shock.  I can

18    consider -- I would compare the way I felt to what I

19    understand posttraumatic stress disorder to be.

13:22:19  20      Q.  What's that?

21      A.  Well, posttraumatic stress.  I mean, it's stress after

22    a very traumatizing situation.  I felt that my life was

23    being endangered because I was surrounded by a large amount

24    of fully automatic assault rifles, and every officer to my

13:22:43  25    knowledge also carried a side arm.  There were a lot of guns

1  there.

2  **Q.**  Okay.  So eventually you do get to the FBI office.  Do

3  you get what they call booked?  Do you get fingerprinted,

4  all that?

13:22:56  5  **A.**  No.  That came later.  They started by -- they took us

6  into this large area.  It felt like a parking garage.  There

7  were a lot of vehicles in there.  Some of them seemed

8  similar to the tank I saw earlier.  And they put us in this

9  room they call the cage.

13:23:23  10  I have to catch myself for a moment.

11  This is the first time I've ever experienced anything

12  like this in my life.  This room they call the cage -- I am

13  just emotional.  I'm not --

14  THE COURT:  Just take your time.  Are you

13:23:53  15  ready for the next question?

16  THE WITNESS:  Yes.

17  BY MR. PYLE:

18  **Q.**  Okay.  You're in this room.  It looks like a cage,

19  right, there were bars?

13:23:59  20  **A.**  Yeah.  They put us all in separate corners in the room,

21  just facing into the corner.  I sat there for well over an

22  hour, soaking wet, not knowing what was going to happen.

23  **Q.**  Did anyone talk to you or did you talk to anybody

24  during that next hour?

13:24:30  25  **A.**  No.

1    **Q.**  What is the next thing that happened?

2    **A.**  They proceeded to take us all individually away.  I

3    didn't know what was happening.  They took us up to the room

4    where the FBI began to do what they call an interview, but I

13:24:51  5    know very well it's an interrogation.

6    **Q.**  Had you been fingerprinted or photographed before you

7    got into the room?

8    **A.**  No.

9    **Q.**  Go ahead.

13:25:03  10    **A.**  From there -- where did I leave off?

11    **Q.**  They brought you into the room.

12    **A.**  As you can tell by the video, I am -- I'm in some -- I

13    am dazed and I am confused, I am nervous, I'm terrified.

14    And I felt very intimidated, and I felt if I didn't tell

13:25:40  15    them what they wanted to hear, that I didn't know what was

16    going to happen.

17    **Q.**  They gave you coffee, though?

18    **A.**  Right.

19    **Q.**  They let you go to the bathroom?

13:25:49  20    **A.**  Yeah.

21    **Q.**  You heard Agent Molina talk about telling you about

22    what they had on you and the seriousness.  Were you

23    listening to them?

24    **A.**  Yes.

13:26:02  25    **Q.**  After hearing him talk about the seriousness and the

1     taking what you said to the U.S. Attorney's Office, what

2     were you feeling then?

3     **A.**  I felt like they -- it was like they were giving me an

4     offer, "If you talk to us, things will not be as bad as they

13:26:31  5     could be if you don't."

6     **Q.**  You heard Agent Molina talk about the advice of rights

7     form, right?

8     **A.**  Uh-huh.

9     **Q.**  Before he gave you that form, you said something about

13:26:46  10     "I know I don't have any rights"?

11     **A.**  Correct.

12     **Q.**  Why did you say that?

13     **A.**  Because I had knowledge of what you had mentioned

14     earlier in the cross-examination of the NDAA, National

13:27:01  15     Defense Authorization Act.  To my knowledge, it was signed

16     in by President Obama on the New Year's of this year, and

17     there was a clause that's been called the indefinite

18     detention clause, which gave the military of the United

19     States the right to indefinitely detain any U.S. citizen

13:27:31  20     without reading them their rights, that it more or less gave

21     the military the ability to make anybody just disappear.

22     They didn't have to announce it.  They didn't have to have a

23     warrant.  They could just make you go away.

24     **Q.**  You actually sat down and read that piece of

13:27:57  25     legislation?

1    **A.**   I read parts of it, not the whole thing.  This part of

2    the clause itself, the act itself is a very lengthy

3    document.  It goes into larger details on the whole military

4    defense of the country, but this is a clause.

13:28:19  5    **Q.**   Why didn't you ask the agent, "Gee, am I covered by the

6    National Defense Authorization Act," or words to that

7    effect?

8        Why didn't you just ask him about, "Am I being held

9    pursuant to that law?"

13:28:34  10    **A.**   I was afraid.  I don't want to bring that up.  I mean,

11    I was --

12    **Q.**   Okay.  After you say, "I don't have any rights," then

13    he gives you the form, right, with the rights on it?

14    **A.**   Right.

13:28:49  15    **Q.**   What did you think when you were reading that form?

16    **A.**   The form right here?

17    **Q.**   Yes.  If it's not, I can show you a copy of it.

18        The form that advises you that you have a right to

19    remain silent, et cetera.

13:29:21  20    **A.**   I remember I did read this, and I asked about the

21    lawyer.  I asked where would it be appointed from, and then

22    the interrogating agent at that point just told me where he

23    thought I could get a lawyer and kind of jumped on to,

24    "Well, we need to talk.  We need to talk."

13:29:47  25        I felt like I was being pressured to sign this paper,

1    if I didn't sign this paper and I didn't talk to these

2    people, that there were going to be grave repercussions.  Of

3    what exactly, I was unaware; but I was afraid for my life at

4    this point.

13:30:05  5    **Q.**  So I want to kind of summarize now.

6              THE COURT:  I am sorry.  I didn't get the

7    question.

8              MR. PYLE:  I want to summarize.

9              THE COURT:  Okay.

13:30:19 10   BY MR. PYLE:

11   **Q.**  First of all, did you believe that you had the right to

12   say, "I'm not going to talk to you"?

13   **A.**  No.

14   **Q.**  What made you feel that way?

13:30:29 15   **A.**  What made me feel that way was the way I was arrested.

16   It was like -- you ever seen a movie of when Nazis come and

17   take over a town?  That's what I felt like.  I mean, the

18   German Shepherd is on top.  They didn't stop barking the

19   entire time.  I just --

13:31:03 20   **Q.**  Okay.  There were the circumstances of your arrest,

21   right?

22   **A.**  Uh-huh.

23   **Q.**  What else?

24   **A.**  Circumstances of my arrest, the fact that I was soaking

13:31:15 25   wet and I was held in a cage.  And I -- I was under a lot of

```
 1   stress.  And I was under -- I was confused.  I go from a
 2   situation where everyone is bashing orders at me and
 3   pointing guns at my face, they're telling me to "Get on the
 4   ground," to "Hey, you want some coffee?"
 5   Q.  Had the alcohol worn off at that point?
 6   A.  Well, I mean, have you drank before, Mr. Pyle?
 7                 THE COURT:  You don't get to question.
 8                 MR. PYLE:  I take the Fifth Amendment anyway,
 9   Judge.  Go ahead.
10                 THE WITNESS:  I am sure we're well aware, your
11   buzz goes away.  There's still some lingering effects.  I
12   mean, the government's trying to say that --
13   BY MR. PYLE:
14   Q.  We'll let the government speak for themselves, but
15   there's that drinking.  When was the last time you used any
16   kind of illegal drug?
17                 THE COURT:  Illegal?
18                 MR. PYLE:  Illegal.
19                 THE COURT:  Illegal drugs?
20                 MR. PYLE:  Illegal.
21                 THE COURT:  I didn't hear you talk about
22   illegal drugs.  I thought it was alcohol.
23                 MR. PYLE:  That night, yes.
24                 THE WITNESS:  On April 28, I had taken an
25   Adderall, which is a prescription medication for people who
```

1    have ADHD.  For those of us who do not have ADHD, if we take

2    this prescription medication, it gives us the inability to

3    sleep.  For the night of April 28, I had absolutely no

4    sleep, and I stayed up all night in the Occupy Cleveland

13:33:22 5    info booth, honestly hanging out with a bunch of homeless

6    people, one of which was an Iraqi vet with posttraumatic

7    stress disorder, and I tried to keep him stable for the

8    night.

9    BY MR. PYLE:

13:33:39 10   **Q.**  So how much sleep had you had?  When was the last time

11   you had gotten any sleep before your interrogation?

12   **A.**  I believe I slept -- I believe I slept the night of

13   April 29, but Occupy Cleveland had occupied the Heart Fest

14   going on at that time.  So I was up very late helping them

13:34:05 15   put supplies away because the city was not allowing us to

16   stay in Willard Park.  They weren't allowing us to keep our

17   supplies in the park overnight.  So I helped, I stayed at

18   the park later to help load a truck with all the supplies

19   that were in the park.

13:34:24 20       I did get sleep that night, but I -- I have a bad

21   memory.  I am trying to recall.  I did get sleep that night,

22   but I was woken up, I believe, the next day.

23   **Q.**  Who gave you the Adderall?

24   **A.**  That Adderall was given to me by a friend whom I'd like

13:35:03 25   to remain unnamed.

Lori A. Callahan, RMR-CRR       (330) 252-6022

1      Adderall was something back when I was a few years

2   younger, I had an addiction to.  And I had gotten over this

3   addiction at one point.  While I was working for Mr. Azir,

4   he gave me a job fixing up his house.  He had given me an

13:35:21 5   Adderall, and this was the first Adderall I had had in a

6   number of years, and it kick started back up my addiction.

7   **Q.**  Okay.

8                  MR. PYLE:  Those are my questions.  Thank you.

9                  THE COURT:  You may cross-examine.

13:35:44 10                  MR. HERDMAN:  Thank you, Your Honor.

11                  CROSS-EXAMINATION OF BRANDON BAXTER

12   BY MR. HERDMAN:

13   **Q.**  Good afternoon, Mr. Baxter.  My name is Justin Herdman.

14   I'm an Assistant United States Attorney.  I will be asking

13:35:52 15   you a few questions.  My questions will call for a "yes" or

16   "no" response.  If you don't understand something I say,

17   please let me know.  Okay?

18      You described the circumstances of your arrest on April

19   30.  You actually went into somewhat great detail during

13:36:09 20   your direct examination from Mr. Pyle?

21   **A.**  Uh-huh.

22   **Q.**  You remembered leaving Applebee's?

23   **A.**  Yes.

24   **Q.**  You remembered getting into the SUV?

13:36:19 25   **A.**  Yes.

1    **Q.**  You remembered --

2              THE COURT:  I think you should say, "Do you?"

3    You're making a statement rather than asking him a question,

4    so ask a question.

13:36:30  5              MR. HERDMAN:  Will do, Your Honor.  Thank you.

6    BY MR. HERDMAN:

7    **Q.**  Do you remember how everyone was arranged inside the

8    SUV?

9              THE COURT:  The one he was in?

13:36:42 10              MR. HERDMAN:  Yes, Your Honor.

11              THE COURT:  State the question again.

12    BY MR. HERDMAN:

13    **Q.**  Do you remember how everyone was arranged inside the

14    SUV?

13:36:53 15              THE COURT:  Well, I still -- you mean the SUV

16    where he occupied?  I thought he described more than one

17    SUV.

18    BY MR. HERDMAN:

19    **Q.**  Did you leave Applebee's and get into an SUV?

13:37:07 20    **A.**  Yes.

21    **Q.**  Do you remember how everyone inside that SUV was

22    arranged?

23    **A.**  Most of them.

24    **Q.**  Who was driving?

13:37:15 25    **A.**  Shaquille.

1      **Q.**  Who was in the front passenger seat?

2      **A.**  Mr. Wright.

3      **Q.**  Where were you seated?

4      **A.**  I was in the very back row.  I don't remember which

13:37:24  5      side I was on.

6      **Q.**  Who was seated in front of you?

7      **A.**  In the front row, in the row in front of me, there was

8      Anthony and Connor Stevens.

9      **Q.**  You don't know where Mr. Stafford was seated?

13:37:43 10      **A.**  He was next to me; I don't remember which side.

11      **Q.**  You remember pulling out of the Applebee's -- do you

12      remember pulling out of the Applebee's parking lot?

13      **A.**  Yes.

14      **Q.**  Do you remember where the vehicle actually stopped?

13:38:02 15      **A.**  I wasn't paying attention which way we were driving.

16      **Q.**  Do you remember when the vehicle stopped?

17      **A.**  Yes.

18      **Q.**  Do you remember what caused the vehicle to stop?

19      **A.**  Yes.

13:38:12 20      **Q.**  What caused the vehicle to stop?

21      **A.**  Mr. Azir pulled on the brakes and there were a bunch of

22      SUVs that blocked our path along with all the agents that

23      seemed to appear out of nowhere.

24      **Q.**  Was there any sort of audible indication that the car

13:38:31 25      should come to a stop?  Was there some sort of noise?

1    **A.**   The first thing I remember hearing -- a lot of my

2    memory from this is from going over the tapes provided by

3    the FBI.  And the first thing I remember is a loud screech

4    from what sounds to be like a megaphone or a PA system.

13:38:55 5    **Q.**   So you just said a lot of memory is based on the tapes

6    you've reviewed provided by the FBI; is that correct?

7    **A.**   The vivid details, yes, of what happened when the FBI

8    pulled up upon us.

9    **Q.**   If there's a detail like somebody carrying a P90

13:39:15 10   machine gun, submachine gun, is that based upon your review

11   of the FBI tapes?

12   **A.**   No.  I am speaking about the audio, the sounds of what

13   happened that night.

