# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO: 1:12CR00238-5 |
| Plaintiff, | : | JUDGE DAVID D. DOWD, JR. |
| -vs- | : | |
| JOSHUA STAFFORD, | : | **DEFENDANT JOSHUA STAFFORD'S SENTENCING MEMORANDUM** |
| Defendant. | : | |

Defendant Joshua Stafford, through stand-by counsel, hereby submits the following Memorandum in anticipation of sentencing on September 26, 2013.

Respectfully submitted,

/s/ Timothy C. Ivey
TIMOTHY C. IVEY (Reg. No.0039246))
Assistant Federal Public Defender
1660 West Second Street, #750
Cleveland, OH 44113
(216) 522-4856 Fax: (216)522-4321
E-mail: timothy_ivey@fd.org

## **MEMORANDUM**

### **I.** **Introduction**

The following Sentencing Memorandum of Joshua Stafford represents defendant's full invocation of Title18 U.S.C. §3661, which permits any party to present any information regarding the "background, character and conduct of a person convicted of an offense which a court of the United States may receive and consider" at the time of sentencing, without limitation. Because there was a trial in this case, and over 14 months of pretrial publicity, and the convictions and sentences of the co-defendants in this case, there will be no recitation of the facts of the offense, as this Court is keenly cognizant of those facts and the consideration thereof as they apply to this Court's sentencing decisions. Thus, instead of a recitation of the "nature of the offense," this memorandum will focus on "the history and characteristics" of Joshua Stafford. See, 18 U.S.C. §3553(a)(1).

The background social and mental health history was obtained from documents from MetroHealth Medical Center, The Cleveland Clinic, Positive Educational Program, Laurelwood and Windsor Hospital, Ohio Department of Youth Services, Bellefaire Jewish Children's Bureau, and Lorain County Juvenile Court. None of these documents are attached, as all are protected through various state and federal privacy laws and not for public dissemination. Counsel provided Probation Officer Stranathan with the bulk of the aforementioned documents on compact disc, should Joshua Stafford's placement in the Bureau of Prisons need the records for treatment purposes or historical analysis. It is counsel's hope that as the Presentence Report is used by the Bureau of Prisons, the records will likewise be used in assisting the medical and psychiatric staff with assessing and hopefully treating Joshua Stafford during his incarceration.

The objections to the Presentence Investigation Report by defendant have been incorporated into the final PSR, and Mr. Stafford shall address those objections at the time of sentencing, except

for the objection of the application of the terrorism enhancement, which is addressed herein.

**II      History and Characteristics of Joshua Stafford**

Joshua Stafford was represented at the initial appearance on May 1, 2012 by Assistant Federal Public Defender Edward Bryan, who made the first contact with Stafford and gathered information relative to the young man who had been arrested with four other individuals for the attempt at blowing up the Brecksville-Northfield High Level Bridge on April 30, 2012. Upon his return to the Federal Defender's office after arraignment, AFPD Bryan, a 16 year federal defender with eight years prior experience at the Lake County Public Defender, stated that "I have never seen a more mentally disturbed client in my career." Indeed, at the arraignment on May 7, 2012, before Magistrate Judge Greg White, it became apparent to counsel that Mr. Stafford was suffering from at least one or more severe mental disease or defects. In light of the interaction and communications with Mr. Stafford, a multitude of medical and psychological professionals who had treated Mr. Stafford in the past, from birth forward, were contacted for guidance and information into the history and characteristics of the then 23 year old. The following is a summary of the thousands of pages of documentation reflecting a troubled toddler, a troubled child, an increasingly disturbed teen, and the young adult who will stand before this Court on September 26, 2013 to be sentenced for his role in this offense.

*A.    Early Social History*

Joshua Stafford was the second son born to Lisa Stafford, a teenager who would find that she was ill-equipped to handle her second son, born four weeks premature. Baby Stafford's lungs were not fully developed, which contributed to his aspiration of amniotic fluid at birth, causing pneumonia. After an extended period without oxygen, Baby Stafford was what is colloquially termed, a "Blue Baby," and was rushed to the Neonatal Intensive Care Unit at MetroHealth Medical

Center, on October 3, 1988. Lisa Stafford was able to take her infant son home approximately eight days after his birth.  Ms. Stafford was a single mother who had a difficult time raising her young boys, as her first born was not yet two years of age at the time of Joshua Stafford's birth.

