IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:12-CR-238 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID D. DOWD, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| JOSHUA STAFFORD, | ) | <u>GOVERNMENT'S MEMORANDUM</u> |
| | ) | <u>IN SUPPORT OF APPLYING THE</u> |
| Defendant. | ) | <u>TERRORISM ENHANCEMENT</u> |

Now comes the United States of America, by and through Steven M. Dettelbach, United States Attorney, and Duncan T. Brown and Justin E. Herdman, Assistant United States Attorneys, and respectfully submits this Sentencing Memorandum, which summarizes the United States' position that the Defendant, Joshua Stafford, (hereinafter, "the Defendant") should be sentenced to a term imprisonment that applies the Terrorism Enhancements.

The United States Pretrial Services and Probation Office (hereinafter, "the Probation Office") has prepared a Presentence Investigation Report (hereinafter, "PSIR") for the Defendant. Using the November 1, 2012 edition of the United States Sentencing Guidelines Manual (hereinafter, "the Guidelines" or "U.S.S.G."), the Probation Office calculated the Total Offense Level to be 36, which includes an enhancement under U.S.S.G. §3A1.4 for terrorism offenses. Through operation of the terrorism enhancement under U.S.S.G. § 3A1.4, the

Defendant's Criminal History Category was calculated at VI.[1]  Accordingly, the guideline range for a sentence of imprisonment under the U.S.S.G. is 324 to 405 months.

In this Memorandum, the government explains why this Court should apply the Terrorism Enhancement.

## I.    <u>Case History</u>

On April 30, 2012, the Defendant, along with four co-conspirators, was arrested by agents of the Federal Bureau of Investigation ("FBI") outside of a restaurant in Garfield Heights, Ohio.  The Defendant was arrested shortly after he placed an Improvised Explosive Device ("IEDs") – which the Defendant believed contained actual C4 plastic explosives – at the base of the Brecksville-Northfield High Level Bridge (alternatively, "the Route 82 Bridge") and repeatedly attempting to detonate that IED.

On May 3, 2012, a three count indictment was unsealed charging the Defendant, along with co-defendants Douglas Wright, Brandon Baxter, Connor Stevens, and Anthony Hayne, with the following crimes:

- Count One: Title 18, United States Code, Sections 2332a(a)(2)(B) and (D) – Conspiring to Use Weapons of Mass Destruction;

- Count Two: Title 18, United States Code, Sections 2332a(a)(2)(B) and (D), and 2 – Attempting to Use Weapons of Mass Destruction;

---

[1] Based on the PSIR's calculation of the Defendant's prior convictions, the Defendant would be a Criminal History Category IV even without the enhancement under U.S.S.G. § 3A1.4, as he has been calculated to have accrued 8 criminal history points (adjusted downward from 10 criminal history points under U.S.S.G. § 4A1.1(c)).

- Count Three: Title 18, United States Code, Sections 844(i) and 2 – Attempting to Damage or Destroy Property Used in Interstate Commerce by Means of Explosives;

On May 7, 2012, the Defendant and his co-defendants were arraigned on the Indictment. Shortly thereafter, trial was scheduled for September 17, 2012. On August 10, 2012, the Defendant filed a motion requesting a court-ordered competency examination and a competency hearing, which was granted by the Court three days later. While the Defendant was undergoing psychiatric evaluation a Federal Bureau of Prisons medical facility, his four co-defendants entered pleas of guilty and were sentenced to terms of imprisonment ranging from 138 months (Douglas Wright) to 72 months (Anthony Hayne). The Court applied the Terrorism Enhancement to all four co-defendants after reviewing filings by both parties and holding hearings on the proper application of the enhancement.

A jury trial commenced on June 10, 2013. Following the testimony of eight witnesses on behalf of the United States and one witness (the Defendant himself) for the defense, the jury returned verdicts of guilty as to all three counts on June 13, 2013. Following a request for extension, the Court scheduled a sentencing hearing for September 26, 2013.

On August 7, 2013, the Probation Office prepared and submitted a final PSIR for the Defendant. Having reviewed this document, the United States submits that the PSIR correctly determines the applicable Guideline range at 324 to 405 months' imprisonment for the Defendant.[2] The application of the Terrorism Enhancement for this Defendant is consistent with the application of it for his co-defendants.