14   **Q.**   How are you familiar with a P90 submachine gun?

13:39:29 15   **A.**   I was raised in the era of video games.  Have you ever

16   played -- I can't ask questions.

17       I am raised in the era of video games.  Most everyone

18   in my generation has played a game where you play as a

19   soldier going to fight some war.

13:39:47 20   **Q.**   What's the name of the game?

21   **A.**   One I can think of, Modern Warfare.

22   **Q.**   And Modern Warfare, that's a game that is also you

23   gained some familiarity with an M16 gun or rifle?

24   **A.**   Yes.

13:40:00 25   **Q.**   Which you also identified in your direct examination

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    you recognized?

2      **A.**   Yes.

3      **Q.**   Is that also a game that you were familiar with C-4

4    plastic explosive?

13:40:09  5      **A.**   I believe C-4 is used in that game, yes.

6      **Q.**   Because before that car stopped and before you were at

7    Applebee's on the night of April 30, Mr. Baxter, isn't it

8    true --

9                MR. PYLE:  Objection, Your Honor.  I know

13:40:25 10    where this is going.  I think the court does, too.  My

11    questions were limited to after the arrest leading up to --

12    this is -- this is intended to inquire about his knowledge

13    of explosives and weapons.

14                MR. HERDMAN:  Judge, I believe I am entitled

13:40:39 15    to inquire as to the reasons why the law enforcement

16    response was such that it was.  And those reasons go

17    directly to why Mr. Baxter was at that bridge on the night

18    of April 30.

19                THE COURT:  Well, you can put testimony on

13:40:51 20    about that, but I am a little concerned about the

21    cross-examination going beyond the direct.

22                I believe when Mr. Pyle placed this defendant

23    on the stand, he limited his questions to the arrest and

24    what took place after the arrest.  There's been no question

13:41:13 25    about his conduct prior to his arrest, and I think that's an

1    improper area to go into.

2                    MR. HERDMAN:  Your Honor, I can either

3    approach to ask the court if you -- how would you like me to

4    proceed here?  There are some details I think I should be

13:41:29  5    entitled to inquire about.  I'm happy to approach.

6                    THE COURT:  About prior to his arrest?

7                    MR. HERDMAN:  Yes, Your Honor.  Specifically

8    his exposure to the elements, and he's testified about

9    events that occurred prior to his arrest.  He's testified

13:41:43 10    about April 28 and 29 and his prior arrests, Your Honor.

11                    THE COURT:  You can go to his prior arrests,

12    but don't go to this event.

13                    MR. HERDMAN:  But he did reference his prior

14    arrests, and this particular arrest on April 30 was very

13:42:04 15    different than those prior experiences.

16                    THE COURT:  Well, so it was.  I gather that

17    he's attempting to establish to my satisfaction that his

18    subsequent statement was involuntary.  I think that's the

19    thrust of Mr. Pyle's questioning.  That's a matter for me to

13:42:25 20    decide.

21                    MR. HERDMAN:  Your Honor, again, I'm happy to

22    approach on this, but I do think I would be entitled to

23    inquire as to why he was up so late, why he didn't get any

24    sleep the night before.  I think there are reasons that I

13:42:39 25    should be allowed to inquire as to why it was that he didn't

           1    get any sleep on the night of the 29th or limited sleep on

           2    the night of the 29th.

           3              And I am sorry, but that may impact -- that

           4    may involve eliciting some responses here that Mr. Pyle is

13:42:55   5    not happy with.

           6              THE COURT:  Let's take it question by

           7    question.  If you have an objection, you make the objection

           8    and I will rule on it.

           9    BY MR. HERDMAN:

13:43:01  10    Q.  Your testimony on direct examination by Mr. Pyle was

          11    that when you got out of the car, you were asked to get

          12    into -- you were asked to lay on the ground, correct?

          13    A.  Correct.

          14    Q.  There was a puddle there?

13:43:14  15    A.  There was a puddle everywhere.

          16    Q.  It was raining?

          17    A.  Yes.

          18    Q.  It was raining?

          19              THE COURT:  This was at Applebee's?

13:43:19  20              MR. HERDMAN:  Yes, Your Honor.

          21    BY MR. HERDMAN:

          22    Q.  Just for clarification, the car stops some distance

          23    away from Applebee's, correct?

          24    A.  Yes.

13:43:27  25    Q.  Okay.  And you were inside the car when it stopped?

1    **A.**   Yes.

2    **Q.**   Now, were you the first person to be asked to get out

3    of the car?

4    **A.**   No.

13:43:34 5    **Q.**   Were you the last person to be asked to get out of the

6    car?

7    **A.**   Yes.

8    **Q.**   That's because you were seated in the back row?

9    **A.**   Yes.

13:43:41 10    **Q.**   So who was the first person to get out of the car?

11    **A.**   Mr. Azir.

12    **Q.**   Who was the second person to get out of the car?

13    **A.**   Mr. Wright.

14    **Q.**   Who was the third person to get out of the car?

13:43:53 15    **A.**   One of the two in the second row.  It was either

16    Mr. Stevens or Mr. Hayne.

17    **Q.**   Would I be correct in concluding that either Mr. Hayne

18    or Mr. Stevens was then the next person to get out of the

19    car?

13:44:07 20    **A.**   Yeah.

21    **Q.**   And the other person that was in the row -- and

22    Mr. Stafford got out of the car before you did?

23    **A.**   Yeah.

24    **Q.**   You were the last person out of the car?

13:44:13 25    **A.**   Yes.

1    **Q.**  Now, when the first person in the car got out of the

2    car, was that person taken immediately from the car to some

3    other location before the next person got out of the car?

4        Do you understand my question?

13:44:24  5    **A.**  Yes.

6    **Q.**  Was that person taken away before the next person got

7    out of the car?

8    **A.**  Yes.

9    **Q.**  Was that person put inside of another vehicle?

13:44:32  10    **A.**  I believe that -- I believe I was laying on the

11    pavement next to somebody else that was arrested with me.

12    **Q.**  So at least someone else had been out of the car at the

13    point in time you got out of the car and were put on the

14    ground?

13:44:50  15    **A.**  Everyone was out of the SUV.

16    **Q.**  Everyone?

17    **A.**  Everyone was out of the SUV.  I was the last one pulled

18    out.

19    **Q.**  Just so I'm clear, when you got out of the SUV,

13:45:01  20    everyone else who was in the SUV was outside of the SUV

21    laying on the ground?

22    **A.**  At least one other person was laying on the ground.

23    I'm not going to say all of them, because I'm not sure.

24    **Q.**  Now, that night, April 30, it had been raining earlier

13:45:19  25    in that evening, correct?

1   **A.**   Yes.

2   **Q.**   In fact, you were outside on the evening of April 30?

3   **A.**   Yes.

4   **Q.**   And you were outside for an extended period of time,

13:45:28   5   longer than, say, 20 minutes you were outside?

6           THE COURT:   You're talking about before the

7   arrest?

8           MR. HERDMAN:   I'm talking about at the bridge.

9   I am just trying to be careful.

13:45:38   10           THE COURT:   I don't think before the arrest is

11   a better way to ask it.

12           MR. HERDMAN:   Let me see if I could narrow it

13   down, Your Honor.

14   BY MR. HERDMAN:

13:45:45   15   **Q.**   Were you at a location prior to going to Applebee's to

16   eat dinner?

17   **A.**   Yes.

18   **Q.**   I'm not going to ask you to specify what location that

19   was at, but was that location outside?

13:45:55   20   **A.**   Yes.

21   **Q.**   And at that point in time that you were at that

22   location, were you by yourself?

23   **A.**   No.

24   **Q.**   You were there with how many other people?

13:46:03   25   **A.**   Five.

1    **Q.**  And when you were at this location with those other

2    people, was it raining at that point in time you were at the

3    location?

4    **A.**  Yes.

13:46:13  5    **Q.**  Was it raining heavily at the time you were at that

6    location?

7    **A.**  Yes.  I had a jacket.

8    **Q.**  You had a jacket on?

9    **A.**  Yes.

13:46:20 10    **Q.**  And at some point, you left that location and you got

11    back into an SUV and you drove to Applebee's?

12    **A.**  Yes.

13    **Q.**  At the point in time you left the location to go to

14    Applebee's, when you got into the SUV, were you wet when you

13:46:38 15    got into the SUV?

16    **A.**  Yes.  I took my jacket off.

17    **Q.**  Did you leave the jacket in the SUV when you got to

18    Applebee's?

19    **A.**  Yes.

13:46:40 20    **Q.**  So you had to walk through the parking lot to get to

21    Applebee's from the SUV?

22    **A.**  Yes.

23    **Q.**  Did you get wet when you walked from the SUV to

24    Applebee's?

13:46:50 25    **A.**  Yes.

1    **Q.**  Because it was raining?

2    **A.**  Yes.

3    **Q.**  So how long were you at Applebee's for?

4    **A.**  I couldn't say precisely.  I would hypothesize that it

13:47:16  5    was maybe half an hour to 45 minutes.

6    **Q.**  And during that entire half an hour, 45 minutes, you

7    didn't have your coat on, correct?

8    **A.**  Correct.

9    **Q.**  And you were wet?

13:47:28  10    **A.**  Uh-huh.

11    **Q.**  You left Applebee's, you got into the SUV and you did

12    not put your coat on, right?

13    **A.**  Correct.

14    **Q.**  You left it there on the seat of the SUV?

13:47:36  15    **A.**  Uh-huh.

16    **Q.**  That's why you didn't have your coat when you were

17    asked to get out of the car when it was stopped?

18    **A.**  Correct.

19    **Q.**  So you are transported from this parking lot close to

13:47:52  20    Applebee's, you are transported to the Cleveland FBI?

21    **A.**  Correct.

22    **Q.**  And do you remember who transported you there?

23    **A.**  No.

24    **Q.**  Did you have any conversation with this -- these people

13:48:05  25    when you were transported?  Did you talk at all?

1    **A.**   In the vehicle, I don't remember saying a word.

2    **Q.**   Did you complain about anything?

3    **A.**   No, I just kind of stared out the window and watched my

4    life fly before my eyes.

13:48:19  5    **Q.**   You state "out the window."  So you were able to see

6    out the window?

7    **A.**   Yes.

8    **Q.**   Nobody put a hood over your head when they put you in

9    that car?

13:48:24 10    **A.**   No.

11    **Q.**   Nobody put a blindfold on you when they put you in the

12    car?

13    **A.**   No.

14    **Q.**   You were able to look out the window and see where

13:48:30 15    you're going?

16    **A.**   Yes.

17    **Q.**   And when you arrived at the FBI, you said that you were

18    placed in something called the cage.  What is the cage?  Is

19    it a room?

13:48:39 20    **A.**   Now that I -- I'm a little more calm, I can -- that was

21    within the parking garage-like structure, and I believe it

22    was literally a cage.  I don't remember -- I don't remember

23    if there was a door or not, but it was literally like a big

24    cage, probably about this size -- from here to about there,

13:49:08 25    this whole wooden panel thing.

1              THE COURT:  About 15 feet one way?

2              THE WITNESS:  Yes.  And it was -- I don't

3    remember if it was chain link or if it was thicker gauge

4    wire.  But we were locked in there and there were federal

13:49:28 5   agents.  I think there was about one appointed to like stand

6    by each of us and a number of which stood by the entrance to

7    the cage.

8    BY MR. HERDMAN:

9    **Q.**  But this enclosure you've talked about, you've called

13:49:46 10  the cage, it's actually inside of an enclosed parking lot,

11   right?

12   **A.**  Not enclosed, no.

13   **Q.**  The parking lot is not enclosed, the parking lot is

14   open to the elements?

13:49:56 15  **A.**  It felt like -- felt like that way to me.  It felt like

16   I was in a parking garage with like open walls.

17   **Q.**  Could you see outside?  Could you see outside from

18   where you were sitting in the cage?

19   **A.**  No.  I was told to point my face towards a corner.

13:50:13 20  **Q.**  Could you hear the rain falling while you were sitting

21   in that cage?

22   **A.**  I wasn't paying attention.

23   **Q.**  But you said that there were federal agents that were

24   walking around in that area that you were in?

13:50:24 25  **A.**  Yeah.  They kind of stood by you, and there was some

                  Lori A. Callahan, RMR-CRR        (330) 252-6022

1    moving around.

2    **Q.**  How many agents were down there?

3    **A.**  Quite a few; quite a few.

4    **Q.**  At some point in time you were asked to leave that area

13:50:44  5    and go upstairs where you're placed into a room with Special

6    Agent Molina, who you've already seen testify?

7    **A.**  Correct.

8    **Q.**  There was someone else in the room with him, correct?

9    **A.**  Correct.

13:50:57  10    **Q.**  Who was that; do you remember?

11    **A.**  No.

12          MR. HERDMAN:  I'm going to ask Agent Stark to

13    stand up, Your Honor, who's seated in the galley.

14    BY MR. HERDMAN:

13:51:05  15    **Q.**  Do you recognize this individual?

16    **A.**  Yes.

17    **Q.**  Who is that?

18    **A.**  That is the other agent who was involved in my

19    interrogation.

13:51:12  20    **Q.**  So you sat in that room with Special Agent Dan Molina,

21    who we heard testify, and Special Agent Michael Stark,

22    correct?

23    **A.**  Correct.

24    **Q.**  And during the entire time that you talked to both

13:51:25  25    Agent Molina and Agent Stark, they never pulled a gun out,

1      did they?