The initial signs that Joshua Stafford may have some mental health issues arose early, as his mother reported to health care providers that as a baby Joshua would stare, unmoving as if in a trance, for periods of up to 30 seconds, being oblivious and non-reactive to surrounding stimuli.  As he grew older, the episodes of staring became more pronounced, with medical professional concerned that Stafford was suffering seizures.  Also during his toddler years, Joshua would have bouts of anger, where he would lash out at his mother physically.  Being ill-equipped to understand onsets of mental illness, Lisa Stafford often responded to her sons behavior by beating her sons, particularly Joshua, in order for them to behave.  This physical abuse would continue for the majority of Joshua's adolescence, and would escalate and involve abuse by male boyfriends of Ms. Stafford.

Joshua Stafford could not attend preschool, as his behaviors toward his peers was unpredictable and sometimes violent.  By the time Stafford was pre-school age, he had begun biting himself until he would bleed, hitting himself, and jumping from high places, putting himself in danger of injury.  Joshua first received mental health treatment around age 4, with his first psychiatric hospitalization occurring at age 5, at the Cleveland Clinic's Child Psychiatric Unit.  Although the records as sparse for this period of time, the hospitalization was in response to self harm including banging his head, ripping out his hair and a tooth. He was medicated at this time, however the choices for medications were slim due to his young age and undeveloped brain.

By the time Joshua Stafford entered kindergarten at Anthony Wayne Elementary in Cleveland, Ohio, Stafford had been diagnosed as having Attention Deficit Hyperactivity Disorder,

and was prescribed Adderall.  By First Grade, Joshua Stafford became so disruptive and aggressive in class, throwing chairs, refusing to remain clothed, that he was home schooled, and a tutor was provided by Cleveland Metropolitan School District.

### B. Early Adolescence - Psychiatric Hospitalizations and Therapeutic School

Joshua Stafford's home life was inconsistent and violent, with abuse at the hands of the authority figures in his life, and at the hands of his older brother, with whom Joshua never developed a meaningful relationship.  Indeed, throughout Joshua Stafford's life, until the Occupy Cleveland movement, Joshua Stafford's social skills were woefully incomplete, and he was never able to make and maintain consistent friendships or any sustainable relationship with anyone.  As a young child Joshua's self harm had elevated to using materials around his home to cut himself with, and at seven years of age, Joshua Stafford used a metal dust pan, used to gather dust from sweeping, and repeatedly cut himself in the face, causing his mother to call the KIDS hotline, and transporting him to MetroHealth.

Joshua Stafford's first extended (more than 10 days), mental health commitment occurred as a result of this event at age seven, as the officials at MetroHealth determined that this young child was suicidal, and needed acute psychiatric care.  Joshua Stafford was hospitalized at Laurelwood for psychiatric evaluation and treatment for 30 days, after which time he was released to his mother, and placed on several psychotropic medications.  The records received from Laurelwood through the requests do not contain the exact therapies utilized during the first hospitalization at Laurelwood, but the clinical notes from Joshua Stafford's second stay at Laurelwood references his hospitalization and treatment, and the records from Metrohealth Medical Center also refer to their initial examination and treatment for the injuries sustained during the first suicide attempt.

Eventually Joshua's mother determined that Joshua would try to attend public school again,

5

this time at Henry Longfellow Elementary, also in Cleveland, for Second Grade, as the family had moved to the east side of Cleveland. Joshua was soon removed from the special education classroom, due to his behaviors, and was recommended to be placed in the Positive Education Program, or "PEP," which is a therapeutic public school whose mission is to help "troubled and troubling children learn and grow," through integrated special education and mental health services. Joshua would spend the remainder of his educational years at PEP, as his primary psychiatrist, Dr. Erica New, and his case workers were part of the PEP experience. During his six years of attending PEP, Joshua Stafford was placed in restraints, as the school does not have a suspension/expulsion policy, due to the nature of the school and its mission. Near the end of his educational and psychiatric treatment at PEP, Joshua would be placed in restraints daily, in order to calm him and keep him from causing harm to himself or to others.

Throughout review of the hundreds of pages of therapeutic records from PEP, as well as the education records, testings, and other information obtained, Joshua's story remained the same throughout his experience in the program. Even while medicated with psychotropics such at Depakote, Adderall, Cylert, and at times Haldol and Risperdal, Joshua's behaviors and attempts at self harm and destructive behaviors continued. After reviewing the PEP records it became apparent that Joshua's home life was not conducive to following the psychiatric regimen that the doctors and counselors had established, as there was many instances of non-compliance, due to the mother's lack of follow up, which eventually led to escalating psychotic episodes. Joshua was not in a stable home, moved frequently, and had no person who he would communicate with, as his ability to share his emotions and feelings was severely stunted.