---

[2] This calculation of the applicable Guideline range is predicated upon an initial offense level of 24, as determined by this Court with respect to Douglas Wright, Brandon Baxter, and Connor

## II.     Application of the Terrorism Enhancement

The application of the Terrorism Enhancement for the Defendant is appropriate not only because of his individual actions as a member of the conspiracy, but also because he was part of a conspiracy in which the enhancement was properly applied to the other members as a well.

### 1.     U.S.S.G. § 3A1.4 - Terrorism Enhancement

Part A of Chapter Three of the U.S.S.G. provides for "Victim-Related" adjustments to the Guidelines offense level.  Following Congressional passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132 (1996), the current version of U.S.S.G. § 3A1.4 provides:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense is less than level 32, increase to level 32.

> (b) *In each such case*, the defendant's criminal history category . . . *shall be Category VI.* (Emphasis added).

The Application Notes to Section 3A1.4 were amended to their current form after enactment of the USA PATRIOT Act in 2001.  The current version of U.S.S.G. § 3A1.4 consists of four Application Notes which are viewed as "part of the Guidelines themselves and not mere commentary on them."  *Stinson v. United States*, 508 U.S. 36, 38 (1993).

Viewed in the aggregate, these amendments reflect an understanding by both Congress and the Sentencing Commission that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and difficulty of deterring and rehabilitating the

Stevens in a Memorandum Opinion and Order (Document No. 187, November 14, 2012, PageID 2949-50).

criminal, and thus that *terrorists and their supporters should be incapacitated for a longer period of time*." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (emphasis added).

### a. Application Note 1

Application Note 1 to § 3A1.4 states that the term "Federal Crime of Terrorism" is defined at 18 U.S.C. § 2332b(g)(5); the term means an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is one of a series of specifically enumerated violations. As discussed below, the crimes of which the defendants stand convicted in this case were clearly calculated to influence and affect the conduct of government by intimidation and coercion, as well as to retaliate against government conduct. In addition, both 18 U.S.C. § 2332a and 18 U.S.C. § 844(I) are enumerated offenses.

### b. Application Note 3

Application Note 3 serves as an addendum to § 3A1.4's subsection (b) by clarifying that the enhancement does not require a prerequisite criminal history Category VI for its application. It provides for the automatic increase of criminal history to Category VI "in each such case."

The Second Circuit noted in *Meskini* that Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4, "because even *terrorists* with no prior criminal behavior are *unique among criminals* in the likelihood of *recidivism, the difficulty of rehabilitation*, and *the need for incapacitation*." 319 F.3d at 91. (emphasis added).

**2. Each Count of Conviction Implicates a Specified Federal Statute that Supports the Terrorism Enhancement**

Each count of conviction triggers the terrorism enhancement. *See* 18 U.S.C. § 2332b(g)(5) and U.S.S.G. § 3A1.4.

### a.     Count One: 18 U.S.C. § 2332a

Title 18, United States Code, Section 2332a is an enumerated offense within the definition of "federal crimes of terrorism" in 18 U.S.C. § 2332b(g)(5). Therefore, the terrorism enhancement in U.S.S.G. § 3A1.4 applies, thereby increasing the offense level by 12 levels, and applying a criminal history category of VI to the Defendant.

The statutory punishment for this offense as set forth in 18 U.S.C. § 2332a is as follows:
(A)  Maximum imprisonment: up to life;
(B)  Statutory fine: $250,000;
(C)  Maximum period of supervised release: 5 years; and
(D)  Special assessment: $ 100**.**

It is important to note that 18 U.S.C. § 2332a is a statute containing an express conspiracy and attempt provision. It is comprised of two prongs, the first criminalizing conspiracies to victimize persons, and the second dealing with conspiracies to destroy or damage certain types and classes of property.

### b.     Count Two: 18 U.S.C. § 2332a

Title 18, United States Code, Section 2332a is an enumerated offense within the definition of "federal crimes of terrorism" in 18 U.S.C. § 2332b(g)(5). For the reasons discussed above, the terrorism enhancement in U.S.S.G. § 3A1.4 also applies to this offense, thereby increasing the offense level by 12 levels, and applying a criminal history category of VI to each defendant. The statutory punishment for this offense is the same as that for Count One.