2      **A.**  No.

3      **Q.**  They never pointed a weapon at you?

4      **A.**  No.

13:51:35 5      **Q.**  They never yelled at you?

6      **A.**  No.

7      **Q.**  In fact, I know you've listened to this video that I

8      played.  You've heard this before?

9      **A.**  Correct.

13:51:43 10      **Q.**  Throughout the course of that entire interview, they

11      never even raised their voice with you, do they?

12      **A.**  No.

13      **Q.**  In fact, what they did was they asked you if you needed

14      anything, correct?  Didn't they ask you if you needed

13:52:00 15      anything at the very beginning of your discussion with them?

16      **A.**  Yes.  I asked them for a change of clothes, which they

17      did not provide.

18      **Q.**  Okay.

19              MR. HERDMAN:  Your Honor, may I approach the

13:52:12 20      witness?

21              THE COURT:  Yes.

22              MR. HERDMAN:  I am showing him, for the

23      record, a transcript which has been previously --

24              THE COURT:  Let's take the cuffs off so he's

13:52:29 25      got a better chance to work with that.

Lori A. Callahan, RMR-CRR      (330) 252-6022

```
 1    BY MR. HERDMAN:
 2      Q.  Mr. Baxter, if I could turn your attention to page 1 of
 3    that transcript.
 4      A.  Yes.
 5      Q.  And do you recognize this transcript?  You've seen
 6    this, correct?
 7      A.  Yes.
 8      Q.  Seen this -- maybe not this particular copy?
 9      A.  Well, the version of the tape we have has quite a few
10    instances where there's a loud screeching and staticky noise
11    where portions of the tape are cut out.
12      Q.  I think we've covered that with the court.
13      A.  I just want to add that I don't believe those parts
14    that are cut out of the tape are in our transcripts.
15      Q.  Okay.  So have you -- I guess my question is, have you
16    seen this particular transcript that's in front of you
17    before?  This is a government transcript.  Have you seen
18    this?
19      A.  When I was sitting over there.
20      Q.  Okay.  So prior to your testimony right now --
21                THE COURT:  Let's be sure we know for the
22    record.  Is the -- is this a government's exhibit?
23                MR. HERDMAN:  I was going to mark the entire
24    transcript at the conclusion, but maybe --
25                THE COURT:  Let's mark it now.
```

 1          MR. HERDMAN:  I will mark the subset of the

 2    transcript.  That will be Government's Motion Exhibit 3.

 3    And then I will mark the entire transcript and I will give

 4    it to Mr. Pyle.  If there's no objection, then I will offer

13:54:26  5    both of those.

 6               THE COURT:  Well, I want to be sure that the

 7    exhibit that you're now marking, that this witness has a

 8    copy of that exhibit.

 9               MR. HERDMAN:  Yes, Your Honor.  That would be

13:54:39 10    Government's Exhibit 3.  I will confirm at the conclusion of

11    this his testimony that that is, in fact, Government's

12    Exhibit 3 with Mr. Pyle.  I made copies of the exhibits,

13    so --

14               THE COURT:  But you're asking now about

13:54:50 15    Government's Exhibit 3?

16               MR. HERDMAN:  Yes, I am, Your Honor.

17               THE COURT:  Do you want to direct him to a

18    certain page?

19               MR. HERDMAN:  I do.

13:54:56 20    BY MR. HERDMAN:

21     Q.  Page 2, Mr. Baxter, if you would go up to the top

22    there.  And I think it starts on page 1 but goes over to

23    page 2.  Agent Molina says, "Why don't you have a seat.  You

24    want a cup of coffee or somethin'?"

13:55:10 25         Do you see that?

1    **A.**   Yes.

2    **Q.**   And your response is, "Something warm, whatever."

3         And then Agent Molina says, "Warm coffee would be

4    good?"

13:55:18 5         Do you see that part?

6    **A.**   Yes.

7    **Q.**   And you would agree with me this is within -- certainly

8    within a minute of you getting into that room you were asked

9    this question, "You want a cup of coffee or somethin'?"

13:55:32 10   **A.**   Uh-huh.

11   **Q.**   That's pretty much right at the start of your

12   interview; you would agree with me on that?

13   **A.**   Yes.

14   **Q.**   And, in fact, they do bring you a cup of coffee; isn't

13:55:43 15   that true?

16   **A.**   Yes.

17   **Q.**   If you could go to page 3, please.

18        Are you there?

19   **A.**   Yes.

13:55:56 20   **Q.**   At the bottom of page 3, where it says, "Molina:  My

21   name is Dan Molina."

22   **A.**   Uh-huh.

23   **Q.**   At the end of that paragraph, he says, "I want you to

24   have some coffee, try to warm up a little bit before we do

13:56:12 25   that.  Okay?"

1    And your response is, "Think I could use the bathroom,

2  too?"

3    Do you see that?

4  **A.**  Yes.

13:56:18  5  **Q.**  So, again, you were asked if you wanted to warm up a

6  little bit and you asked, "Can I go to the bathroom," and

7  the agents took you to the bathroom; isn't that true?

8  **A.**  Yes.

9  **Q.**  As soon as you came into the interview room, they

13:56:32 10  removed your handcuffs, true?

11  **A.**  Yeah.

12  **Q.**  Okay.  And they had to put the handcuffs back on to

13  take you to go to the restroom?

14  **A.**  Yes.

13:56:41 15  **Q.**  But this time they handcuffed you in the front?

16  **A.**  Yes.

17  **Q.**  So no one had to watch you when you went to the

18  bathroom, so you could go yourself?

19  **A.**  Yes.

13:56:49 20  **Q.**  And which agent took you to the bathroom?

21  **A.**  You said his name was Stark.

22  **Q.**  This gentleman in the galley, Agent Stark?

23  **A.**  Yes.

24  **Q.**  Did you talk to Agent Stark at all when you went to the

13:57:01 25  bathroom?

1    **A.**  I think I asked him how old he was.

2    **Q.**  Do you remember what he said?

3    **A.**  No.

4    **Q.**  Why did you ask him how old he was?

13:57:09 5    **A.**  Because he looks young.

6    **Q.**  Looks young, doesn't he?

7    **A.**  Yeah.

8    **Q.**  But you didn't hear what he said?

9    **A.**  No.

13:57:18 10    **Q.**  Did he say -- he didn't say he was 17 or 20 or anything

11    like that, did he?

12    **A.**  I don't think so and could work for the FBI.

13    **Q.**  Okay.

14                MR. HERDMAN:  We may have to put something on

13:57:30 15    the record to that effect, Your Honor, if it's necessary.

16                THE COURT:  Put what on the record?

17                MR. HERDMAN:  The age of Agent Stark.

18                THE COURT:  If he wants to testify, do that.

19    BY MR. HERDMAN:

13:57:42 20    **Q.**  Okay.  So you came back from the bathroom and then,

21    once again, your handcuffs are taken off, correct?

22    **A.**  Can you repeat that?

23    **Q.**  When you came back from the bathroom, once again, your

24    handcuffs were taken off?

13:57:52 25    **A.**  Yes.

1    **Q.**  And then at that point in time, you were allowed to

2    drink your coffee?

3    **A.**  Yes.

4    **Q.**  And would you agree with me that you started to warm up

13:58:02  5    at that point in time?

6    **A.**  I would say that in the video, I see myself still

7    shaking at that point.

8    **Q.**  Were you more warm when you started drinking the coffee

9    after you came back from the bathroom than you were when you

13:58:27  10    were first brought in?

11    **A.**  I was warmer but not dryer.

12    **Q.**  Okay.  You would agree with me, if you were shivering

13    at all, you were shivering less than you were when you were

14    first brought into the interview room?

13:58:36  15    **A.**  Yes, because I had some time to warm up.

16    **Q.**  And then Agent Molina explains to you why you've been

17    arrested; isn't that right?  This is page 5.  Page 5, page

18    6.  Doesn't he explain to you what the charges are that

19    you've been arrested for?  He tells you there's been a

13:59:01  20    conspiracy.  Doesn't he tell you that?

21    **A.**  Is that on page 5?

22    **Q.**  Page 5 into page 6.

23    **A.**  Yes, uh-huh.

24    **Q.**  And at this point in time, he -- you would agree with

13:59:21  25    me he has not asked you any questions about what happened on

1    the night of April 30?  This is page 5 of the transcript.

2    **A.**  On page 6 he's asking me, "So we kinda know quite a

3    bit."

4    **Q.**  That wasn't my question.  I asked you, he hasn't asked

14:00:07  5    you any questions about what happened on the night of April

6    30; isn't that true?

7    **A.**  It seems that he's only making statements.

8    **Q.**  He didn't ask you if you were at the bridge prior to

9    stating this to you, did he?

14:00:21 10    **A.**  Come again?

11   **Q.**  Prior to stating this, the statement that's on pages 5

12   and 6 of the transcript, he didn't ask you if you were at

13   the bridge?

14   **A.**  It doesn't look like it, no.

14:00:34 15   **Q.**  Well, did he?

16   **A.**  I'm looking at your transcript.

17   **Q.**  The answer to the question is --

18              THE COURT:  Wait a minute.  This is two pages

19   now.  I think he's got the opportunity to read it carefully

14:00:43 20   before he responds to your question.

21              Would you repeat the question, please?

22              MR. HERDMAN:  Your Honor, the question is

23   prior to the portions of the transcript where Mr. Molina is

24   talking -- Agent Molina is talking, pages 5 and 6 of the

14:00:57 25   transcript, did he ask Mr. Baxter if he was at the bridge

1    that night.  And Mr. Baxter's answer was, "It doesn't appear

2    that he did."  And I would like to seek some clarification

3    on that.

4              THE WITNESS:  He has not asked me if I was at

14:01:19  5    the bridge.

6              MR. HERDMAN:  I am prepared to take that

7    answer if the court is willing.

8              THE COURT:  Next question.

9    BY MR. HERDMAN:

14:01:28 10    **Q.**  And prior to Mr. Molina's statements on pages 5 and 6

11    of the transcript, he didn't even ask you who you were with

12    that night, did he?

13    **A.**  No.

14    **Q.**  In fact, what he was asking you was if you were

14:01:55 15    comfortable.  If he asked you a question, Mr. Baxter, it was

16    regarding your comfort; isn't that correct?

17              THE COURT:  He asked the question, "Do you

18    understand that?"  Isn't that a question?  I don't

19    understand your question.

14:02:21 20              THE WITNESS:  There seems to be a lot more

21    questions regarding things other than my comfort.

22    BY MR. HERDMAN:

23    **Q.**  Did he ask you about your comfort prior to pages 5 and

24    6 of the transcript?

14:02:30 25              THE COURT:  Before 5 and 6?

|   |   |
|---|---|
| 1 | MR. HERDMAN:  Before 5 and 6, Your Honor, |
| 2 | before the statement by Agent Molina. |
| 3 | BY MR. HERDMAN: |
| 4 | **Q.**  Didn't he ask you if you wanted anything? |
| 5 | **A.**  Yes. |
| 6 | **Q.**  Didn't he ask you if you wanted some coffee? |
| 7 | **A.**  Yes. |
| 8 | **Q.**  Didn't he ask you if you needed anything else? |
| 9 | **A.**  Yes. |
| 10 | **Q.**  You told him you needed to go to the bathroom? |
| 11 | **A.**  Yes. |
| 12 | **Q.**  But he didn't ask you anything about why you had been |
| 13 | arrested on April 30 prior to page 5 of the transcript, |
| 14 | pages 5 and 6 of the transcript? |
| 15 | **A.**  Correct. |
| 16 | **Q.**  Thank you. |
| 17 | Now, do you still have Government's Motion Exhibit |
| 18 | Number 1 up there with you, Mr. Baxter? |
| 19 | **A.**  Yes, I do. |
| 20 | **Q.**  Do you remember seeing that on the night of -- I guess |
| 21 | it was the morning of May 1, 2012? |
| 22 | **A.**  Yes. |
| 23 | **Q.**  You signed that piece of paper, right? |
| 24 | **A.**  Yes. |
| 25 | **Q.**  And you actually read each line of the advice of rights |

14:02:48
14:02:51
14:03:01
14:03:16
14:03:24

1    form?

2      **A.**  Yes.

3      **Q.**  And you understood each line of the advice of rights

4    form?

14:03:32 5      **A.**  Yes.

6      **Q.**  And at the conclusion where it asked if you want to

7    speak without an attorney present, you said yes.

8      **A.**  It does not say that.  It says, "You have the right to

9    have a lawyer with you during questioning."  And then --

14:03:46 10                    THE COURT:  Let's do this by line by line.

11                    MR. HERDMAN:  Your Honor, I am happy to do

12    that.

13                    THE COURT:  Where are you?

14                    MR. HERDMAN:  This is Government's Motion

14:03:54 15    Exhibit 1.  It's the advice of rights form.

16                    THE COURT:  Somebody got a copy for me,

17    please?

18                    MR. HERDMAN:  Here you go.

19                    THE COURT:  Thank you.

14:04:24 20    BY MR. HERDMAN:

21      **Q.**  Okay.  Mr. Baxter, could you please read the top line

22    of that form, the first line you were asked to read, to

23    yourself?

24      **A.**  Read it out loud?

14:04:36 25      **Q.**  Please.

                    Lori A. Callahan, RMR-CRR        (330) 252-6022

1   **A.**  "Before we ask you any questions, you must understand

2   your rights."