This instability in his mental health would eventually lead to more attempts at self harm. The clinical notes from one of Joshua Stafford's hospitalizations at the Cleveland Clinic's Pediatric

6

Psychiatric Unit indicated that his mother related that Joshua had consistently cut himself, and would place objects, like paint chips, underneath his skin. Stafford would also scratch his legs furiously until they were scarred and bleeding, and hand continued to risk his safety by climbing to high places and jumping to the ground, and climbing into manholes in the street. By the time Joshua Stafford was eight years of age, he had received diagnoses of Psychosis NOS, Self-Mutilation, ADHD, and Anxiety. Joshua would be awake for days without sleeping, constantly moving, running out of the house, and hiding in sewers. Stafford would crawl on the floor making animal noises, and even took painfully drastic measures by breaking off parts of his teeth, because he believed he was a werewolf.

### C. Preteen - Teen Years - Therapy and ODYS

During the Cleveland Clinic hospitalization in June of 2000, information surfaced which began to shed some light on the family history of Joshua Stafford, a history which is riddled with severe mental illness, Bipolar Disorder, Schizophrenia and Depression. During this 10 day hospitalization, the psychiatrist, Dr. Kathleen Quinn, conducted a neurological examination including an MRI, looking for a structural anomaly which would help explain Joshua Stafford's psychosis. Finding no marked abnormalities, his 10 day treatment consisted of finding a balance of medications which would calm Stafford and relieve the anxiety. Joshua Stafford was eleven years old during this 10 day hospitalization in 2000.

By age 15, the many doctors and psychiatrists that had treated Joshua Stafford from his early years of life still had not reached a firm diagnosis of precisely what "label" to place on Joshua's psychiatric condition. What all doctors and mental health professional could agree on was the fact that he was a severely disturbed teen. And, in early 2004, Joshua Stafford was again hospitalized at Laurelwood, for attempted use of a knife on his mother, and himself, after being brought home

by Lakewood, Ohio police officers after wandering the streets after curfew. The notes from the treating psychiatrist from Laurelwood provide a glimpse into the person Joshua Stafford was at 15:

> *... patient is 15 year old young boy who was admitted because he is acting bizarre. He has regressed to like a 2 or 3 year old kid. . . . He is unable to pay attention through the interview. . . . He tried to hide himself under the sofa. He is bizarre. Yesterday he was banging his head. . . . He definitely appears to be psychotic and depressed.*

During his March, 2004 hospitalization at Laurelwood, he was given Risperdal, Prozac, Zyprexa, and doses of Haldol as needed. After five days at Laurelwood, Lisa Stafford removed Joshua from the hospital against medical advice, notwithstanding the lack of modifications made to his drug treatment regimen. Because many of the medications given to Joshua Stafford required consistent monitoring due to the adverse side effects, it was important to maintain appointments and medication schedules. There was no follow through in obtaining the medication, and no one monitoring whether he followed the regimen. Most of the time, Joshua would decide to stop taking the prescribed medications on his own.

By age 15, Joshua Stafford's attendance at PEP was peppered with discipline and behavior problems, including an assault of a teacher, which landed him in juvenile detention. During the Summer of 2005, Stafford was arrested for breaking into a concession stand in an Avon Lake public park, after opening a hole in the roof of the stand and squeezing through to the inside, where he stole candy. While in juvenile detention in 2006 in Lorain County, Joshua Stafford was required to participate in the mental health program run through Bellefaire Jewish Children's Bureau, as a component of his ODYS detention. During this time, Joshua Stafford made another attempt at suicide, having broken a light fixture at the detention facility and cut his wrist and choked himself. This resulted in another 10 day hospitalization at Belmont Pines for inpatient psychiatric hospitalization.

In light of the clinical setting that Joshua was unable to remove himself from, the psychiatrists at Bellefaire were able to make some progress through therapy and medication in addressing many of his mental and emotional problems. At Bellefaire, Joshua Stafford was able to begin identifying his emotional triggers as well as learn techniques to de-escalate his actions, however he continued having suicidal ideations and remained unable to express himself in a healthy manner.