### c.      Count Three: 18 U.S.C. § 844(I)

Title 18, United States Code, Section 844(I) is an enumerated offense within the definition of "federal crimes of terrorism" in 18 U.S.C. § 2332b(g)(5).  For the reasons discussed above, the terrorism enhancement in U.S.S.G. § 3A1.4 also applies to this offense, thereby increasing the offense level by 12 levels, and applying a criminal history category of VI to the Defendant.

The statutory punishment for this offense as set forth in 18 U.S.C. § 2332a is as follows:

(A)  Maximum imprisonment: 20 years;
(B)  Minimum imprisonment: 5 years;
(C)  Statutory fine: $250,000;
(D)  Maximum period of supervised release: 3 years; and
(E)  Special assessment: $ 100.

## 3.  The Defendant's Conduct was Calculated to Influence or Affect the Conduct of the Government by Intimidation and Coercion and to Retaliate Against Government Conduct

The evidence before this Court leaves no question that the conduct of the defendant was "calculated to influence [and] affect the conduct of the government... [and] to retaliate against government conduct."  As such, the defendants' conduct involves a federal crime of terrorism and the enhancement under U.S.S.G. § 3A1.4 should be applied.[3]

That evidence, when viewed in light of each individual defendant's actions and in light of the conspiracy as a whole, makes clear that the act of detonating the improvised explosive devices at the base of the Route 82 Bridge was meant to convey a message to the civilian population, the corporate word, the financial system, and all levels of government.  This was not

---

[3] The defendants concede that the counts of conviction meet the statutory predicates outlined in 18 U.S.C. § 2332b(g)(5)(B).

an innocent "prank" conducted simply for the sake of fulfilling some juvenile fascination with explosives. Rather, this was a carefully considered, planned, and executed "operation" to demonstrate anarchist support for a nationwide strike to be held on May 1, 2012 (the day after the attempted detonation of the explosives in this case) and as a prelude to a "civil war" that would commence at the joint G-8/NATO Summit scheduled to be held in Chicago in the middle of May.[4]

The evidence supporting the application of the terrorism enhancement to the defendants' conduct runs through the entire case. Topically, it can be broken down into the following:

**a.** **Individually as to the Defendant:**

At its core, this offense constitutes an effort by the Defendant and his co-conspirators to terrorize the civilian populace of the United States and, as a consequence, adversely affect what they perceived to be a cozy collusion between the government and corporate interests. By detonating two IEDs – filled with what all the co-conspirators believed was actual C4 plastic explosive – at a pillar supporting the Route 82 Bridge, the Defendant and his confederates hoped to destroy the support of that bridge, callously dismissing the possible (if not certain) loss of human life as mere "collateral damage" to this violent expression of their extremist, anarchist worldview.

- **The Defendant Participated in Anti-Government Rallies in Cleveland and New York**: On March 2, 2012, Douglas Wright and Brandon Baxter introduced the

---

[4] The "Group of 8" Nations is comprised of the United States, United Kingdom, France, Italy, Germany, Japan, Canada, and Russia. The annual summit between the heads of the G8 governments was scheduled to be held in Chicago on May 18-19, in advance of the NATO Summit to be held in Chicago on May 20-21. The G8 Summit was moved to Camp David in light of security concerns related to expected protest activity. The NATO Summit was held, as scheduled, in Chicago.

Defendant to the Confidential Human Source (CHS). Shortly thereafter, the Defendant travelled to New York City to interact with the "Occupy Wall Street" protest movement and returned to the Cleveland area in mid-April.

- **The Defendant Was Predisposed to Join the Plot:** Prior to this meeting, the CHS asked Douglas Wright and Brandon Baxter about the Defendant and whether he was trustworthy. Brandon Baxter stated that the Defendant had "been talkin' about doing [stuff] for awhile." (Gov. Trial Ex. 3A)("1D24b"). Douglas Wright stated, "I been tryin to find somebody the whole time and I finally found somebody I knew that I could trust. That I knew would be down for it. I mean it's just a dude that likes to do crazy [expletive]. And wants to do revolutionary [expletive], but not the way that Occupy wants to do it, he wants to do it more like the way that we want to do it." (Gov. Trial Ex. 3A)("1D24d").