3   **Q.**  Did you read that line?  Did you read that line on the

4   morning of May 1?

14:04:46  5   **A.**  Yes.

6   **Q.**  I didn't mean right now.

7   **A.**  Yes.

8   **Q.**  On the morning of May 1, did you understand that line?

9   **A.**  Yes.

14:04:52  10   **Q.**  What was the next line you read on the morning of May

11   1?

12   **A.**  "You have the right to remain silent."

13   **Q.**  You read that line on the morning of May 1?

14   **A.**  Yes.

14:05:01  15   **Q.**  You understood that line on the morning of May 1?

16   **A.**  I read it and understood all of this.  I just didn't

17   believe it.

18   **Q.**  We will get to that in a second.  We are going to go

19   line by line.  I want just to confirm that you read each

14:05:14  20   line and you understood it.  What was the next line you read

21   on the form?

22   **A.**  "Anything you say can be used against you in court."

23   **Q.**  Okay.  You read that on the morning of May 1?

24   **A.**  Yes.

14:05:23  25   **Q.**  To yourself?

1    **A.**   Yes.

2    **Q.**   You understood that line on the morning of May 1?

3    **A.**   I would say I understood it in the context that these

4    are the rights that you're telling me that I have, but,

14:05:47  5    again, I didn't understand that I would be getting into a

6    situation where I'd be sitting here right now.

7        I feel that if I understood that more clearly, I

8    wouldn't have said a word to you.

9    **Q.**   Mr. Baxter, you read that line on the morning of May 1,

14:06:06 10    that you had the right to remain silent?

11   **A.**   Yes.

12   **Q.**   You understood the English words, "You have the right

13   to remain silent," right?

14   **A.**   Yes.

14:06:14 15   **Q.**   You understood that meant you didn't have to say

16   anything, correct?

17   **A.**   Yes, but I understood the English, but I was

18   disoriented from the experiences that I had gone through

19   earlier that night.

14:06:26 20   **Q.**   And you didn't ask any questions about that particular

21   line to Agent Molina, did you, on the morning of May 1?

22   **A.**   No.

23   **Q.**   You didn't ask for a follow-up explanation or any

24   follow-up questions?

14:06:36 25   **A.**   No.

1    **Q.**  In fact, you read to the next line, which was what?

2    What was the next line that you read on the morning of May

3    1?

4    **A.**  "You have the right to talk to a lawyer for advice

14:06:45  5    before we ask you any questions."

6    **Q.**  So you read that line on the morning of May 1?

7    **A.**  Yes.

8    **Q.**  You understood that line on the morning of May 1?

9    **A.**  Yes.

14:06:52  10    **Q.**  You didn't ask any questions about that line on the

11    morning of May 1?

12    **A.**  No, I did not.

13    **Q.**  You moved to the next line.  You read the next line to

14    yourself on the morning of May 1.  What was that line?

14:07:13  15    Please read it out loud.

16    **A.**  "You have the right to have a lawyer with you during

17    questioning."

18    **Q.**  Okay.  And you understood that line on the morning of

19    May 1?

14:07:21  20    **A.**  Yes.

21    **Q.**  You didn't ask any questions about that line on May 1?

22    **A.**  No.

23    **Q.**  You moved to the next line on May 1 and you read --

24    **A.**  I read part of it aloud.

14:07:32  25    **Q.**  Please read aloud the next line.

1    **A.**  "If you cannot afford an attorney, one will be

2    appointed for you before any questioning if you wish."

3    **Q.**  It's at this point you read, "Cannot afford a lawyer,"

4    you read that out loud, correct?

14:07:47  5    **A.**  Yes.

6    **Q.**  And you asked a question of Agent Molina?

7    **A.**  Yes.

8    **Q.**  What was that question?

9    **A.**  "Where would" -- I believe something along the line of,

14:07:59 10    "Where would a lawyer be appointed from?"

11    **Q.**  And Agent Molina's response included the word "judge,"

12    didn't it?

13    **A.**  Yes.

14    **Q.**  You heard the word "judge"?  You heard him say "judge"?

14:08:13 15    **A.**  Yes.

16    **Q.**  And you affirmed, actually, visually, I think you can

17    see on the video, you affirmed with a nod that you had heard

18    Agent Molina's response?

19    **A.**  I believe so.

14:08:24 20    **Q.**  You went back down to the form and you looked at the

21    form, and I think you nodded, didn't you?

22    **A.**  I believe so.

23    **Q.**  Then you moved to the next line.  You didn't ask any

24    additional questions of Agent Molina at that time.

14:08:40 25          You read the next line on the form, which was what?

1    **A.**  "If you decide to answer questions now without a lawyer

2    present, you have the right to stop answering at any time."

3    **Q.**  And you understood that line on the morning of May 1?

4    **A.**  I actually don't really remember reading this one.  I

14:09:03  5    remember reading the last one, and then -- I don't remember

6    reading this last one here.

7    **Q.**  Okay.  You didn't ask any questions of that one, did

8    you?

9    **A.**  No, I didn't.

14:09:15  10    **Q.**  And you moved to the next line.  You did, in fact, read

11    it, because you signed it, right?

12    **A.**  Yes.

13    **Q.**  Okay.  And what line was that?

14    **A.**  "I have read this statement of my rights and I

14:09:29  15    understand what my rights are.  At this time, I am willing

16    to answer questions without a lawyer present."

17    **Q.**  Okay.  So you acknowledged that you had read that line

18    and you had read the rest of the statement with a signature,

19    correct?

14:09:40  20    **A.**  I signed your paper.

21    **Q.**  You signed your paper, didn't you, Mr. Baxter?  That's

22    got your name on it, right?

23    **A.**  I signed a paper that I felt that I was obligated to

24    sign because I was in the custody of the federal agency that

14:09:56  25    had my life on the line.

1    **Q.**  Well, let's talk a little bit about this National

2    Defense Authorization Act that you have indicated that you

3    had some knowledge of.  You said that this National Defense

4    Authorization Act was signed by President Obama.  When was

14:10:12   5    it signed by President Obama?

6    **A.**  I believe on New Year's of this year.

7    **Q.**  And I noticed in your direct testimony when you were

8    describing this law, you were -- you said that it relates to

9    U.S. citizens who are arrested, but you didn't say what they

14:10:31  10    were arrested for?

11    **A.**  Correct.

12    **Q.**  And isn't there a particular type of crime to which the

13    National Defense Authorization Act would apply?

14    **A.**  I believe it says along the lines that more -- to my

14:10:53  15    understanding, National Defense Authorization Act means that

16    the military had the right to detain anybody for any reason

17    at any time, for any reason.

18    **Q.**  For any reason, not for people who were arrested of

19    terrorism crimes?

14:11:06  20    **A.**  To my understanding, it was for people who -- for any

21    reason, and that reason did not have to be disclosed.  So

22    that leaves -- that leaves room for open -- that leaves open

23    room.

24    **Q.**  Mr. Baxter, you've read the law, right?  You testified

14:11:22  25    you've read the law?

1    **A.**   I've read part of a clause.

2    **Q.**   So you haven't read the entire law?

3    **A.**   The entire law is an act, which I stated is a very long

4    act, which I haven't read all of.

14:11:34 5    **Q.**   Okay.  I thought your testimony was you read the entire

6    law.  I may be mistaken, but that's what I thought your

7    testimony was.

8    **A.**   My testimony was that I had read a clause.

9    **Q.**   And that clause relates to individuals who are

14:11:47 10    suspected of committing terrorist acts; isn't that true?

11    **A.**   I'm not aware of that.

12    **Q.**   Okay.  Are you aware of the case of the airliner that

13    was flying into Detroit where a young man had a bomb

14    strapped to his legs and tried to blow up that airliner?

14:12:04 15    Are you familiar with that?

16    **A.**   No.

17    **Q.**   You're not familiar with that case?

18    **A.**   No.

19    **Q.**   On Christmas Day 2009?

14:12:10 20    **A.**   No.

21    **Q.**   Are you familiar with the discussion that was going on

22    related to arrests in the United States of U.S. citizens

23    suspected of terrorism crimes and whether or not those

24    individuals should be afforded Miranda rights?

14:12:22 25    **A.**   No.  This act was of 2012, not 2009.

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    **Q.**  And you would agree with me that an event that took

2    place in 2009, prior to the passage of the act, might have

3    informed why that law was passed in the first place; would

4    you agree with me on that one?

14:12:41  5              THE COURT:  Well, I constantly caution lawyers

6    not to ask the witness "Would you agree with me?"  I would

7    prefer you to say, "Is it true that," but not whether they

8    agree with you or not.  That's not relevant.

9              MR. HERDMAN:  Okay.

14:12:55 10   BY MR. HERDMAN:

11   **Q.**  Mr. Baxter, is it true that a terrorist event that took

12   place in 2009 or 2010 or 2011 would have been relevant to

13   the passage of the National Defense Authorization Act on

14   December 31st, 2011?

14:13:11 15   **A.**  I'm not aware of why it was put into effect.

16   **Q.**  So you're very familiar with the law, according to the

17   testimony, but you're not familiar with why it was put in

18   place?

19   **A.**  No.

14:13:23 20   **Q.**  Did you think you had been arrested for a terrorist

21   act?

22   **A.**  I thought -- I don't see how this falls under your

23   cross-examination.

24   **Q.**  I don't think that's the question that was asked.  I

14:13:43 25   asked, did you think you were arrested for a terrorist

| | |
|---|---|
| 1 | attack? |
| 2 | MR. PYLE:  Objection. |
| 3 | THE COURT:  Sustained. |
| 4 | MR. HERDMAN:  Your Honor, Mr. Pyle brought up |
| 14:13:49  5 | the act and the fact that the defendant apparently thought |
| 6 | he was not going to be afforded Miranda rights.  I think I |
| 7 | should be allowed to ask if he thought that it would apply |
| 8 | to him. |
| 9 | THE COURT:  Well, he's already advised of his |
| 14:14:01  10 | Miranda rights, I thought, as part of your case. |
| 11 | MR. HERDMAN:  Well, that's certainly going to |
| 12 | be argument, Your Honor, but he's put on evidence here, and |
| 13 | I think I am entitled to test that evidence. |
| 14 | THE COURT:  I'm not sure why it's relevant. |
| 14:14:16  15 | MR. HERDMAN:  May I approach, Your Honor? |
| 16 | THE COURT:  No.  Let's keep going. |
| 17 | BY MR. HERDMAN: |
| 18 | Q.  You testified that vehicles you thought were military |
| 19 | were present at the site of your arrest? |
| 14:14:31  20 | A.  Correct. |
| 21 | Q.  There were individuals with weapons, long weapons, |
| 22 | rifles that were present at the arrest? |
| 23 | A.  Correct. |
| 24 | Q.  There were individuals you called paramilitary present |
| 14:14:40  25 | at the arrest? |

1     **A.**  Yes.

2     **Q.**  They were dressed in olive uniforms.  There was some

3     body armor that was visible.  That was your testimony?

4     **A.**  Correct.

14:14:48 5    **Q.**  So when you were taken to the FBI, you were still under

6     the belief that you were in the custody of the military?

7     **A.**  No.  I said that they looked like military.  They

8     looked militant.

9     **Q.**  You knew you were going to the FBI?

14:15:02 10   **A.**  Yes.

11    **Q.**  No one said they were taking you to the Department of

12    Defense facility?

13    **A.**  No.

14    **Q.**  No one said they were taking you to Guantanamo Bay?

14:15:11 15   **A.**  No.

16    **Q.**  No one put a hood on your head?

17    **A.**  No.

18    **Q.**  No one dressed you in an orange jumpsuit at that time

19    when you were being taken to the FBI?

14:15:19 20   **A.**  No.

21    **Q.**  You were told you were being taken to the FBI, and

22    that's, in fact, where you were taken?

23    **A.**  Yes.

24    **Q.**  When you were downstairs, you saw a number of federal

14:15:28 25   agents walking around, and those were FBI agents?

```
         1              THE COURT:  You're asking if he knew they were

         2    FBI agents?

         3    BY MR. HERDMAN:

         4      Q.  Did you know if they were FBI agents?

14:15:35 5      A.  Yes.

         6      Q.  And when you went up to be interviewed, Agent Molina

         7    identified himself as an FBI agent?

         8              THE COURT:  Well, that's a statement.  I tried

         9    to get you to ask questions, not make statements.  For some

14:15:49 10   reason, I guess, in law school they now teach you you can

        11    make an affirmative statement and the witness has to believe

        12    it's a question.

        13              MR. HERDMAN:  Your Honor, I'll go on.

        14              I will change it and I will go on --

14:16:00 15             THE COURT:  I wish you would do it constantly

        16    and not --

        17              MR. HERDMAN:  Corrupting influence of law

        18    schools.  I will be cautious of phrasing my questions.

        19              THE COURT:  Thank you.

14:16:10 20             MR. HERDMAN:  I apologize.

        21    BY MR. HERDMAN:

        22      Q.  Do you remember when you were brought into the

        23    interview room, Special Agent Molina identified himself as

        24    an agent of the FBI?

14:16:22 25     A.  Yes.
```

                1    **Q.**  And did you have any question that Special Agent Stark

                2    was a special agent of the FBI?

                3    **A.**  No.

                4    **Q.**  You knew he was an agent of the FBI, that Agent Stark

14:16:37        5    was an FBI agent?

                6               THE COURT:  That's an affirmative statement

                7    again.