Joshua was transferred to the Ohio Department of Youth Services to serve a six month sentence for the concession stand break-in, and was immediately assigned to the Marion Juvenile Correctional Facility's Intensive Mental Health Unit, in June of 2006. Joshua Stafford remained in Marion IMHU for his entire six month term, continuing to display signs of self harm, depression, anger and general disruptiveness. Indeed, the treating psychiatrist at Marion, Dr. Julie Niedermier, related that during their therapeutic session, soon to be 18 year old Joshua Stafford was "climbing the walls, literally." When the climbing was addressed, Stafford responded that he was not suicidal, but he was trying to get away from everybody. However, Stafford was not concerned that if he fell from the rafters in the ceiling, he would likely be seriously injured. Joshua Stafford became increasingly non-compliant with his "pharmocopia" of anti-psychotic medications, and by the time of his transfer to serve 90 days in an adult facility, the psychiatrist had discontinued all of his medications except for Lithium, due to non-compliance. By the time Joshua Stafford was 17 years of age, he had begun to had auditory hallucinations, with the voices telling him to cut himself. The psychiatrists at Marion INHU were concerned about this new symptom, given Stafford's age, which was typical of the age where Bipolar disorder begins to manifest itself.

By the time Joshua Stafford was an official adult, he had consistently refused medications, and had instead determined that marijuana was the best choice for him in relieving his mental health

9

outbursts and challenges.  Stafford, who had received Supplemental Security Income and Medicaid since he was five years old, was able to live on his own in modest rooms rented in neighborhood homes, living off of his SSI benefits with a 9th grade education, a 5th grade reading ability, and a mental age of approximately 12 years of age.

### D. Adulthood - Occupy Cleveland

Joshua Stafford was living on his own, often wandering the streets of Cleveland, rummaging through empty warehouses, tagging, and being a fringe member of the street scene in Cleveland, and continuing to medicate himself with marijuana.  Many times Stafford would be stopped by police officers in light of is strange affect and appearance, and he experienced several misdemeanor offenses for carrying a knife or vandalism.  On his last arrest prior to Occupy Cleveland, Joshua Stafford again made a suicide attempt during his incarceration at City Jail.  He stated to the treating physician at MetroHealth where he was transported, that he hear voices that got louder and louder, telling him to kill himself, so he found a "spork" in his cell and began sawing at his neck, and then at his wrist.  Therefore, by February of 2010, Joshua Stafford is hearing voices and seeing shadows, or visual hallucinations, and having racing thoughts. This progression supports the concerns expressed while at Marion in ODYS custody, that it appeared that Stafford's mental health was evolving once again.  Joshua Stafford was treated for his wounds and transported back to Cleveland City Jail.

Occupy Cleveland's first meeting in downtown Cleveland occurred just three days after Joshua's 23rd birthday.  Joshua Stafford joined the growing group of individuals, and was accepted as a member, on his terms, for the first time in his life.  Joshua was street savvy, unlike most of the young individuals that occupied the sidewalks at Public Square in Cleveland, and was willing to stand guard during the night, to protect the group from those who may try to harm the sleeping

protesters. Joshua, who had a history of days of insomnia, became a member of Nightwatch, which consisted of a group of individuals who would take turns being "security" for the group.

It was during his duties on Nightwatch that he got to know Doug Wright and Connor Stevens. Brandon Baxter was already known by Joshua, as they had met at a coffee shop on the near westside of Cleveland earlier in the year. Stafford remained at the Tent City, always helping out and working, but never consistently involving himself in conversations with the Occupiers. Joshua Stafford was content to remain on the fringe, but found the friendships that he was beginning to form with other members of Occupy not involved in this case, in addition to Wright, Baxter, and particularly Stevens. Many of the letters of support that are appended to this Memorandum are from those original Occupy members, individuals who remain supportive of Joshua to this day. [See, Defendant's Sent. Exh A, Letters of Support].

### E. Present Condition

Since his arrest in this case, Joshua Stafford has received no medications by his choice, no counseling, and by his actions while being evaluated for competency at FCI Devens, it is clear that the mental illness and its manifestations of bizarre behavior, self harm, cutting, anger, depression, bouts of sleeping for several days or not at all, have been a prevalent theme throughout Joshua Stafford's life. Far from being an "act," this is who Joshua Stafford is, and has been, for all of his 24 years. Since the June, 2013 trial, Stafford has taken backward steps in his ability to understand cause and effect, in his judgment, and his ability to assess his situation. It is for these reasons, and the extensive history provided herein, that a firm request is made that no matter the length of sentence, a therapeutic environment is crucial for him. In isolation or general population, Joshua Stafford would not survive mentally.