- **The Defendant Was Informed of Plot:** On April 27, 2012, the Defendant met with the CHS and Douglas Wright – this conversation was consensually-recorded by the CHS. When the Defendant got into the CHS's vehicle Douglas Wright immediately told him the following: "Anyway, so basically tomorrow, the plan is uh- tomorrow we're gonna go pick up some merchandise. And in that merchandise is um, bulletproof vests, um, police batons, C4, gas masks… Oh yeah, and some tear gas canisters and yeah, and then, Monday we're gonna go to a spot that we were in recon… the highway it goes over the bridge. I mean the highway that goes over the uh, river and it's like a big valley, it's a huge bridge. Um, Monday, at some point during the evening, we're going to place the C4 and we're gonna blow it. So yeah, that's the gist." Douglas Wright then followed up by stating, "We have bulletproof vests and stuff like that for whenever – like we're goin'

to Chicago."  The Defendant then replied, "Right."  The Defendant then shared a plan he had conceived with Douglas Wright to target police stations using "thermite" (a metallic compound that burns at an extremely high temperature).  The Defendant then asked how many blocks of C4 they had, to which Douglas Wright responded, "We got eight pounds. Two different devices (UI) all we have to do is push the button."  The Defendant and Douglas Wright then agreed that they would be the two individuals who would place the IEDs.  (Gov. Trial Ex. 3A)("1D24e").

- <u>The Defendant Knowingly Participated the Night of the Attempted Bombing</u>:  On April 30, 2012, the CHS picked up the Defendant and Brandon Baxter in the early evening.  So eager was he to participate in the bombing, the Defendant had walked from his apartment that day – a distance of almost seven miles – in order to be picked up by the CHS.  (Gov. Trial Ex. 4A)("1D31-3a"); (Gov. Trial Ex. 10).

- <u>The Defendant Made Comments About Bombing Other Targets</u>:  En route to the target, Brandon Baxter then suggested that the CHS drive them to a hardware store, where they could acquire tape in order to secure the IEDs to the pillar of the bridge. (Gov. Trial Ex. 4A)("1D31-3a").  While Brandon Baxter was in the hardware store, the CHS (with the assistance of his cellular telephone) stated that there were 14 McDonalds restaurants in close proximity.  The Defendant then replied, "14 McDonalds in this area? Damn.  Maybe we should blow them up."  (Gov. Trial Ex. 4A)("1D31-3d").  Shortly thereafter, the CHS drove with the Defendant and Brandon Baxter to pick up Douglas Wright, Connor Stevens, and Anthony Hayne.

- **The Defendant Materially, Knowingly and Substantively Participated in the Placement and Detonation of theIEDs:**  During the drive from Cleveland to the Route 82 Bridge, the Defendant was given the "red" detonator phone. (Gov. Trial Ex. 12); (Gov. Trial Ex. 4A)("1D31-4e").  Douglas Wright instructed the Defendant to use latex gloves, purchased by the conspirators that evening, in order to avoid leaving fingerprints. (Gov. Trial Ex. 4A)("1D31-4f").  The conspirators also devised a cover story in the event that they were stopped by law enforcement, (Gov. Trial Ex. 4A)("1D31-4g"), and discussed that they would go to Guantanamo Bay, Cuba in the event that they were ever caught for the bombing.  (Gov. Trial Ex. 4A)("1D31-4h").

Upon arriving at the Route 82 Bridge, Connor Stevens (who was seated directly in front of the Defendant in the CHS's vehicle) stated, "We can blow up this bridge.  You know that little tiny one (UI)… Let's blow that one up… That way at least we know for damn sure it's comin' down."  (Gov. Trial Ex. 4A)("1D31-5a").  When the vehicle stopped, Connor Stevens then requested to look at the IED.  With the Defendant looking over his left shoulder, Connor Stevens viewed the explosives and stated, "That's beautiful… beautiful."  (Gov. Trial Ex. 4A)("1D31-5a"); (Gov. Trial Ex. 17).

The Defendant, carrying one of the IEDs, then walked for several minutes to the bridge pillar selected as the target of the conspiracy.   During this walk, the sound of automobiles passing on the bridge deck overhead was clearly audible.  (Gov. Trial Ex. 6A)("1D33-2a-1").   Despite this cogent evidence of the innocent lives at risk, the Defendant placed an IED – containing what he believed to be four blocks of C4 plastic explosive – on the ground next to one of the support pillars of the bridge; he then armed the device by turning on both the attached cellular telephone and a switch on the device

itself. (Gov. Trial Ex. 7)("1D36"). The conspirators then returned to the CHS's vehicle, at which point Connor Stevens said to the Defendant and Anthony Hayne: "We just committed the biggest act of, or the only act of terrorism, that I know in Cleveland since the 1960s." (Gov. Trial Ex. 6A)("1D33-2a-2").