                8               MR. HERDMAN:  I'm sorry, Your Honor.  I am

                9    trying my best not to do it.  It's awfully hard.

14:16:45       10    BY MR. HERDMAN:

               11    **Q.**  Do you remember if you believed that Agent Stark was an

               12    FBI agent throughout your interaction with him?

               13    **A.**  Yes.

               14    **Q.**  So you did believe that he was an FBI agent?

14:17:00       15    **A.**  Yes.

               16    **Q.**  In fact, everyone that you interacted with on the

               17    evening of April 30 or May 1 was an FBI agent?

               18               THE COURT:  "Is it true that?"

               19    BY MR. HERDMAN:

14:17:18       20    **Q.**  Was everyone you interacted with on the evening of

               21    April 30 and the morning of May 1 an FBI agent?

               22    **A.**  To my knowledge.

               23    **Q.**  You testified on direct examination regarding April 28.

               24               THE COURT:  That's a question?

14:17:36       25    BY MR. HERDMAN:

                         Lori A. Callahan, RMR-CRR        (330) 252-6022

1    **Q.**  You got no sleep on the night of April 28; is that

2    true?

3    **A.**  Correct.

4    **Q.**  So on the afternoon of April 29, you had had no sleep

14:17:51 5    since when?  When was the first time prior to that that you

6    had sleep?

7    **A.**  I believe on April 27.

8    **Q.**  The night of April 27 was the last time you had slept?

9    **A.**  Yeah.

14:18:04 10    **Q.**  Okay.  And what day of the week was that?

11    **A.**  I don't know.

12    **Q.**  Well, what day was April 30, do you remember that, what

13    day of the week?

14    **A.**  No.

14:18:19 15    **Q.**  Okay.  I'll get back to that later, but April 27 was

16    the last night you got some sleep.

17        How many hours of sleep did you get on April 27?

18    **A.**  I don't know; I don't keep track of that.

19    **Q.**  You don't keep track of how many hours you sleep?

14:18:38 20    **A.**  No.

21    **Q.**  All right.  But you know you didn't sleep on April 28,

22    the night of April 28?

23    **A.**  Correct.

24    **Q.**  And on April 29, isn't it true that there was a meeting

14:18:51 25    that was relevant to why you were arrested on April 30?

1          MR. HERDMAN:  I'm not asking for details, Your

2     Honor.

3     BY MR. HERDMAN:

4      Q.  I'm asking whether there was a meeting on April 29 that

14:18:58 5     was relevant to why you were arrested on April 30.

6      A.  I don't have a copy of the sequence of events, but I

7     believe so.

8          MR. HERDMAN:  Can I have just a moment, Your

9     Honor?

14:19:16 10          THE COURT:  Yes.

11     BY MR. HERDMAN:

12      Q.  Mr. Baxter, on the day before you were arrested, did

13     you have a meeting at a hotel room with some other

14     individuals?

14:19:47 15      A.  Yes.

16      Q.  And I'm not asking you what took place in that meeting.

17     But was that meeting in the afternoon of April 29?

18      A.  I believe it was in the afternoon.  It might have been

19     before 1:00.  I'm not sure.

14:20:08 20      Q.  But after that meeting, your testimony is that you

21     slept the night of April 29?

22      A.  Yes.

23          THE COURT:  It's a statement.  Is it a

24     question or a statement?

14:20:22 25     BY MR. HERDMAN:

1     **Q.**  Did you sleep the evening of April 29 following this

2     meeting at this hotel?

3     **A.**  Yes.

4     **Q.**  How many hours did you sleep for?

14:20:31  5     **A.**  I already told you I don't keep track of how much I

6     sleep.

7     **Q.**  Okay.  You don't keep track of how much you sleep.

8     That's right.  You don't remember how many hours you slept

9     on the night of April 29.  You don't know when you woke up

14:20:42  10    on the morning of April 30?

11    **A.**  No.

12    **Q.**  Okay.  And at this point in time, were you living in a

13    regular place?  Did you have a regular address that you

14    called home?

14:20:54  15    **A.**  I had a place where I stayed more often than I stayed

16    in other places, but I considered myself a -- a phrase I

17    would use, a couch surfer.

18    **Q.**  I think you said that in your discussion with Agent

19    Molina you were a couch surfer.

14:21:21  20        The night of April 29th, do you know where you stayed?

21    **A.**  Yes.

22    **Q.**  Who did you stay with?

23    **A.**  I stayed in a warehouse with a group of people that

24    were associated with Occupy Cleveland.

14:21:35  25    **Q.**  And is that the same place -- was this warehouse the

1    same location where you slept the night of April 27?

2    **A.**  I'm not aware.  It's possible.  I could have been

3    sleeping somewhere else.

4    **Q.**  But you don't remember if you slept in that warehouse

14:22:01  5    on the night of April 27?

6    **A.**  No.

7    **Q.**  Mr. Baxter, what did you have on you when you were

8    arrested?  What were you carrying?

9    **A.**  I don't quite remember what I had on me at that time.

14:22:27  10    **Q.**  Did you have a knife on you?

11    **A.**  I usually carry a pocket knife, yes.

12    **Q.**  How long was the blade on that knife?

13    **A.**  Three to four inches, maybe, maybe two and a half.

14    **Q.**  Was it a blade that swung out of a handle?

14:22:44  15    **A.**  Yes.

16    **Q.**  You could -- could you swing that blade out of the

17    handle with the thumb?

18    **A.**  Yes.

19    **Q.**  Would the blade lock into place after you swung it out?

14:22:54  20    **A.**  Yes; it was a pocket knife.

21    **Q.**  Did you carry that knife in your pocket?

22    **A.**  Yes.

23    **Q.**  Which pocket did you carry it in?

24    **A.**  In my right pocket.

14:23:04  25    **Q.**  Right front pocket or right back pocket?

1    **A.**   Front.

2                      MR. HERDMAN:  Could I just have a moment, Your

3    Honor?

4                      THE COURT:  Yes.

14:23:23  5          MR. HERDMAN:  Thank you.  I appreciate it.

6    BY MR. HERDMAN:

7    **Q.**   One last question, Mr. Baxter.  With respect to this

8    couch surfing, how long have you been doing that?  I'm

9    sorry.  I will let you take a drink.  I didn't know you were

14:24:16  10   doing that.

11   **A.**   I had moved out of my dad's in late February.

12   **Q.**   Of 2012?

13   **A.**   Yes.  So from about that time.

14                     MR. HERDMAN:  I have nothing else, Your Honor.

14:24:52  15   Thank you.

16                     THE COURT:  We will take a brief recess, about

17   ten minutes.  You may give the defendant an opportunity to

18   go to the restroom.

19         (Thereupon, a recess was had.)

14:31:14  20                THE COURT:  Do you have any more questions?

21                     MR. PYLE:  I have no redirect.

22                     THE COURT:  You may step down.

23                     Does the defendant have any additional

24   testimony you wish to offer?

14:31:29  25                MR. PYLE:  Thank you.  No, Your Honor.

1          THE COURT:  Does the government have any

2    rebuttal testimony that you wish to offer?

3          MR. HERDMAN:  We do not, Your Honor, subject,

4    I think, to the extent that it was relevant at all, the fact

14:31:41 5    that Special Agent Stark is not 17 or 20.  I think --

6          THE COURT:  I don't think Mr. Stark has been

7    even identified.

8          Are you prepared to argue in support of your

9    motion?

14:31:57 10          MR. PYLE:  I am, Your Honor.

11          THE COURT:  Why don't you proceed.

12          MR. PYLE:  Your Honor, setting aside the

13    question about the technical problems, and the government

14    assures me there are none, but setting aside that for a

14:32:15 15    moment, Your Honor, the question of voluntariness is a very

16    case-specific analysis.  You know, we understand that on one

17    extreme, agents can't beat somebody.  They can't have them

18    lay down naked for prolonged periods.  We kind of know it

19    out there what they can't do, but, you know, as you get

14:32:40 20    closer and closer to the middle, the line becomes blurrier,

21    blurrier and blurrier.

22          In this case, you had, among other things, and

23    what I would say was an extreme governmental response at the

24    time of the arrest, which Brandon characterizes as being

14:33:02 25    traumatic, and you can understand why he would.  I mean, so

1      many weapons, men, et cetera, laying on the ground, wet,

2      tired.  He certainly gives that appearance of somebody who's

3      disoriented on the videotape.

4                  There's no question the rights were given to

14:33:23  5      him on the page.  There's a real question about whether he

6      legitimately understood that he had a right to say no, and

7      that goes to the core of the voluntariness issue.  Whether

8      there's a combination of circumstances which were legally

9      sufficient for us to conclude that they overbore his will to

14:33:46 10      say, "I want a lawyer," or "I want to refrain from" --

11                  THE COURT:  Wait a minute.  That's two

12      different things.  Voluntariness and his Miranda rights are

13      two different things.

14                  MR. PYLE:  I understand.

14:33:57 15                  THE COURT:  So I thought you were going --

16      your argument is going to be that when you take all the

17      facts into consideration, all the background testimony, his

18      statement was not voluntary.

19                  MR. PYLE:  Judge, that's my argument.  I just

14:34:17 20      would like to add one kind of novel -- what some people --

21                  THE COURT:  Well, sketch for me the facts that

22      you believe support a judicial decision that the statement

23      of the defendant was not voluntary.

24                  MR. PYLE:  Okay.  The circumstances of his

14:34:36 25      arrest, being wet, being cold, being --

1          THE COURT:  Let's start with circumstances of

2     his arrest.

3          MR. PYLE:  Yes, sir.

4          THE COURT:  Am I to ignore all the testimony I

14:34:47  5     heard earlier on the motion for detention?  You know, am I

6     supposed to wipe my mind clear about what I heard during

7     that testimony about the apparent willingness of this

8     defendant and other defendants to blow up a bridge?  Am I to

9     ignore that?

14:35:10 10          MR. PYLE:  I think so.

11          THE COURT:  Why?  Why is that not part of the

12     background material?  That goes to the arrest.  You seem to

13     be arguing that the arrest is overly broad and inappropriate

14     and somehow that weighs on the voluntariness of the

14:35:29 15     defendant's subsequent statement.  But it seems to me that

16     I'm allowed to take into consideration the earlier testimony

17     that I heard that stands unrebutted about the attempt of the

18     five defendants to blow up a bridge across a national park.

19     I heard that in the initial motion for detention.

14:35:56 20          Now, am I supposed to wipe that out of my mind

21     when I consider the nature of the arrest?

22          MR. PYLE:  I would, at the very least, like

23     you to put it into context.

24          THE COURT:  Okay.  All right.

14:36:14 25          MR. PYLE:  There's a broader context.  I mean,

1   what led up to the events of the bridge, that was a

2   six-month evolution or lead-up.

3                    THE COURT:  That may well be, but does the

4   government not have the right to arrest them at the site?

14:36:29   5                    MR. PYLE:  They have a right.  We're not

6   arguing it's an illegal arrest.

7                    THE COURT:  All right.  But they've got to be

8   more kindly about it?  They have to avoid any show of force

9   and shouldn't have weapons around when they arrest them?

14:36:44  10                    MR. PYLE:  Judge --

11                    THE COURT:  I'm trying to put it in context of

12   what you're -- what your client said at the beginning, and I

13   took from his initial ten minutes that he was real upset

14   that the government was prosecuting him.  He seems to be

14:37:00  15   unable to connect the arrest with the prior conduct, as if

16   it's not -- it's somehow not relevant.

17                    MR. PYLE:  In my view, what I was attempting

18   to do through my questioning and what I think Brandon was

19   trying to do with his answers is to try to describe for the

14:37:20  20   court what was going through his head at the time he was --

21                    THE COURT:  It's going through his head that

22   somehow it's improper to arrest him because he hadn't really

23   engaged in criminal conduct.  I gather that's what he's

24   trying to get across.

14:37:33  25                    MR. PYLE:  No.  I'll do the talking here,

1    Brandon.  But that's not the point at all, Your Honor.

2                  We have --

3                  THE COURT:  What would you have the government

4    do in this context?

14:37:44 5        MR. PYLE:  Well, you know, whether they used

6    50 officers or 5 officers, I can't nitpick, but I can say,

7    and I think a reasonable person or reasonable juris would

8    say that a person who's confronted with that kind of show of

9    force, when they're Mirandized, they are going to say, "Wait

14:38:03 10   a minute.  They say I have a right, but do I?"

11                 THE COURT:  Okay.

12                 MR. PYLE:  And that's why I say the issue is

13   so very --

14                 THE COURT:  So what's the government supposed

14:38:15 15   to do, psychoanalyze the defendant when they advise him of

16   his rights?

17                 MR. PYLE:  Well, at the least, Your Honor, I

18   think an inquiry, a statement like "I know I have no rights"

19   requires, and I mean that, requires an interrogator to say,

14:38:34 20   "You do have rights.  Here are your rights.  You have the

21   right to exercise those rights."  And the novel and unique

22   part of this motion is I am saying that they have the

23   additional obligation to say, "And if you exercise these

24   rights, your exercise cannot be used against you in a

14:38:52 25   criminal proceeding."

1          THE COURT:  I have yet to hear anybody say

2     that.  I know that's what you're talking about, but I don't

3     see any requirement in Miranda jurisprudence to advise the

4     defendant that were he to stand trial, the government is

14:39:07 5     going to say, "The fact that you remain silent at trial

6     cannot be considered."