**III.     Sentencing Guidelines - Terrorism Enhancement**

Defendant Stafford objects to the application of the Terrorism Enhancement in this case, for there was no evidence presented which proved that Joshua Stafford understood the reason why Wright, Stevens, and Baxter wanted to blow up the bridge, or that it was politically motivated. Stafford understands that this Court has already ruled that the enhancement applied to hsi co-defendants, and understands this Court's application to them. However, as endorsed in United States v. Stewart, et al, 590 F.3d 93 (2nd Cir.2009),

> [C]ommission of a federal crime of terrorism, which would trigger the "involved" prong of the enhancement, incorporates "a specific intent requirement, namely, that the underlying felony was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.' 18 U.S.C. § 2332b(g)(5)." *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir.2008). So the problem for the government remains: there is no evidence that Yousry himself sought to influence or affect the conduct of a government. The enhancement therefore does not apply under the "involved" prong. See *Leahy*, 169 F.3d at 446.

*Stewart*, 590 F.3d 138.

Stafford submits that the proof at trial showed that Stafford was told that the others had established that they were going to attempt to detonate what they believed would be C-4 explosives under the Route 82 Bridge. In the conversation between the Informant, Wright and Stafford, no motivation for the act was provided. No explanation of their planning, why they chose the bridge, who they through it would affect, etc., none of the information which would lead a person to believe that Stafford knew anything more than that his friend needed his help and he was actually inviting him to join the group in this activity. Given Stafford's mental state, there's no telling what Stafford was thinking. The preponderance of the evidence standard is not met in this instance.

In *Stewart*, the government also argued that it was "reasonably foreseeable" to Yousry that his co-defendants actions were motivated for terrorist reasons, citing the relevant conduct guidelines,

12

U.S.S.G. §1B1.3. The Stewart Court responded:

> The government asserts that it was reasonably foreseeable to *139 Yousry that his co-conspirators were acting in a manner "calculated to influence or affect the conduct of government," so that the requirement of section 2332b(g)(5)(A) is satisfied as to him.
>
> But sections 1B1.3(a)(1)(A) and (B) apply to "acts and omissions," while, as noted above, section 2332b(g)(5)(A) describes a motivational requirement, a "specific intent." *Chandia*, 514 F.3d at 376. We cannot conflate Yousry's acts with his co-defendants' mental states. As one member of this Court has pointed out, "We have never regarded mens rea as an 'act' of the defendant for purposes of the relevant conduct guideline, nor should we." *United States v. McHugh*, 122 F.3d 153, 158 (2d Cir.1997) (Newman, J., concurring). "Section 1B1.3(a)(1)(A) permits selection of an enhanced guideline for 'acts' committed by the defendant.... The natural meaning of 'act' connotes conduct, and the meaning of the guideline should not be strained to include state of mind." Id. Here, too, the terrorism enhancement's motivational requirement, as incorporated by reference to section 2332b(g)(5)(A), is not an "act" or "omission" under section 1B1.3(a)(1)(B). The enhancement is therefore not applicable.

*Stewart*, 590 F.3d at 139. In light of the lack of a factual basis for finding that Stafford knew the motivation behind the attempted bombing, and the inability to impute this knowledge from his co-defendants, Joshua Stafford submits that the terrorism enhancement does not apply to his sentencing calculations, and that his adjusted Offense Level is 24, not 36 as calculated by the probation officer in the Presentence Report.

IV. **Variance**

Initially, Joshua Stafford requests that should this Court find that the terrorism guidelines apply, that he sentence Mr. Stafford in the same manner as his co-defendants, that is, without the additional 12 levels. In addition, Mr. Stafford requests a sentence which meets his mental health needs, which includes a firm recommendation for FCI Butner, where there are facilities that can assess Mr. Stafford effectively. Counsel understands that there is quite a wait for placement at Butner, however counsel suggests that the wait would be preferential to placement at a facility which may intensify any decompensation currently existing, and may exponentially increase the risk of

harm to Mr. Stafford through self infliction or through conflicts with other inmates. Counsel requests a sentence which reflects the minimum sentence permitted by statute, or 60 months, for all counts, to run concurrently, or a sentence between 60 months and the low end of the applicable guideline range, absent the terror enhancement - 77 months.

Respectfully submitted,

*/s/ Timothy C. Ivey*
TIMOTHY C. IVEY
Assistant Federal Public Defender
(Standby Counsel for Joshua Stafford)

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2013 a copy of the foregoing ***Defendant Stafford's Sentencing Memorandum*** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

Sincerely,

s/ *Timothy Ivey, Esq*.
Assistant Federal Public Defender