The conspirators then travelled to a restaurant located off of Interstate 480, where they planned to remotely detonate the IEDs in order to provide an alibi for the bombing. While at the restaurant, the Defendant made repeated attempts to detonate the IED by text-messaging a pre-arranged code to the cellular telephone attached to the IED. When the conspirators realized that they had not yet heard an explosion, they left the restaurant after eating in order to see if there was any breaking news on the radio. At that point in time, they were arrested.

The Defendant's explanation of his role in the conspiracy – as adduced from his testimony during trial – was that he believed the explosive devices were supposed to spray paint. This account is not only implausible on its face, as it would be nonsensical to conduct a "paint operation" on the backside of a bridge pillar in the middle of a heavily-wooded park, but it is more fundamentally undermined by the overwhelming trial evidence to the contrary. First, Douglas Wright explained the specific objective of the conspiracy to the Defendant on April 27, 2012 – not once during that discussion was the word "paint" ever mentioned (while the words "C4", "bridge", "devices", and "blow it" certainly were uttered). Second, the Defendant's own words on the night of April 30 – including a comment about blowing up McDonald's – show that he was well aware of the purpose of the devices before the conspirators even reached the Route 82 Bridge. Third, the Defendant laid eyes on the device immediately before leaving the CHS's vehicle

(when Connor Stevens described it as "beautiful"). The simple fact is that these IEDs look like one thing and one thing only – bombs. Not paint. Fourth and finally, the entire course of discussion on the night of April 30 was consistent amongst all the conspirators – this was about blowing up a bridge using explosives, an act that was something done by "terrorists", an act that would result in the conspirators' detention at Guantanamo By if they were caught. All of the above demonstrates that the Defendant – far from accepting responsibility for his criminal actions – lied under oath in a naked effort to mislead the jury as to his role in the bombing conspiracy.

**b.** **As applied to the group:**

- Early Selection of Targets:  The Route 82 Bridge was but one of many locations proposed by the defendants (and not the CHS) as a target for violent action directed at government, corporate, and civilian populations.  Before the defendants discussed specific targets for the explosive devices, they also suggested, in rough chronological order, taking violent action against Cleveland police officers (during an anarchist riot), bank signs in downtown Cleveland, a hospital, the Horseshoe Casino in Cleveland, the G-8 Summit in Chicago, and the Republican and Democratic National Conventions.

- Targeting a Bridge:  The original suggestion of targeting a bridge was made by Baxter to Wright and the CHS on March 28, 2012.  Specifically, while driving over the bridge at the interchange at I-480 and I-77 (the Valley View Bridge), Baxter asked "How much [explosives] do we need to take out a bridge?"  In reference to the Valley View Bridge, Wright stated "This would be a good one" and Baxter followed by saying "It would be!"  This inquiry by defendant Baxter

was made immediately following a discussion by Wright, Baxter, and the CHS about the perceived start of a "civil war" in Chicago during the joint G-8/NATO Summit in mid-May. Both Wright and Baxter suggested "coordinating" their efforts with the anarchist element in Chicago; thus, the original plan to target a bridge had at its very core a tie to the expected violent, anarchist protest of the G-8/NATO Summit. After a discussion about the placement of explosives on the columns of a bridge, Baxter stated "You know that... that if we... that this... if this is some... this happens they're gonna make security on almost every bridge in the entire [expletive] country." Wright responded, "No, just the important ones. But I mean, they got the Detroit Bridge, that would kill a bunch of people... that would kill a bunch of people." Baxter then expressed concern that taking out the Detroit Bridge would be potentially problematic because "You don't wanna kill the people that [UI] like be on your side." Wright then responded, "You don't want collateral damage." These conversations make clear that both Wright and Baxter were supportive of the idea of disrupting commerce through the targeting of major transportation arteries, that they had considered the possibility of casualties, and that they approved, by inference, of the consequent death of individuals who were not on their side.