7          MR. PYLE:  That's the interesting part, Your

8     Honor.  Because when Miranda was decided, we didn't have

9     that corresponding right, defendants did, to prevent the

14:39:26 10    government from arguing that their exercise of the right

11    could be considered by the jury.

12          That came later.

13          THE COURT:  That's the Doyle case?

14          MR. PYLE:  Yes.

14:39:36 15         THE COURT:  All right.

16          MR. PYLE:  Mr. Jim Willis would be happy to

17    tell you about it many times if you would like to hear it.

18          But that came later.  So when Miranda was

19    decided, they incorporated what were then essentially the

14:39:50 20    Fifth and Sixth Amendment rights into these warnings.  So

21    when Doyle was decided, in my view, what should have

22    happened and didn't happen, as before you now, is the

23    question about whether that right should be incorporated

24    into the Miranda warnings.

14:40:07 25         THE COURT:  Okay.  Let's go on as to why you

1    believe that the evidence viewed in the light -- I think the

2    burden of proof is upon you to establish the statement is

3    not voluntary.  So in viewing the evidence in the light most

4    favorable to the defendant, what are the building blocks for

14:40:37  5    determination that the statement was involuntary?  The

6    nature of the arrest?

7                    MR. PYLE:  Yes, the time of night, the wet,

8    the cold, the government's response to his statement or

9    question about not having rights.

14:40:53  10                    And, further, Your Honor, and I think this is

11    just huge, is when he does raise a question about who's

12    going to appoint a lawyer, the response is, "The U.S.

13    Attorney's Office and the judge," I mean, neither of whom

14    are in the room, of course, but to hear that the

14:41:12  15    prosecutor's office is going to appoint the lawyer?

16                    THE COURT:  But that has to do with whether

17    he's waived his rights under Miranda.  That, in my view,

18    doesn't -- is not a building block of the idea that the

19    statement is involuntary.

14:41:28  20                    MR. PYLE:  I may be mixing apples and oranges,

21    and I probably am.

22                    THE COURT:  Well, I appreciate the confusion.

23    I am just -- I want to be sure I understand the building

24    blocks that support, in your view, a judicial determination

14:41:46  25    that the statement was involuntary.

Lori A. Callahan, RMR-CRR        (330) 252-6022

1          Do you have anything else you would like to

2     raise?

3          MR. PYLE:  Just that what some may argue as a

4     detail, I do not, but him being held in the "cage," quote,

14:42:01  5     unquote.  He wasn't being booked or he wasn't being

6     processed.  He was just being held in a cage for what

7     everybody agrees was at least an hour, and that certainly --

8     certainly has an effect on a person, let's put it that way.

9     That's my argument.

14:42:19 10          Thank you, Judge.

11          THE COURT:  Thank you.  Counsel for the

12     government may respond.

13          MR. HERDMAN:  Thank you, Your Honor.

14          Where would you like me to begin?

14:42:31 15          THE COURT:  Well, let's focus on the Miranda

16     rights and whether you believe you established compliance

17     with Miranda.

18          MR. HERDMAN:  Yes, Your Honor.  In short, the

19     answer is absolutely.  If this is a defendant -- you saw him

14:42:50 20     testify.  He is absolutely intelligent enough, he's facile

21     enough, he understands what's going on, he's mentally acute,

22     he's mentally aware.  This is not some sort of person who

23     had diminished capacity to understand what those rights are.

24          He completely understood.  In fact, his

14:43:12 25     testimony was that he understood them, and the one he had

1      some questions on, he asked some follow-up questions.

2                    And, Judge, from whether it's focused on this

3      case or if it's a larger case, that advisement of rights

4      form is the touchstone in terms of advising an individual of

14:43:30  5    what their rights are.  There's no -- I will address the

6      Doyle argument in a moment, but there's no requirement that

7      the government go beyond what that advisement of rights form

8      is, and that's exactly what happened here.

9                    The defendant said he had no rights.  And to

14:43:48 10    correct that perception, to the extent that it was a

11     truthful perception, Agent Molina presented him with that

12     advisement of rights form which had them written out in

13     black and white on the form.  The defendant has testified,

14     confirmed he read the form, he understood it, he signed it

14:44:03 15    and he agreed to participate in questioning.

16                    And to focus on what I think the court is

17     going to ask about is with respect to this follow-up

18     question that the defendant asked.  He says, "Cannot afford

19     an attorney," I don't want to misquote this because it is

14:44:22 20    very important.

21                    He says, "Cannot afford a lawyer, where would

22     one be appointed from?"

23                    And Agent Molina says, "Uh, the U.S.

24     Attorney's Office."  He's explained why he said that, at

14:44:34 25    least in his mind why that was the first thing that came to

1   his mind.

2                And let me just say this for a moment, Your

3   Honor.  It's very easy, I realize, to be in the confines of

4   this courtroom and go back through a recorded statement and

5   do precisely what counsel is asking this court to do, which

6   he's saying he's not asking the court to do, but he is

7   asking to court to nitpick this statement and to nitpick his

8   advisement of rights.

9                And what Agent Molina did was he made a

10  misstatement, which he's admitted to, and he corrected it by

11  saying, "The judge is who appoints the attorney," and

12  that's -- Your Honor, that's factually true.  He didn't lie

13  to the defendant.  He told him the truth.  And the defendant

14  apparently accepted that.  He nodded yes.  He continued

15  reading the advisement of rights form.

16               And what Agent Molina has testified to is, in

17  fact, what does happen.  If at some point a defendant

18  invokes an attorney, like happened in another one of his

19  codefendants, invoked an attorney, the interview ceased at

20  that exact moment.  It stopped.

21               And this is so far removed from the case law

22  that discusses implication of an attorney.  I'm not even

23  sure there's any authority addressing what Mr. Pyle would

24  have this court do, which is to suppress this statement

25  based on what he claims is a faulty Miranda advisement based

1    on a simple question, a simple truthful answer to a

2    defendant, and then the defendant agrees to be questioned.

3    And there's no discussion about, "Gee, maybe it would be

4    great to have an attorney.  Where do I get an attorney?

14:46:05  5    When do I get this attorney?"  He didn't even ask when.

6            So I just think that -- I think that this

7    argument is so far outside the heartland of Miranda cases

8    with respect to this attorney question and whether or not

9    someone can be appointed an attorney that I saw certainly no

14:46:26 10    persuasive law that was cited by counsel, and I would

11    venture to say that he can't find any, because this is -- if

12    this statement is considered, in light of all of the

13    prevailing law in Miranda, it quite simply cannot be

14    anything but a proper advisement of rights and, therefore,

14:46:44 15    the defendant's waiver was voluntary.

16            THE COURT:  Let's go to the issue of

17    voluntariness.

18            MR. HERDMAN:  Okay, Your Honor.

19            And this is a factual issue, and, you know,

14:46:51 20    I -- it's hard for me to pick a point to start here on this.

21    But I will start at the arrest of the defendant.  And, Your

22    Honor, I am sorry to have to ask the questions to go to

23    earlier in the night, but I just want this court to remember

24    that this defendant is the one who put himself in the middle

14:47:13 25    of the night, in the pouring rain, at the base of a bridge

1  in a national park.  He was there to set off explosives.

2              THE COURT:  That's why I challenge Mr. Pyle

3  about whether I'm supposed to forget what I heard in the

4  detention.  I don't think you were present for the detention

14:47:28  5  hearing.

6              MR. HERDMAN:  I was not, but I'm aware of it.

7              THE COURT:  It was very -- it's a 128-page

8  transcript, and I listened carefully to what the agent had

9  to say and I concluded that detention was appropriate.  And

14:47:41 10  certainly, I heard evidence that certainly made a prima

11  facie case that all of the defendants, including this

12  defendant, were present at the time that the -- the apparent

13  explosives were set at the bridge and then they traveled on

14  to Applebee's where they were arrested after they believed

14:48:09 15  that they had a cell phone that would set off the bomb.

16              I don't think I can eliminate that from my

17  recollection.

18              MR. HERDMAN:  Nor, Your Honor, do I think that

19  you should, because there was testimony from Agent Molina

14:48:20 20  that the affidavit itself formed the basis of his approach

21  to the interview with the defendant.  And I'm happy to

22  proffer that as a separate exhibit for this motion.  I know

23  it's a document on the court's docket.

24              THE COURT:  I don't think that affidavit had

14:48:32 25  been filed at the time that he was questioned.  The

1    questioning took place almost simultaneously with the

2    arrest.  I don't think -- the affidavit wasn't filed until

3    after the arrest.

4             MR. HERDMAN:  I believe it was filed prior to

14:48:48 5    the arrest.  To the extent that's relevant, I could make a

6    record of that.

7             But the point is, Your Honor, that those facts

8    absolutely inform everything that's associated with the

9    arrest, but it's also associated with what's -- what is the

14:49:01 10    defendant's mental state.

11             And he's well aware of what he's done earlier

12    that night, and the fact that his -- is he cold and wet?

13    Yes, he is.  But that's -- you know what?  He did that to

14    himself in more ways than one.

14:49:14 15             And, you know, I did ask him questions.  He

16    said he was cold and wet and he left his jacket in the SUV.

17    And to the extent that goes to his physical condition,

18    again, that's him putting himself in a particular position

19    where he's walking around wet, he's been walking around in

14:49:30 20    the pouring rain probably for longer than he was outside

21    that SUV.

22             So to the extent his condition is relevant at

23    all to the interview setting, I would say it only improved

24    once he got into that interview room.  He was offered really

14:49:46 25    anything that he needed to make himself comfortable, and he

1    said he wanted some coffee and he said he had to go to the

2    bathroom.

3              I don't know what else these agents could have

4    done at that point in time.  And that was not -- that wasn't

14:49:59  5    a reward for doing anything.  It wasn't anything other than

6    making sure that he was comfortable, and, as Agent Molina

7    testified, that he was aware of what was about to happen,

8    and he was comfortable making a decision, which is exactly

9    all he was afforded.  He was afforded an opportunity to see

14:50:11  10    whether or not he wanted to talk.

11              He was unhandcuffed in the room, Your Honor.

12              I'm sorry.  Do you have a question?

13              THE COURT:  Well, I don't think I heard any

14    testimony as to what he eventually said.  Does he make an

14:50:28  15    incriminating oral statement?

16              MR. HERDMAN:  He did, Your Honor.  I did

17    solicit some testimony from Agent Molina.  It was a summary,

18    but a summary of some of the specifics that the defendant

19    incriminated himself, as well as others.

14:50:41  20              THE COURT:  All right.

21              MR. HERDMAN:  There was some testimony about

22    the fact that the charge had been placed at the base of the

23    bridge.  It was supposed to be detonated by a cell phone.

24    Those are the kind of things that he admitted to.

14:50:52  25              THE COURT:  Thank you.

1             MR. HERDMAN:  You're welcome.

2             I would submit to the court there's absolutely

3       zero evidence that this defendant was intoxicated, zero.

4       His recall of details from that night probably rivals that

14:51:03 5     of every agent who was on the scene, and you can understand

6       why that would be.  He was the one getting arrested after

7       all.

8             But he remembers the type of machine guns that

9       agents were wearing.  He remembers how many agents there

14:51:14 10    were.  He remembers where everyone was sitting in the car,

11      with the exception of whether he was on the left side or the

12      right side of the car.  He remembers who was sitting next to

13      him.  He remembers everything about that arrest.

14            And I submit to you that means he wasn't drunk

14:51:26 15    from this one tallboy that he drank, and you can see that on

16      the video that I played for the court.  He doesn't slur his

17      speech; he doesn't droop his head.  Agent Molina testified

18      he didn't appear intoxicated.  He didn't smell like alcohol.

19            So he's not intoxicated.  He's made much more

14:51:43 20    comfortable in the interview setting, and this is all prior

21      to him ever being advised of his Miranda rights.

22            He is apparently not on drugs or any sort of

23      medication at the time of this interview, according to his

24      testimony.  And, Your Honor, with respect to -- I never saw

14:52:01 25    this sleep deprivation brought up in the interview at all.

1    But Mr. Baxter never complained of being sleepy, never

2    complained of needing a nap or anything like that.  In fact,

3    he says he doesn't even keep very close track of the number

4    of hours of sleep he gets.

14:52:20   5              So I would just say, with respect to his

6    testimony about whether or not he slept in the days leading

7    up to his arrest on the 30th, I don't think that that's

8    credible or reliable evidence.  He said he doesn't remember

9    how many hours of sleep he gets each night.

14:52:37   10              I'm sorry, Your Honor.

11              Those are -- I think those are the highlights

12   with respect to voluntariness.  I mean, I would like just

13   for a second to direct the court's attention back to the

14   law, the authority on this, which is that if you're going to

14:52:54   15   find this statement was involuntary, there has to be some

16   indicia of police coercion and there's none of that here.

17              Mr. Pyle cannot cite to a case that will be on

18   point where a statement that was taken under these

19   circumstances was found to be involuntary.  The fact that it

14:53:10   20   took place in the middle of the night, again, that's on the

21   defendant.  That's when they chose to commit their crime.

22              And, Your Honor, I have a case that I want to

23   submit to the court.  I'm going to provide a copy to

24   Mr. Pyle, but I think that this case is, for all of these

14:53:24   25   defendants, about as on point as it gets.  And for the

1       record, it's United States versus Stokes, 631 F.3d 802.

2       It's a Sixth Circuit case, decided and filed February of

3       2011.