- Purchase of Riot Gear: On March 28, 2012, Wright and Baxter met with an Undercover Employee (UCE) of the FBI. During this meeting, Wright and Baxter agreed to purchase five ballistic (i.e. bullet-resistant) vests, five retractable batons, ten canisters of tear gas, and five gas masks. These items were purchased to be used in anarchist riot activities either in Cleveland or Chicago (during the

G-8/NATO Summit) and would be used to engage law enforcement and other emergency responders.

- Anger at Cleveland City Hall:  On March 31, 2012, Baxter expressed frustration with obtaining a permit from the city of Cleveland for the planned "Heart Fest" to be held at the end of April.  Baxter proposed marching on Cleveland City Hall and telling them "we are not playing by your [expletive] rules… if you shut [Heart Fest] down, we will blow it wide open."

- Purchase of C4 Plastic Explosive:  On April 1, 2012, Wright negotiated the purchase of 8 blocks of C4 plastic explosive with the aforementioned UCE. During the negotiation of the purchase, Wright and the UCE specifically discussed the use of C4 on a supporting column for a bridge.

- Federal Reserve Bank in Cleveland: On April 1, 2012, following Wright's agreement to purchase the 8 blocks of C4 plastic explosive, the three defendants met with the CHS to discuss possible targets.  Wright stated that they could attach the explosives underneath an armored truck entering the Federal Reserve Bank in downtown Cleveland.  Wright stated that this would "blow a big chunk of the [expletive] Federal Reserve."  Baxter stated, "Ok, wait, wait, wait, now we're talkin' a little bit like higher scale.  Let's just, let's see this, this is an open group discussion on this… on what we could be doin' right now."  Wright then stated, "I mean basically, that's what planning is. You gotta figure out what you're doing."  Baxter then raised the Fusion Center (see discussion below) and stated that "People have been attacking banks, and the Federal Reserve, for a long time, little progress."

- Northeast Ohio Fusion Center: Also on April 1, immediately following the discussion of targeting the Federal Reserve, Baxter stated "So I don't think anyone has ever done anything to [expletive] with the Fusion Center."[5] When asked where the Fusion Centers were located, Baxter stated that the largest one is in Ohio. Stevens then asked, "You talkin' about the DHS Fusion Centers?"[6] After Baxter responded in the affirmative, Stevens then stated, "Hell yeah, man. That would be a great [expletive] target." Baxter and Stevens then discussed a leaked report by the DHS related to the Occupy Movement and the role of Fusion Centers in "oppressing" the Occupy Movement. Baxter and Stevens agreed that taking out the Fusion Center database would be difficult, but "monumental." Baxter stated that there may not be a time when nobody is working at the Fusion Center, but there might be less people there during the night. Stevens then stated that the Northeast Ohio Fusion Center is located in Cleveland on the ninth floor of the Justice Center. [7]

- The Justice Center: Also on April 1, in the midst of the discussion of targeting the Northeast Ohio Fusion Center, Wright stated to Stevens, "Hey, Connor, what was I talkin' about? Takin' down the Justice Center… bringin' the Justice Center

---

[5] On March 28, 2012, Baxter observed a billboard for the Northeast Ohio Regional Fusion Center. Baxter stated "I hate these things [Fusion Centers]." Baxter then told Wright and the CHS that the Fusion Centers "came out shortly after the PATRIOT Act… and… they report to no one… They're a self-serving entity of the government."

[6] "DHS" is the United States Department of Homeland Security.

[7] The Justice Center Complex is located in downtown Cleveland and houses the Cleveland Police Headquarters Building, the Cuyahoga County and Cleveland Municipal Courts Tower, and the Correction Center.

to the ground." Wright then stated that he would wear a suicide vest filled with C4 plastic explosive into the Justice Center. Baxter responded that "a long time ago, I was willing to do that… about a year ago, I was, I was really considering putting on a suicide vest." Stevens then stated, "My thing is that if you can survive the attack, like another day, then why, why not?"

- <u>Guantanamo Bay</u>: Throughout the course of the conspiracy, the defendants expressed concern that they would be placed in military custody at Guantanamo Bay Naval Base if they were caught.[8] These conversations reveal the objectives of the defendants were purely to coerce, intimidate, and retaliate against the government – actions for which they expected to be treated as terrorists. For instance, on April 10, 2012, Baxter stated that "if we get caught for this we are going to Guantanamo Bay." Wright then agreed, "Yeah, we're not going to jail." On April 18, 2012, Wright stated to the CHS that if they go caught, they would go "directly to Guantanamo Bay… do not pass go, do not collect two hundred dollars."