4                    May I hand that up, Your Honor?

5                    THE COURT:  Sure.

6                    MR. HERDMAN:  Your Honor, when you look at the

7       facts of Stokes, this is an individual who was arrested --

8       in the Stokes case, he was arrested, for lack of a better

9       term, at a flop house.  I don't know what else to call it.

10      It's some sort of a transient hotel area, New York City.  I

11      know they call them flop houses.

12                   He's arrested there on suspicion of

13      participating in an armed robbery, and that's late at night

14      that he's arrested.  He's taken to the police station where

15      he's interviewed for approximately five hours, until 5:00 in

16      the morning, at which point in time, the interviewing ceases

17      because the defendant doesn't appear to be responsive

18      anymore.  And all of those circumstances were found to be

19      perfectly a -- perfectly lawful, and the defendant's

20      confession was held to be voluntary.

21                   And that's what we have here across this case,

22      Your Honor.  I think the relevant portion starts at page

23      809, which would be page 9 of 10 in the handout there.

24                   And so, Your Honor, I guess just to bring this

25      back to the point here is that there is no evidence at all

1 that this defendant's will was ever overborne by these

2 officers.  You heard them talk to him.  They were very

3 polite.  They were very respectful.  There was never a voice

4 raised.  There was never a yell.  There was never a threat.

14:55:17 5 And the defendant, he acknowledged that and wanted to talk

6 to these officers.

7     And it wasn't because they were threatening

8 him or that he was scared or intimidated.  I can't put Agent

9 Stark's face on the record, short of taking a photograph of

14:55:31 10 him, but I think the record should reflect that he looks

11 very young and he is not an agent that you would roll out if

12 you wanted to scare somebody into making a statement.

13     I submit that the same principle applies to

14 Agent Molina.  He's a soft-spoken, straight-talking agent

14:55:48 15 who came up on the stand and explained everything that

16 happened that night to court and counsel.

17     I don't know if there was something specific,

18 Your Honor, that you wanted me to address in terms of facts.

19     THE COURT:  Anything further?

14:56:11 20     MR. HERDMAN:  I would like to be heard briefly

21 on this defense counsel's proposal to expand the Miranda

22 warnings to include a Doyle v Ohio advisement.

23     THE COURT:  You can talk about it if you want

24 to, but I'm not taking it into consideration.

14:56:28 25     MR. HERDMAN:  Then I will just leave it as the

1    fact that I don't think it's certainly retroactively

2    appropriate to apply an additional requirement on these

3    officers, these agents, in terms of advising the defendant

4    of his rights.

14:56:48  5              I have nothing further.

6              THE COURT:  Any rebuttal?

7              MR. PYLE:  Your Honor, at the very least, the

8    discussion by the agent before questions were asked about

9    what Brandon is charged with and the fact that they will

14:57:08 10   relay what he says to the prosecutor, in my view,

11   constitutes a baseline of coercion there.

12             I mean, there's a suggestion that if you

13   don't, then -- you know, if you don't make this statement,

14   we're going to take that to the prosecutor and that's going

14:57:23 15  to be taken into account as well.

16             Yeah, I seen Stokes.  I read this now.  I've

17   read other cases like it.  But every case is very unique and

18   that combination of circumstances is what's key here.

19             And I believe we've got a combination of

14:57:38 20  factors here that would cause reasonable people to say that

21   the government failed to meet their burden on voluntary --

22   that we have met our burden, however you want to think about

23   it, by a preponderance of the evidence on the voluntariness

24   issue.  Thank you.

14:57:52 25             THE COURT:  Thank you.  I am going to address

1    the Miranda warning first.

2              One can make the argument that when the

3    authorities undertake to interrogate a suspect, while that

4    suspect is in custody, the very first words out of their

14:58:22 5    mouths ought to be the Miranda warning.  That didn't happen

6    here, to the contrary.

7              But the court is of the view that the fact

8    that the Miranda warning was not given initially does not

9    equate with the determination that there was a failure to

14:58:45 10   provide an adequate Miranda warning, and the court finds

11   that the defendant's execution of the Miranda warning waiver

12   certainly put him on notice as to what his rights were, and

13   he also signed the consent form.

14             And so based on the execution of the advice of

14:59:13 15   rights, notwithstanding the fact that he wasn't advised

16   initially of his Miranda rights, the court finds that there

17   was substantial compliance with the mandate of the Miranda

18   decision and, therefore, the court will not suppress the

19   subsequent statements of the defendant, because I believe

14:59:39 20   there was no Miranda violation.

21             The issue of voluntariness, it appears to me

22   that the defendant has the burden of establishing that its

23   statement was involuntary.  Possibly it's -- the government

24   has the burden to prove it was voluntary.  But no matter

15:00:02 25   which way you cite the burden, it's my view that taking the

1        totality of the circumstances into consideration, the court

2        finds that the statement of the defendant was not

3        involuntary.

4                        I was concerned about the fact that during the

15:00:29  5        interview of the defendant, there was some statement made to

6        the effect of "We'll be glad to take this information to the

7        prosecuting attorney," and one could imply from that that

8        the defendant was led to believe that he -- if he

9        cooperated, it would be to his benefit, but the defendant

15:00:46 10        did not offer any such testimony.

11                        And so in my view, the fact that those

12        statements were made during the interview do not render the

13        subsequent statement involuntary.

14                        I also watched with care the video of the

15:01:03 15        defendant, and there's no question that he was wet and he

16        was cold at the time he was interviewed, but by the same

17        token, I think the agents had a legitimate concern about the

18        possibility that there might be other mischief afoot and

19        that it was important to interview this defendant even if

15:01:25 20        the interview started at the midnight hour.  And as a

21        consequence, the court finds that the timing of the

22        interview did not violate his constitutional rights with

23        respect to voluntariness.

24                        And as a consequence, the court finds that the

15:01:49 25        statement of the defendant that he gave on the night of the

1    interview was voluntary and does -- the motion to dismiss is

2    denied in its entirety.

3                    The court will put a brief order on.  And if

4    counsel wishes to have a record of the court's ruling, you

15:02:06  5    can ask the court reporter for that ruling.

6                    Is there anything further to come before the

7    court today?

8                    MR. HERDMAN:  Not from the United States, Your

9    Honor.

15:02:15  10                    THE COURT:  Mr. Pyle?

11                    MR. PYLE:  A couple housekeeping things, Your

12    Honor.

13                    THE COURT:  Sure.

14                    MR. PYLE:  One is that I will be meeting with

15:02:23  15    whomever from the U.S. Attorney's Office can show me an -- a

16    clean copy of the video that they intend to put in.  In

17    failing that, of course, I renew my objection on technical

18    grounds.

19                    THE COURT:  Well, I would ask the government,

15:02:42  20    do you have any intention of putting -- I know it was the

21    earlier hearing today, you had no intention of putting --

22    placing the post-arrest statement of that defendant in your

23    case in chief, but do you have a different approach with

24    this defendant?

15:02:58  25                    MR. HERDMAN:  We do, Your Honor.  Again, this

| | |
|---|---|
| 1 | kind of refers back to where we were at yesterday.  Our |
| 2 | intention is to, certainly by the 17th, but I would actually |
| 3 | do that earlier, provide counsel and the court with our |
| 4 | proposed -- what we would introduce from each defendant's |
| 15:03:17 5 | statement in our case in chief, if that makes sense, the |
| 6 | portions of those statements that we would seek to |
| 7 | introduce. |
| 8 | THE COURT:  I thought you said you weren't |
| 9 | going to introduce the previous defendant's? |
| 15:03:25 10 | MR. HERDMAN:  With the exception of |
| 11 | Mr. Stafford. |
| 12 | THE COURT:  The other three you are? |
| 13 | MR. HERDMAN:  Possibly, Your Honor.  Again, I |
| 14 | would say -- |
| 15:03:34 15 | THE COURT:  Don't you have a date to provide |
| 16 | me with transcripts? |
| 17 | MR. HERDMAN:  We do.  By the 17th, Your Honor |
| 18 | we're supposed to provide court and counsel with not only |
| 19 | transcripts, but also portions of the transcript that we are |
| 15:03:48 20 | going to play. |
| 21 | THE COURT:  Very well. |
| 22 | MR. HERDMAN:  Those would include -- I would |
| 23 | say our interpretation, that includes whatever the |
| 24 | defendants have said in their video-recorded statements.  I |
| 15:03:58 25 | think we certainly have identified a need to address that |

1    with the court probably as soon as possible.

2              So to the extent, I have to say, I think

3    Mr. Baxter's statement is of a nature that of the defendants

4    whose statements we would still seek to introduce, I would

15:04:14  5    put him at the top of the list.  I think his statements are

6    such that we would probably be most interested in admitting

7    it.

8              But with that said, Your Honor, to Mr. Pyle's

9    point, I -- we plan to provide him with an additional copy

15:04:30 10    and I will personally ensure that that copy works.

11              THE COURT:  The copy I had this morning did

12    not include any incriminating statements.  That was the --

13    well, there was some incriminating statements, yeah.

14              MR. HERDMAN:  That's the -- Government's

15:04:50 15    Exhibit 3, Government's Motion Exhibit 3.  Yes, that's true.

16    To that point, as I said, I think Mr. Baxter's statement is

17    one which we would probably be most likely to seek to

18    introduce some portion, subject to whatever the prevailing

19    Bruton law is in light of the traffic offense here.

15:05:21 20              THE COURT:  Is there more in the way of

21    admissions beyond what's in this 11 pages?

22              MR. HERDMAN:  It's a 90-page transcript,

23    thereabouts.  The entirety of the transcript is about 90

24    pages.

15:05:36 25              THE COURT:  You've got that on video?

Lori A. Callahan, RMR-CRR        (330) 252-6022

1            MR. HERDMAN:  Yes.

2            THE COURT:  You intend on playing that for the

3     jury?

4            MR. HERDMAN:  Not the entirety of the 90

15:05:43  5     minutes, no.  That I can promise the court right now.

6            THE COURT:  Well, I don't have an answer to

7     that question at the moment, but the general proposition of

8     law is that an admission against interest by a defendant is

9     admissible as an exception to the hearsay rule, whereas a

15:06:10 10     statement by a defendant that exonerates or not -- that is

11     exculpatory is not admissible is the exception to the

12     hearsay rule.

13            Now, the difficulty I've encountered in

14     reading the transcript of the defendant we were talking

15:06:33 15     about yesterday is the statement goes on for four hours and

16     there's a great mixture of inculpatory and exculpatory

17     statements throughout that statement.  What you intend to

18     play, apparently, of this defendant is inculpatory and not

19     exculpatory?

15:06:54 20            MR. HERDMAN:  Yes, Your Honor, that would

21     certainly be our intention.

22            THE COURT:  Now, do they blend together?

23            MR. HERDMAN:  To the extent that they would, I

24     think there would be a couple of evidentiary legs we would

15:07:04 25     seek to stand on.  One of the most obvious, obviously the

1    rule of completeness.  That is, if there's something that

2    informs what's said in the inculpatory portion, we should be

3    entitled to put that in.

4            THE COURT:  Well, I see it as a problem.

15:07:20  5    That's what I'm trying to bring to Mr. Pyle's attention, is

6    that this intermingling of inculpatory and exculpatory

7    statements in the same document, it gets very difficult to

8    sort out as to what is admissible and what is not

9    admissible.

15:07:34  10            I am doing some research on that now, but

11    anything you can do to help me on that issue, I would

12    certainly appreciate it.

13            Do you follow what I am talking about?

14            MR. PYLE:  I do.  One -- one of the rule of

15:07:47  15    evidence -- I think it's Rule 106 -- isn't the rule of

16    completeness?

17            THE COURT:  That's what I am concerned about,

18    is a rule of completeness, how do you interpret that against

19    that inculpatory statements are admissible and exculpatory

15:08:04  20    statements not admissible?  So the issue of completeness is

21    involved.

22            And in that determination, and I don't have

23    any final view as to how that should be handled, but I see

24    it as a potential problem, and counsel may wish to deal with

15:08:23  25    it, and if you could agree to it on a particular submission,

1    I would be more than delighted.

2              MR. HERDMAN:  That would certainly be our

3    preference, Your Honor.  That's part of the reason we want

4    to preview these with defense counsel.  And to the extent

15:08:37  5    they have an objection like that, we can hopefully deal with

6    it outside of having to come here.

7              THE COURT:  We're getting closer and closer to

8    the trial date.  Was it the 17th of September?  I think I

9    continued it one day because of the Jewish holiday.

15:08:50 10              Okay.  When is our next status conference?

11              MR. PYLE:  I don't think we have one, Judge.

12              MR. HERDMAN:  I want to see -- after these

13    hearings were set, that was our next status conference.

14              THE COURT:  And I have a date where I wanted

15:09:26 15    potential voir dire questions submitted.

16              MR. HERDMAN:  You did, and that is the 4th,

17    Your Honor.

18              MR. PYLE:  I have a vivid recollection of the

19    last time we were in court, you said we're going to cancel

15:09:47 20    that status conference.

21              THE COURT:  All right.  If anybody believes --

22    if I get a request for a status conference, I'm going to

23    schedule it, from anybody.