- <u>The Route 82 Bridge</u>: On April 18, 2012, Wright stated that he had identified a target in a "state park"; Wright confirmed that he had found this target on his own by using Google Maps. Wright stated that they would obtain the explosives on April 27, which Wright stated was good because it still gave them four days before May 1st. This target, later identified conclusively as the Route 82 Bridge, was targeted specifically due to its location, its position on a major road

---

[8] Since late 2001, members of Al Qaeda and associated terrorist groups who have been designated as unlawful enemy combatants have been detained in military custody at Guantanamo Bay Naval Base.

connecting to an interstate highway, and the high volume of passenger and commercial vehicular traffic. The date of the actual attempted detonation of the devices is also critical. As outlined above, the attack on the bridge was designed to coincide with the May 1st nationwide strike and the upcoming violent protest activity against the G-8/NATO Summit in Chicago.

- <u>"Greatest Act of Terrorism"</u>: On April 30, 2012, immediately after placing the improvised explosive devices at the base of the Route 82 Bridge, Stevens stated, in front of the other defendants, "We just committed the biggest act of, only act of terrorism, [UI] that I know in Cleveland since the 1960's." Stevens then stated "The more I've been dealin' with [expletive] like this, the more I realize this like, Department of Homeland Security people, they've got their heads so far [expletive] up their [expletive]… it's so easy to run around them."

- <u>Acknowledgment of Casualties</u>: Also on April 30, 2012, immediately after placing the improvised explosive devices at the base of the Route 82 Bridge, Baxter asked, "How are we gonna make sure there's no cars on the bridge when it happens?" Wright responded, "We can't." Baxter then stated, "Okay." Wright then stated, "All they gotta, if they notice the bridge shakin', they better floor it, that's all I gotta say." A few moments later, Stevens stated, "Ain't that the [expletive] American dream, to get a [expletive] burger at Applebee's and blowing up [expletive]."

Thus, the evidence that the defendants' conduct was calculated to influence, affect, and retaliate against government conduct is replete in the record. The defendants all concede that they placed improvised explosive devices at the base of the Route 82 Bridge with the intent to

destroy or damage the structure. They also concede to attempting to detonate those devices. They also concede to engaging in conversations, over the course of many weeks, about using explosive devices against government property. Finally, the defendants concede, as they must, that they made absolutely zero effort, whatsoever, to minimize civilian deaths and casualties, an omission that is all the more chilling given their demonstrated intent to bring down the Route 82 Bridge.

## V.    Conclusion

With respect to this Court's application of the terrorism enhancement, the factual question then is whether the defendants' criminal conduct during the months leading up to April 30, 2012 – and on that night itself – were "calculated to influence [and] affect the conduct of the government... [and] to retaliate against government conduct." The very clear answer to this inquiry is resolutely yes. The defendants' actions were calculated to influence and affect the conduct of the government. The defendants' actions were further calculated to retaliate against government conduct.

The touchstone of the defendants' crime was not merely the planting and detonation of explosives. Were this merely a "prank," as described by one defense attorney at an earlier proceeding in this matter, then the target of the defendants' angst would not matter in the least bit. If the defendants' objectives were simply the result of a juvenile desire to blow something up, or to inject some element of jest into the act, then they could have chosen any rock, tree, or outhouse as the object of this pursuit. Yet that is not what occurred here. The defendants' actions were guided, informed, and calculated at every step of the way by a singular purpose – to intimidate and coerce the civilian population and the government of the United States and to retaliate against that same government for a variety of perceived ills. Accordingly, all of the

criteria for the terrorism enhancement are met in this case. For the foregoing reasons and those to be presented at the sentencing hearing, the Court should thus adopt the PSRs on this issue and apply the enhancement under U.S.S.G. § 3A1.4 to the Defendant.

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney

By:      /s/ Duncan T. Brown
Duncan T. Brown (NY: 3982931)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3933
(216) 685-2378 (facsimile)
E-Mail:  duncan.brown@usdoj.gov

/s/ Justin E. Herdman
Justin E. Herdman (OH: 0080418)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3965
(216) 685-2378 (facsimile)
E-Mail:  justin.herdman@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of September 2013 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

/s/ Duncan T. Brown
Duncan T. Brown
Assistant U.S. Attorney