24              The other thing I want to be sure that you're

15:10:00 25    familiar with, and I am sure you are, Mr. Pyle, that you

```
 1   have to make sure that your client has appropriate dress

 2   clothing for the trial.  And I don't want him here in that

 3   jumpsuit.  And maybe the family could assist you in getting

 4   clothing, and you have to get the clothing to the marshal's

 5   office, because they will -- I know what they're going to

 6   do.  They're going to bring him in his jumpsuit and have him

 7   change clothes in the marshal's office when he's due to

 8   appear.  And I want to be sure that's taken care of.

 9              MR. PYLE:  Judge, I am sorry that I have to

10   admit that I have a closet full of clothes that other

11   clients have left when they were taken out the wrong door,

12   so --

13              THE COURT:  Is there anything else I can

14   address right now?

15              MR. PYLE:  I would like to kind of preview a

16   couple issues that are on the horizon.

17              THE COURT:  Sure.

18              MR. PYLE:  The 17th is that date for the

19   government to disclose the transcripts they're going to use.

20   We will, of course, look at them.  We're going to work with

21   them.

22              We have an expert audio guy trying to sort

23   things out as best we can, but I think there's going to be

24   some disputes, not only on the rule of completeness, but on

25   some technical issue, too.  And we will, of course, be
```

1    breaking down your door to set a date if that comes to be,

2    Your Honor.

3                    The other thing is, I think Mr. Gilbert took

4    it up with you, but I want to make it abundantly clear on

15:11:29  5    the record that I am giving notice on behalf of Mr. Baxter

6    that we intend to cross-examine -- I will call him AZ -- on

7    convictions that occurred beyond the ten-year period.

8    And --

9                    THE COURT:  I don't think that's been briefed

15:11:46 10    yet, as I understand it?

11                    MR. PYLE:  Step one is to give notice.

12                    THE COURT:  Are you going to file a motion in

13    limine to exclude that questioning?

14                    MR. GETZ:  Yes, Your Honor.

15:11:58 15                    THE COURT:  Well, if you could elaborate what

16    those convictions are and what the case law that you think

17    supports limiting cross-examination of those convictions

18    that are less than ten years old, I would appreciate that.

19                    I don't know if I've had that issue -- it's

15:12:15 20    been a long time since I've seen that issue.

21                    MR. PYLE:  And in speaking for myself, I would

22    like some time to respond to their motion in limine.

23                    MR. HERDMAN:  Your Honor, one issue Mr. Pyle

24    brought up at a break, that apparently the defense has

15:12:34 25    retained a bomb expert, and we have not received a formal

1    notice that they have such an expert.  I know he told me

2    about it.  We don't know who that person is and what the

3    substance of the testimony would be, and I think it's very

4    likely that the government would be making a motion to

15:12:49 5    preclude that evidence, because I can imagine why they'll

6    want to introduce it and what they were going to introduce.

7            I think we have a pretty good argument that

8    it's not going to be relevant, and I am just alerting the

9    court, we've not received formal notice of any of this, and

15:13:06 10    I do think that we're entitled to it at some point

11    relatively soon so we could make a motion to preclude it if

12    we need to.

13            MR. PYLE:  We went over this at the last

14    hearing, that we haven't been provided with -- and there's

15:13:17 15    been E-mails.  I don't know if you've been noticed on.  But

16    there's been E-mails asking for a view of the evidence,

17    which is the predicate for our expert to write an expert

18    opinion.

19            We're trying to set that up either for

15:13:29 20    Wednesday or Thursday.  But we gave everybody notice that --

21            THE COURT:  What do you anticipate your expert

22    is going to opine?

23            MR. PYLE:  That this amount of C-4, even if it

24    was real, wouldn't bring down any of that deck on the

15:13:47 25    bridge.

1      MR. HERDMAN:  That's what I suspect he's going

2   to say, Your Honor.  I think our position will be that

3   that's not relevant, although I haven't seen a report yet.

4           THE COURT:  What's the relevance?

15:13:59  5      MR. PYLE:  Well, the relevance is, and the

6   court may view it as a subtle issue, but we don't.  The

7   government's been, in their press releases and everything

8   else, they were going to blow up this bridge, they were

9   going to kill people.  This amount of C-4 would just cause a

15:14:17 10   dent at the base of the bridge.  It wouldn't put anybody's

11   life in danger.

12           THE COURT:  Do you intend to introduce any

13   expert about the explosive force of what apparently was

14   placed at the bridge?

15:14:36 15      MR. HERDMAN:  Certainly if defense counsel

16   seeks to, I think we would have to, Your Honor.  But I think

17   at the outset, my instinct is that -- again, this is -- I'm

18   not trying to lock us into this position because I haven't

19   seen the report, but these are inchoate offenses.  They're

15:14:54 20   an attempt at a conspiracy.  And that type of evidence is

21   precisely what would not be relevant to the charges in this

22   case.

23           THE COURT:  Mr. Pyle, if there was an

24   indictment charging two or more persons with a conspiracy to

15:15:21 25   rob a bank on a given day, and there was proof that that was

1    the nature of the conspiracy, would it be relevant to show

2    that the bank wasn't open on that day?

3                It seems to me what you're trying to show is,

4    well, the explosive wasn't going to work, and your claim

15:15:48  5    that's relevant on what subject?

6                MR. PYLE:  Judge, no.  Our argument is, and

7    it's a rebuttal argument to the government's claim that the

8    intention was to do harm to people.  And this amount of C-4

9    would not have caused anybody on that bridge to be harmed

15:16:12  10   whatsoever.  It's more of a -- more in the nature of a prank

11   than it is an intent to cause anybody damage or harm.

12                THE COURT:  Because they were ignorant as to

13   what the explosive force was?

14                MR. PYLE:  Well, they kind of understood what

15:16:31  15   it was, and certainly an expert is --

16                THE COURT:  That's back to my -- if they -- if

17   the evidence is they believed it was going to bring down the

18   bridge, is the fact that it was insufficient to bring down

19   the bridge, is that relevant?

15:16:51  20                MR. PYLE:  Well, there is going to be

21   testimony that they did not believe that it was going to

22   bring down the bridge.

23                THE COURT:  In the government's case in chief?

24                MR. PYLE:  Through cross-examination, yes,

15:17:03  25   through their own statements.  I mean, this mixed bag about

                Lori A. Callahan, RMR-CRR        (330) 252-6022

1    the tapes they're going to play with the CHS, the jurors are

2    going to hear about this.

3                But overriding all this, Judge, is what the

4    government has been doing consistently, and that is, is

15:17:19  5    putting out a theme here that they -- these guys were

6    intending or conspiring to blow up the bridge.  Well, this

7    little bit of C-4 is not going to blow up anything.

8                MR. GETZ:  Your Honor, Mr. Pyle keeps making

9    those statements regarding what the government is putting

15:17:37 10    out, and I guess at some point, we've got to challenge him

11    to point out where it is the government has been saying or

12    putting that information out.  It certainly hasn't been in

13    this courtroom.  And I would challenge Mr. Pyle to point to

14    any interactions with the press or the media that the

15:17:55 15    government has had since this case was charged.

16                He's talking about putting an expert on in

17    rebuttal to evidence that the government has not put on yet.

18    As indicated, we have already stated it does not appear

19    likely there to be any evidence like that that would be

15:18:13 20    relevant to the charges in this case.  And so the

21    anticipation of rebutting something that the government has

22    no intention of putting on, I would say, again, I question

23    the relevance of having that.

24                THE COURT:  Well, would you view this as a

15:18:28 25    Daubert hearing?  I have those in civil cases, where the

1    claim is that the expert is not capable or appropriate or

2    well trained to give the expert opinion he proposes to

3    offer.  We call that the Daubert hearing, D-A-U-B-E-R-T

4    hearing.  I've never had a Daubert hearing in a criminal

15:18:54  5    case, but it sounds to me at least like it's a kissing

6    cousin of a Daubert.

7                    Do you intend to raise it in a motion in

8    limine?

9                    MR. HERDMAN:  I think so.  I have had to deal

15:19:04  10   with Daubert issues in criminal cases, so it really depends

11   on what the expert is, who the expert is, what his opinion

12   is and what the basis of that opinion is.  We don't have

13   that.

14                    THE COURT:  When is the expert required to

15:19:17  15   give notice of the opinion?  Isn't that covered in the

16   rules?

17                    MR. HERDMAN:  Yeah.  By the rules, it's 30

18   days before trial.  I think there may be a court order to

19   this effect.  I think it might be the 17th.  For some reason

15:19:37  20   I want to say it's the 17th.  I know there's some other

21   things that are due on the 17th.

22                    THE COURT:  Why don't you file a motion

23   suggesting a proposed order with respect to a defense

24   expert, because I gather you do not intend to offer an

15:19:51  25   expert?

Lori A. Callahan, RMR-CRR        (330) 252-6022

1                    MR. HERDMAN:  Like I said, Your Honor, that's

2      all contingent on what this proffered testimony is, and

3      what, if any, testimony we would have to rebut it or

4      challenge it.  I just don't know.  I'm in a vacuum right now

15:20:07  5      not knowing any more.

6                    THE COURT:  Why don't you give me a proposed

7      order with respect to that.

8                        Is there anything more, Mr. Pyle?

9                    MR. PYLE:  I just want to make it abundantly

15:20:18 10      clear that we've been on the record with this court saying

11      we haven't gotten discovery.  We haven't seen a single

12      stitch of physical evidence.

13                    THE COURT:  You haven't seen what?

14                    MR. PYLE:  We haven't seen any physical

15:20:30 15      evidence whatsoever, and we've asked for it before.

16                    THE COURT:  What physical evidence do you have

17      other than the --

18                    MR. HERDMAN:  My understanding is not much.

19                    THE COURT:  There's a video, isn't there --

15:20:42 20      that I thought I watched during the detention hearing?

21                    MR. HERDMAN:  Right.

22                    THE COURT:  And have you seen that video?

23                    MR. PYLE:  We've seen that significantly.  We

24      haven't seen the fake C-4.  We haven't seen what's referred

15:20:55 25      to in some of the reports.

|  | 1 | THE COURT:  All right.  Let me stop.  Was the |

                         1    THE COURT:  All right.  Let me stop.  Was the

                         2    so-called fake C-4 seized by the government?

                         3            MR. HERDMAN:  Yes, Your Honor.

                         4            THE COURT:  Have you displayed that to him?

    15:21:04            5            MR. HERDMAN:  No, Your Honor.  That's what we

                         6    were trying to schedule for this week so they could come see

                         7    it.

                         8            THE COURT:  Is there any other physical

                         9    evidence?

    15:21:09           10            MR. HERDMAN:  I was talking to the agent about

                        11    that.  If so, it is very limited.  It is not -- this isn't a

                        12    case where there was a search warrant executed and there

                        13    were reams of documents and all sorts of seized property.

                        14    It's just not that kind of a case.

    15:21:25           15            THE COURT:  Well, will you be able to have the

                        16    evidence disclosure, say, by -- is this a Tuesday?

                        17            MR. HERDMAN:  Today is Tuesday, Your Honor.

                        18            THE COURT:  A week from today, can you have

                        19    it?

    15:21:39           20            MR. HERDMAN:  We can.  At this point, it's

                        21    subject to whatever scheduling for defense counsel is.

                        22            Your Honor, I will credit Mr. Pyle.  I know

                        23    that there's been discussions about this expert.  We've

                        24    just -- that's not good enough.  We need a formal notice.

    15:21:54           25    So, yes, I know that there's been discussion about this.  I

149

1    don't mean to make it sound otherwise.  But we don't have a

2    formal expert notice, and I don't know if you need --

3              THE COURT:  It's been a while since I've

4    looked at the criminal rule.  What do the criminal rules

15:22:08  5    require in terms of disclosure of experts?

6              MR. HERDMAN:  I thought it was 30 days.  But

7    in my request to the court that we will file, I will lay

8    that out, what the rule is.

9              MR. PYLE:  Further, the date for disclosure of

15:22:32 10    the Giglio/Brady material is set for September 3.  And in

11    our view, there should be a substantial amount of

12    information disclosed there, including -- you know,

13    including documents.

14              So since that date has been set, and the

15:22:48 15    government proposed Giglio materials, any rule saying that

16    it's got to be 30 days, 30 days before trial, certainly

17    that's inconsistent with the government's position and the

18    court's order.

19              THE COURT:  Let's come up here and see what

15:23:07 20    the rules say about expert disclosure.

21              MR. PYLE:  It's 26 something.

22              THE COURT:  It's not Rule 12?

23              MR. PYLE:  It's either 16 or possibly a 26.

24              THE COURT:  Well, 16-Z talks about expert

15:26:10 25    witnesses from the government's standpoint, and then

150

1    16(b)(C) has the defendant, at the government's request,

2    give to the government a written summary of any testimony

3    that the defendant intends to use, blah, blah, blah.  It

4    doesn't -- I don't see any date.  I don't see any time.

15:26:55    5           MR. HERDMAN:  For some reason the 30 days

6    jumps out at me.

7                THE COURT:  I don't think there's a rule.

8                Court will be in recess.  Thank you.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3            I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8                s/Lori A. Callahan
                 Lori Ann Callahan, RMR-CRR
9                U.S. District Court, Suite 568
                 2 South Main Street
10               Akron, Ohio  44308
                 (330) 252-6022
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3      DIRECT EXAMINATION OF DANIEL MOLINA              6
       BY MR. HERDMAN
4      CROSS-EXAMINATION OF DANIEL MOLINA             35
       BY MR. PYLE
5      REDIRECT EXAMINATION OF DANIEL MOLINA          51
       BY MR. HERDMAN
6      DIRECT EXAMINATION OF BRANDON BAXTER           58
       BY MR. PYLE
7      CROSS-EXAMINATION OF BRANDON BAXTER            70
       BY MR. HERDMAN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25